ACCEPTED
15-25-00016-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 2:31 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00016-CV

In the Court of Appeals

Fifteenth District

At Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 2:31:31 PM
CHRISTOPHER A. PRINE
Clerk

In re MARTY BERRY AND AXIS MIDSTREAM HOLDINGS, LLC, Relators

## Relators' Emergency Motion for Temporary Relief

Axis Midstream Holdings LLC ("Axis") make and file this Relators' Emergency Motion for Temporary Relief requesting stay from an Order of the Respondent trial court. This motion is made pursuant to Texas Rule of Appellate Procedure 52.10.

### I. The Respondent's Order denying Plea in Abatement now has two (2) Texas courts of concurrent jurisdiction adjudicating the same dispute.

There is a "Nueces County Lawsuit" that pits Marty Berry (and Berry companies) against Lawrence Berry ("Lawrence") for control of several Berry companies' assets (e.g., ICI/Orca assets, Axis/LSP assets, and CPH assets).[1] The Nueces County Lawsuit was originally filed in Harris County by Lawrence (November 2023),[2] injunctive relief granted (on disputes related to governance and sale of real property),[3] and then the

---

[1] Exhibit 1 (Counter-Plaintiffs' Original Petition Asserting Counter-Claims); Exhibit 2 (Counter-Plaintiffs' Second Amended Petition Asserting Counter-Claims); Exhibit 3 (GP's Supplemental and Third-Party Petition); and Exhibit 4 (Intervenors' Original Petition in Intervention).

[2] Exhibit 5 (Plaintiffs' (Lawrence's) Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction).

[3] Exhibit 6 (TRO in Nueces County Lawsuit); and Exhibit 7 (Amended TRO in Nueces County

matter transferred to Nueces County.[4]  In this Nueces County Lawsuit, the trial court (Judge Robert Galvan, presiding) accomplished three (3) days of trial to consider Lawrence's Application for Temporary Injunction – and substantially denied all relief requested by Lawrence (relating to Berry companies' governance issues, and sale of Berry companies' real property issues).[5]  In this Nueces County Lawsuit, extensive legal discovery has been engaged with production of tens-of-thousands of pages of sensitive data.[6]  The legal discovery in the lawsuit includes, but is not limited to, extensive document production relating to the following Berry companies:  Berry GP Inc. ("GP"), Berry Contracting LP ("Bay Ltd."), Redfish Bay Terminals Inc. ("RFB"), Canada Projects Holdings Inc. ("CPH"), and Axis Midstream Holdings LLC ("Axis") – each controlled[7] (for times relevant) directly or indirectly by majority vote of the three (3) "Berry Brothers" (Marty, Lawrence, and Dennis (recently deceased and represented by Bonnie)).[8]  This Nueces County

Lawsuit).

[4] Exhibit 8 (Order transferring lawsuit to Nueces County).

[5] See Exhibit 5. See also Exhibit 9, at p. 3 (Judge Galvan's ruling on Lawrence's Application for Temporary Injunction (denying all relief requested relating to governance but granting limited relief with regard to sale of Berry companies' real property)).

[6] Discovery production is too voluminous to readily provide, and Relators believe this fact will not be contested.

[7] Ownership of Axis is disputed.  CPH is controlled by Berry Brothers' trusts (whose trustees are the Berry Brothers (now Bonnie for Dennis)).

[8] See Exhibit 10 (Organizational Chart).

Lawsuit remains pending (inclusive of on-going, hotly contested disputes about Berry companies' governance and real property interests).

On or about October 31, 2024 (a year after the first-filed Nueces County Lawsuit), Ted Powers and Allied Ports LLC filed Plaintiffs' Verified Original Petition and Application for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Original Petition).[9]   Although Lawrence is named as a defendant in Plaintiffs' Original Petition, the pleading makes clear that Lawrence is aligned with Plaintiffs.[10]   In this "Harris County Lawsuit," Plaintiffs and Lawrence teamed up to secure a Temporary Restraining Order ("TRO2")[11] – and thereby enjoined Relators from actively governing several of the same Berry companies that Judge Galvan already has refused enjoin.[12]  On the one hand, Judge Galvan ruled that Marty Berry, and others, were NOT enjoined from following company by-laws to remove directors/change Managers/replace officers (e.g., Lawrence Berry);[13] but – on the other hand – the TRO in the Harris County Lawsuit forbid any and all such changes in management.[14]  This Harris County TRO expired on its own terms, but Plaintiffs and Lawrence (real-parties-in-

---

[9] See Exhibit 11 (Plaintiffs' Verified Original Petition and Application for Temporary Restraining Order and Temporary Injunction).
[10] Exhibit 11, at p.1.
[11] Exhibit 12 (TRO in Harris County Lawsuit).
[12] Compare Exhibit 6, Exhibit 7, and Exhibit 9 (p. 3); with Exhibit 12.
[13] Exhibit 9, at p. 3.
[14] Exhibit 12.

interest) now are requesting that Judge Sofia Adrogue in the Harris County Lawsuit further enjoin Relators (and all those acting in concert with Relators) on the same/similar governance issues and sale/management of real property issues.[15]

## II. Relators' mandamus petition raises meritorious grounds for relief.

There is risk that Judge Galvan's ruling substantially denying Lawrence's requests for injunctive relief in the (first-filed) Nueces County Lawsuit will not be identical to a ruling from Judge Sofia Adrogue in the (second-filed) Harris County Lawsuit – thereby creating a situation where a party (or party's legal counsel) may comply with one judge's ruling while disobeying or perhaps acting in contempt of a second judge's ruling. This precise circumstance begs the question of dominant jurisdiction. Although Judge Sofia Adrogue has rejected[16] the plea[17] that the (first-filed) Nueces County Lawsuit acquired dominant jurisdiction to the (second-filed) Harris County Lawsuit (and the second-filed action thus abated), the facts of the case along with sound public policy considerations support this request for stay and mandamus relief:

- The two (2) lawsuits are inherently interrelated given both involve disputes

---

[15] Exhibit 13 (Plaintiffs' Verified Third Amended Petition and Application for Temporary Restraining Order and Temporary Injunction).
[16] Exhibit 14 (Order signed by Judge Sofia Adrogue).
[17] Exhibit 15 (Marty's Plea in Abatement).

4

between Berry Brothers for control of Berry companies (in fact, the same Berry companies will be affected by both lawsuit);[18]

- The two (2) lawsuits are inherently interrelated given both involve ownership disputes about entities/real property (i.e., GP owns Axis, but LSPE claims to own Axis; GP and RFB own land essential to develop a permitted issued to Axis by USACE, but RBP claims to own the land as an asset; and CPH has right to a leasehold interest on Harbor Island, but HIP claims the lease as an asset). These issues are only properly in the Nueces County Lawsuit, but apparently within the scope of the real-parties-in-interest request for injunctive relief in the Harris County Lawsuit.[19]

- "Where, as here, two courts have concurrent jurisdiction to determine inherently intertwined issues, filing a dilatory plea in abatement is the proper method for drawing a court's attention to another court's possible dominant jurisdiction."[20]

- "It is not required that the precise issues and all of the parties be included in the first filed suit before the second suit is filed, provided that the claims in the first

---

[18] Exhibits 1-7, and 9-12; see also Exhibit 17 (Lawrence's Response filed in Nueces County).
[19] Exhibits 1-7, and 9-12; see also Exhibit 17 (Lawrence's Response filed in Nueces County).
[20] *In re Puig*, 351 S.W.3d 301, 305 (Texas 2011); citing *Mower v. Boyer,* 811 S.W.2d 560, 563 n. 2 (Texas 1991); *Wyatt v. Shaw Plumbing Company*, 760 S.W.2d 245, 247-248 (explaining that it is proper to file a plea in abatement when two inherently interrelated cases are filed in different counties).

5

suit can be amended to bring in all of the necessary and proper parties and claims."[21]

- "[The first-filed case] [h]aving the possession of jurisdiction of the case, that jurisdiction embraced everything in the case, and every question arising which could be determined in it until it reached its termination, and the jurisdiction was exhausted. While the jurisdiction lasted it was exclusive and could not be trenched upon by any other tribunal."[22]

- In the second-filed Harris County Lawsuit, the attorney for real-party-in-interest (Ted Powers) argued there is no dominant jurisdiction in favor of the first-filed Nueces County Lawsuit and that Judge Galvan "can give all that relief and it won't have . . . any bearing at all on this [Harris County Lawsuit] case"[23] (i.e., no interrelationship) – yet attorney for real-party-in-interest (Lawrence) later argued in the first-filed Nueces County Lawsuit that Judge Galvan ruling on application for injunctive relief would "interfere with the Business Court's jurisdiction . . . ."[24] Which is it? Indeed, the two (2) cases (the Nueces County Lawsuit and Harris County Lawsuit) are inherently interrelated/intertwined. This moment begs for relief.

---

[21] *In re Coronado Energy EP Company,* 341 S.W.3d 479, 481-482 (Court of Appeals - San Antonio, 2011); *Wyatt v. Shaw Plumbing Company,* 760 S.W.2d 245, 247 (Texas 1988).
[22] *Cleveland v. Ward, 285* S.W. 1063, 1068 (Texas 1926); citing *French v. Hay,* 22 Wall. (U.S.), 250, 253.
[23] Exhibit 16 (transcript of December 6, 2024, hearing), at p. 55.
[24] Exhibit 17 (Lawrence's Nueces Response), at p. 2.

- "Abatement of a lawsuit due to the pendency of a prior suit is based on the principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues."[25]

- "The first-filed rule flows from "principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues.""[26] "The default rule thus tilts the playing field in favor of according dominant jurisdiction to the court in which suit is first filed."[27]

- "The first-filed rule flows from "principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues.""[28] "The default rule thus tilts the playing field in favor of according to dominant jurisdiction to the court in which suit is first filed."[29]

### III. Emergency relief must be granted to preserve the status quo and the Relators' rights while a mandamus petition is pending.

Texas Rule of Appellate Procedure 52.10 authorizes "a motion to stay any underlying proceedings or for any other temporary relief" while a mandamus petition is pending. TEX. R. APP. P. 52.10(a). That rule "exists to afford the court

---

[25] *Wyatt v. Shaw Plumbing Company,* 760 S.W.2d 245, 248 (Texas 1988).
[26] *In re J.B. Hunt Transportation Inc.*, 492 S.W.3d 287 (Texas 2016), citing *Wyatt v. Shaw Plumbing Company,* 760 S.W.2d 245, 248 (Texas 1988).
[27] *In re J.B. Hunt Transportation Inc.*, 492 S.W.3d 287, 294 (Texas 2016).
[28] *In re J.B. Hunt Transportation Inc.*, 492 S.W.3d 287 (Texas 2016), citing *Wyatt v. Shaw Plumbing Company,* 760 S.W.2d 245, 248 (Texas 1988).
[29] *In re J.B. Hunt Transportation Inc.*, 492 S.W.3d 287, 294 (Texas 2016).

7

opportunity to address the dispute encompassed within a petition for mandamus (for instance) by maintaining the status quo until it can address that dispute." *In re Kelleher*, 999 S.W.2d 51, 52 (Tex. App. – Amarillo 1999, orig. proc.), *citing In re Reed*, 901 S.W.2d 604, 609 (Tex. App. – San Antonio 1995, orig. proc.) (temporary relief proper to "maintain the status quo and preserve … jurisdiction to consider the merits"). For example, an appellate court may stay trial court proceedings "to preserve the parties' rights until disposition of the" matter in the appellate court and to avoid trial court action that "interferes with or impairs the jurisdiction of the appellate court or effectiveness of any relief sought [from] or that may be granted" by the appellate court. *See, e.g.,* TEX. R. APP. P. 29.3, 29.5 (quoted, rules for temporary relief during interlocutory appeal).

Temporary relief is appropriate. Texas law relating to the issue of dominant jurisdiction specifically supports resolution of the current circumstance by mandamus. While this mandamus proceeding is pending, the only way to preserve the parties' rights and issues for adjudication is to grant a temporary stay of proceedings in the trial court below (i.e., Judge Sofia Adrogue's consideration of the Plaintiffs' Application for Temporary Injunction). Given that the hearing on Plaintiffs' Application for Temporary Injunction is scheduled to resume on February 14, 2025, this motion is presented on an emergency basis.

## IV. Certifications

A certificate of compliance with Rule 52.10(a) is provided below, to confirm that counsel for the Relator has notified opposing counsel that this motion would be filed. This motion is supported by facts in the sworn mandamus record, which has been filed contemporaneously with this motion.

**Prayer for relief**

For the reasons stated above, Relators asks this Honorable Court to consider this motion on an emergency basis and to order a stay of further proceedings before the Honorable Judge Sofia Adrogue, pending further order of this Court. Relators also asks for such additional or alternative relief to which Relators are entitled.

Respectfully submitted,

**LAW OFFICES OF DOUGLAS ALLISON**
403 N. Tancahua Street
Corpus Christi, Texas 78401
T:  361-888-6002
F:  361-888-6651
E:  doug@dallisonlaw.com

BY: */s/ Douglas A. Allison*
**DOUGLAS A. ALLISON**
State Bar No. 01083500

**ROBERTS MARKLAND LLP**
2555 N MacGregor Way
Houston, Texas 77004
E:  vg@robertsmarkland.com

BY: */s/ Vanessa D. Gilmore*
**VANESSA D. GILMORE**
State Bar No. 07960010

ATTORNEYS FOR DEFENDANTS
MARTY BERRY AND AXIS MIDSTREAM
HOLDINGS, LLC

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record in accord with the Texas Rules of Appellate Procedure on February 11, 2025.

_/s/ Douglas A. Allison_

# EXHIBIT 1

## CAUSE NO. 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| BERRY GP, INC., | § § | |
| Nominal Plaintiff, | § § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP | § § § § § § § | |
| Defendants. | § | 94TH JUDICIAL DISTRICT |

<u>**COUNTER-PLAINTIFFS' ORIGINAL PETITION ASSERTING COUNTER-CLAIMS**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Berry GP Inc., Berry Operating Company LLC, Berry Contracting LP, and Marty Berry, sometimes collectively referred to as Counter-Plaintiffs, and make and file this Counter-Plaintiffs' Original Petition Asserting Counter-Claims complaining of A. Lawrence Berry, sometimes referred to as Counter-Defendant, and in support of same would show:

I.

**PARTIES**

1.      Berry GP Inc. ("Berry GP") is a Texas corporation with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Berry GP is one of the "Berry Entities" as may be referenced herein.

1

2. Berry Operating Company LLC ("Berry Operating") is a Texas limited liability company with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry Operating is one of the "Berry Entities" as may be referenced herein.

3. Berry Contracting LP (d/b/a Bay Ltd. ("Bay Ltd.")) is a Texas limited partnership with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Bay Ltd. is one of the "Berry Entities" as may be referenced herein.

4. Marty Berry ("M.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd. Marty Berry resides in Nueces County, Texas.

5. A. Lawrence Berry ("L.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd. A. Lawrence Berry resides in Harris County, Texas. A. Lawrence Berry may and shall be served by notice of these proceedings upon legal counsel for A. Lawrence Berry: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002.

6. Berry GP, Berry Operating, Bay Ltd., Marty Berry, and A. Lawrence Berry may be sometimes referred to as the "Parties," or any one of them referred to as a "Party."

7. L.Berry is the original Plaintiff in this legal action by having filed Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Verified Petition"). See Exhibit A. The legal action initiated by Plaintiffs' Verified Petition was filed in Harris County, Texas, but promptly transferred to Nueces County, Texas. See Exhibit B. This Counter-Plaintiffs' Original Petition Asserting Counter-Claims is filed as counter-claim to Plaintiffs' Verified Petition in compliance with Texas Rule of Civil Procedure ("TRCP") 97.

## II.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all Parties.  Specifically, Berry GP, Berry Operating, and Bay Ltd. are legal entities formed in Texas that maintain their principal offices in Texas.  M.Berry and L.Berry reside in Texas.  As such, all Parties have sufficient contacts with the State of Texas and, therefore, are subject to the jurisdiction of this Court.

9.      Venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.002(a)(1) inasmuch as Nueces County is the location where all or a substantial part of the events or omissions giving rise to the claims occurred. See Exhibit C (with attachments).  Moreover, venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.063(3).  See Exhibit B.

## III.

## DISCOVERY

10.     Discovery should be conducted in accordance with Level 3, as permitted by TRCP 109.4.

## IV.

## EXECUTIVE SUMMARY

11.     Counter-Plaintiffs file this counter-petition asserting claims against L.Berry for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, fraud, and other causes of action.  Counter-Plaintiffs' causes of action pleaded against and complaining of L.Berry are directly responsive to L.Berry's claims for self-dealing and breach of fiduciary duty filed against one or more Counter-Plaintiffs.[1]  For all claims referenced in this

---

[1] See Exhibit A, at pp. 13-16.

3

Counter-Plaintiffs 'Original Petition Asserting Counter-Claims, Counter-Plaintiffs now sue Counter-Defendant.

## VI.

## FACTUAL BACKGROUND

12.     The Berry Entities and Berry-Related Entities are a large organization of companies engaged in various businesses throughout the United States, and have successfully done so since the 1950s.

13.     Marvin Berry had four (4) sons:  Marty Berry (M.Berry), Dennis Berry (D.Berry), A. Lawrence Berry (L.Berry), and Kenneth Berry.  After Marvin Berry passed in 1997, control of the Berry Entities shifted to Laura Berry (Marvin's wife), and then to their (Marvin's and Laura's) sons — M.Berry, D.Berry, and L.Berry.  LDMA LP ("LDMA") sits at the top of the Berry Entities. LDMA's 3% general partner is Beacon Inc. which is owned in equal shares by M.Berry, D.Berry, and L.Berry.  LDMA owns Berry GP which, through a series of legal entities, own Berry Operating and Bay Ltd.  The Board of Directors of Berry GP (M.Berry, D.Berry, Bonnie Berry,[2] and L.Berry) — in accordance with the by-laws of Berry GP — primarily govern Berry GP, the Berry Entities, and some of the other affiliated entities (indirectly).  All considered (generally), ownership of the Berry Entities is vested with M.Berry, D.Berry, and L.Berry (shareholders); and control of the Berry Entities (generally, at a policy level) is with M.Berry, D.Berry, Bonnie Berry, and L.Berry (all serving as directors of Berry GP).

14.     For purposes of this pleading, the Berry Entities refers to Berry GP, Berry Operating, and Bay Ltd.  For purposes of this pleading, the Berry-Related Entities refer to the Allen Lawrence Berry 2007 Trust, Orca Assets GP LLC ("Orca"), Inner Channel Investments Inc. ("ICI"), Orca

---

[2] Bonnie Berry is wife of D.Berry, recently appointed director of Berry GP.

4

ICI Development ("Orca ICI," a Texas partnership), West 17th Resources LLC, Gansevoort Investments LLC, Halcon Mineral Interest LLC, Orca Petroleum Ltd., Zilker Acquisitions LLC, Three Rivers Pipe and Rental LLC, Southern Comfort Equipment, Ridgefield Energy Investments LLC, Ridgefield Energy Operating LLC, Ridgefield Eagle Ford, LLC, Ridgefield Permian, LLC, Ridgefield Permian Minerals, LLC (and related companies). The Berry Entities and Berry-Related Entities may be sometimes referred to as the "Berry Companies."

15.     The Berry Companies are and have been started up, owned (legally and/or beneficially), held in trust, managed, developed, operated, and/or controlled at various times by and through Berry GP, and/or by and through (in part) M.Berry, D.Berry, and/or L.Berry (one or all of them), since the 2000s. Such business practices are investments for one or more of the Berry Entities.

16.     As an example of how Berry Entities invested, Counter-Plaintiffs invested substantially in ICI, ICI Orca, and Orca. Specifically, Counter-Plaintiffs seeded capital (money, assets, manpower) to Orca to start-up, manage, develop, operate, and/or control an investment in the Eagle Ford Shale and/or Permian Basin — which, in turn, became seed-money/assets (including mineral interests as assets) for several of the Berry-Related Entities (the "Investment").

17.     From time to time, M.Berry, D.Berry, and/or L.Berry (or all of them) had meetings to discuss how to manage the Investment, whether to sell or continue with the Investment, and other business-type meetings/discussions.

18.     Seeded capital money/assets from Counter-Plaintiffs to ICI to Orca/ICI to Orca involved an agreement/contract as between these legal entities requiring payment-in-full for the base value of the seeded money/assets received by Orca. In contravention of such agreement/contract, L.Berry has very recently refused to pay as required by the agreement/contract.

19. Seeded capital money/assets from Counter-Plaintiffs to ICI to Orca/ICI to Orca also included the agreement/contract that L.Berry/Orca would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment in trust and for the benefit of Counter-Plaintiffs. In contravention of such agreement/contract, L.Berry/Orca has engaged a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs.

20. Specifically, L.Berry has participated in self-dealing transactions involving the Investment (and the Investment's earnings) — taking of seeded money and assets of value (wealth) for his own personal benefit, and not for the benefit of any one or more of the Counter-Plaintiffs. This on-going practice by L.Berry/Orca of self-dealing transactions and ultra vires transactions violates the fiduciary obligations owed by L.Berry to Counter-Plaintiffs (and others).

21. In furtherance of L.Berry's wrongful conduct, L.Berry has intentionally obscured his self-dealing transactions by transfers of money/assets of substantial value to and/or through the following entities: Allen Lawrence Berry 2007 Trust, West 17th Resources LLC, Gansevoort Investments LLC, Halcon Mineral Interest LLC, Orca Petroleum Ltd., Zilker Acquisitions LLC, Three Rivers Pipe and Rental LLC, Ridgefield Energy Investments LLC, Ridgefield Energy Operating LLC, Ridgefield Eagle Ford, LLC, Ridgefield Permian, LLC, Ridgefield Permian Minerals, LLC, and Southern Comfort Equipment. All such transactions constitute L.Berry's wrongful taking of money and assets belonging to, held in trust for, and held for the benefit of Counter-Plaintiffs. L.Berry not only is and has been engaged in such wrongful takings, but also has failed to disclose same (as is required by his (L.Berry's) fiduciary duties owed).

22. L.Berry's wrongful conduct (as described herein) continues to-date. Counter-Plaintiffs file this legal action to demand L.Berry provide financial information as shall be requested through

6

the legal discovery process. Counter-Plaintiffs now plead the following claims and causes of action against L.Berry: conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, and fraud.

## VII.
## CAUSES OF ACTION
### Count 1
### Conversion

23. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 1 in their entirety.

24. Counter-Plaintiffs would show that L.Berry (Counter-Defendant) is liable to Counter-Plaintiffs for conversion of Counter-Plaintiffs' Investment (+ earnings). Specifically, Counter-Plaintiffs seeded capital (money, assets) to L.Berry/Orca to start-up, manage, develop, operate, and/or control an investment in the Eagle Ford Shale and/or Permian Basin — which, in turn, became seed-money/assets for several of the Berry-Related Entities (the Investment). L.Berry was to hold the Investment (+ earnings) in trust for Counter-Plaintiffs.[3] Wrongfully, L.Berry has absconded with the Investment (+ earnings) through a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs. L.Berry's wrongful conduct is a conversion of Counter-Plaintiffs Investment (+ earnings).

25. The elements of conversion are: 1) claimants (Counter-Plaintiffs) owned or were entitled to possession of property; 2) another assumes or exercises control of the property in an unauthorized manner to the exclusion of the claimants; and 3) the claimants' demand for return of

---

[3] Although some monies have been paid by L.Berry or one of his legal entities to one or more Counter-Plaintiffs as part of these transactions, the amounts of money paid have only been a partial repayment of monies owed to Counter-Plaintiffs — still in disregard for that which was agreed to be held in trust by L.Berry for Counter-Plaintiffs.

the property is refused.  In this case, Counter-Plaintiffs clearly own and are entitled to possession of the Investment (+ earnings).  Such Investment (+ earnings) were supposed to be held in trust by L.Berry (the sole person in control of such Investment (+ earnings)) for Counter-Plaintiffs. Counter-Defendant has wrongfully assumed and exercised control over such Investment (+ earnings), and done so in a manner unauthorized by Counter-Plaintiffs and to the exclusion of Counter-Plaintiffs.  Further, and in disregard of requests from Counter-Plaintiffs, Counter-Defendant has failed and refused to return the Investment (+ earnings) to Counter-Plaintiffs.  This is a wrongful conversion of such Investment (+ earnings) — the money/assets — belonging to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

26.     Counter-Defendant's wrongful conversion of Counter-Plaintiffs' Investment (+ earnings) has caused substantial financial harm and losses to Counter-Plaintiffs.  Counter-Plaintiffs now sue for the return of such Investment (+ earnings), or alternatively for the value of such Investment (+ earnings).

**Count 2**
**Breach of Fiduciary Duty**

27.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 2  in their entirety.

28.     Counter-Defendant has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times.  Counter-Defendant held the Investment (+ earnings) in trust for Counter-Plaintiffs all relevant times.  As such, Counter-Defendant owes fiduciary duties to Counter-Plaintiffs for all relevant times.  The fiduciary duties owed by Counter-Defendant to Counter-Plaintiffs include, but are not limited to, the duty of loyalty, duty of utmost good faith and fair dealing, and duty of fairness and honesty.  The fiduciary duties owed by Counter-Defendant to Counter-Plaintiffs further include putting Counter-Plaintiffs' interest before his (L.Berry's) own

8

interest, inclusive of devoting his (L.Berry's) full time and efforts in favor of Counter-Plaintiffs' best interests — not his (L.Berry's) own interests. These duties that Counter-Defendant/L.Berry owes to Counter-Plaintiffs encompass obligations and/or duties to refrain from self-dealing transactions and to make full disclosures of information.

29.     While owing fiduciary duties to Counter-Plaintiffs, Counter-Defendant has engaged in, directed, approved, and/or taken actions in contravention of his (L.Berry's) fiduciary duties owed, including but without limited to the following:

a.     L.Berry took substantial money/assets from Counter-Plaintiffs, and failed to invest same in the name of and/or for the benefit of Counter-Plaintiffs (thereby L.Berry put his own financial interest ahead of Counter-Plaintiffs' financial interest). By way of example, L.Berry took Counter-Plaintiffs money/assets yet wrongfully placed things of value (mineral leases) into Orca (a legal entity that ultimately (later) was determined to be 100% for the benefit of L.Berry). This breach of fiduciary duty caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

b.     L.Berry was supposed to hold the Investment (+ earnings) in trust for Counter-Plaintiffs, yet L.Berry refuses to account for and surrender such Investment (+ earnings) in favor of Counter-Plaintiffs — but rather appears to have absconded with the Investment (+ earnings). This failure to hold, account for, and then surrender the Investment (+ earnings) for the benefit of Counter-Plaintiffs is self-dealing — and a breach of fiduciary duty. This breach of fiduciary duty has caused substantial financial harm and losses

9

to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

c.     L.Berry took the Investment (+ earnings) for his own benefit (as set forth above), and did so without full disclosure of details of the Investment (and earnings) to Counter-Plaintiffs.   Rather than comply with Counter-Defendant's fiduciary duties owed, Counter-Defendant has engaged a series of transactions to obscure Counter-Plaintiffs' rights to its Investment (+ earnings). This lack of full disclosure is L.Berry's breach of his (L.Berry's) fiduciary duty of full disclosure and candor owed to Counter-Plaintiffs.  This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

d.     L.Berry has used Counter-Plaintiffs money/assets to promote and make profit for his (L.Berry's) own businesses in various manners and locations. This is more self-dealing, and a breach of the fiduciary duty owed by L.Berry to the Counter-Plaintiffs.  This breach of fiduciary duty has caused substantial financial harm and losses to the Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

e.     There are additional transactions / ventures by Counter-Defendant that are a breach of his (L.Berry's) breach of fiduciary duties owed to Counter-Plaintiffs, and all of which have caused substantial financial harm and losses to Counter-Plaintiffs.  For same, Counter-Plaintiffs now sue.

30.     Counter-Defendant has taken money/assets/manpower from one or more of the Counter-Plaintiffs; the Investment (+ earnings) from one or more of Counter-Plaintiffs;  misappropriated

equipment, personnel, and other assets from one or more of the Counter-Plaintiffs; and all to the detriment of one or more of the Counter-Plaintiffs — while only benefiting Counter-Defendant. This is self-dealing.  All such conduct described herein evidences Counter-Defendant's breaches of his fiduciary duties owed; that is, self-dealing, advancing his (L.Berry's) own interest rather than Counter-Plaintiffs' interest, breaches of loyalty to the Counter-Plaintiffs, breaches of good faith and fair dealing owed to Counter-Plaintiffs, breaches of full disclosure and candor owed to Counter-Plaintiffs, and more.  Counter-Defendant L.Berry's  misconduct has been and continues to be designed as a subterfuge of his obligations to the Counter-Plaintiffs (whereas other shareholders who may have received benefits account for same to the Berry Entities).  Counter-Defendant's breaches of fiduciary duties owed to Counter-Plaintiffs have caused substantial financial harm and losses to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

**Count 3**
**Breach of Contract**

31.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 3  in their entirety.

32.     As noted herein, seeded capital money/assets from Counter-Plaintiffs included the agreement/contract that L.Berry would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment (+ earnings) in trust and for the benefit of Counter-Plaintiffs.  In contravention of such agreement/contract, L.Berry has refused to perform as promised, but rather engaged a series of self-dealing transactions designed to allow L.Berry to keep all (or some) of the Investment (+ earnings) for himself (L.Berry).

33.     Counter-Defendant's refusal to abide by the agreement/contract is a breach of agreement/contract.  Counter-Defendant's breach of the agreement/contract has caused Counter-

11

Plaintiffs substantial financial harm and losses, and for such substantial financial harm and losses Counter-Plaintiffs now sue.

## Count 4
## Unjust Enrichment

34.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 4 in their entirety.

35.     Recent events now give rise to a concern on Counter-Plaintiffs' behalf that Counter-Defendant may deny the agreement/contract (and/or some terms of the agreement/contract) as between Counter-Plaintiffs and Counter-Defendant — all in an effort by Counter-Defendant to wrongfully abscond with Counter-Plaintiffs' Investment + earnings.  Such a result would be inequitable, and unjustly enrich Counter-Defendant.

36.     Counter-Plaintiffs would show that Counter-Plaintiffs did, in fact, provide seed capital money/assets from Counter-Plaintiffs to Orca/ICI / Orca as a benefit to Counter-Defendant, and to allow Counter-Defendant to invest (again, the Investment).  This benefit to Counter-Defendant was provided by Counter-Plaintiffs, and it will cause a substantial detriment to Counter-Plaintiff if the Investment + earnings are not returned to Counter-Plaintiffs.  As such, equity demands that the Investment + earnings be returned to Counter-Plaintiffs or compensation for value.

37.     For these reasons set forth herein, Counter-Plaintiffs now sue Counter-Defendant for unjust enrichment, as fairness demands Counter-Plaintiffs be made whole by: (1) return of all Investment (+ earnings); or (2) the value of all Investment (+ earnings) be paid by Counter-Defendant to Counter-Plaintiffs.

## Count 5
## Breach of Constructive Trust

38.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 5 in their entirety.

39.     As noted above, Counter-Defendant has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times.  Counter-Defendant held the Investment (+ earnings) in trust for Counter-Plaintiffs for all relevant times.  As such, Counter-Defendant owed fiduciary duties to Counter-Plaintiffs for all relevant times.

40.     Counter-Plaintiffs made transfer of monies/assets to Counter-Defendant (money, manpower, and assets).  Counter-Plaintiffs made these transfers of monies/assets in reliance upon Counter-Defendant's promise to protect and deliver Counter-Plaintiffs' share of the Investment (+ earnings) to Counter-Plaintiffs.

41.     Counter-Defendant now refuses to perform upon Counter-Defendant's promise (but rather now wants to keep for his (L.Berry's) own gain/profit all of the Investment (+ earnings)).   As such, Counter-Defendant will be unjustly enriched.  Given these facts, Counter-Plaintiffs now sue for breach of constructive trust for the Investment (+ earnings) and related, traceable monies/assets.  All such monies and assets should be placed in a constructive trust for the benefit of Counter-Plaintiffs or distributed to same.

## Count 6
## Fraud

42.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 6 in their entirety.

13

43.     As noted above, Counter-Plaintiffs invested heavily ($millions$, the Investment) in ICI, Orca ICI, Orca, and other Berry-Related Entities for the benefit of Counter-Plaintiffs.   Such Investment was seed-money/assets for — and investment in — Berry-Related Companies.

44.     Counter-Plaintiffs invested the millions of dollars/assets based specifically upon Counter-Defendants representation/promise to start-up, manage, develop, operate, and/or control investments in the Eagle Ford Shale and/or Permian Basin for the benefit of Counter-Plaintiffs (which is also for the benefit of L.Berry, in part (1/3rd)).

45.     More specifically, and to induce the Investment, Counter-Defendant promised to re-pay the original value of the Investment ($millions$) to the Counter-Plaintiffs; and further promised that the Investment would be for the benefit of the Counter-Plaintiffs (and understandably so given that L.Berry would still share substantially in the benefits/profits (1/3rd)).

46.     Instead, Counter-Defendant — although Counter-Defendant has paid some interest-only payments from time to time — has absconded with all or a substantial portion of the value of the Investment monies/assets + earnings.  On information and belief, Counter-Defendant apparently made interest payments to prolong the process (run out the clock) — all the while never intending to re-pay the original value of the Investment; and all the while never intending to deliver such Investment (+ earnings) to Counter-Plaintiffs.

47.     Presently, Counter-Defendant has gone dark on this discussion, and thereby indicated that he (L.Berry) never intended to abide by his representation/promise designed to induce the Investment.

48.     Counter-Defendant's fraud/fraud in the inducement has resulted is substantial, unearned profits for Counter-Defendant, personally; and great financial losses to the Counter-Plaintiffs.

49. The above-described conduct constitutes fraud and fraud in the inducement, and thus is actionable in favor of one or more of the Counter-Plaintiffs. For such fraud and fraud in the inducement, the Counter-Plaintiffs now file and assert all such claims and causes of action against Counter-Defendant.

## VIII.
## CAUSATION

50. Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

51. Counter-Plaintiffs would show that all causes of action/claims set forth herein have been the cause, proximate cause, producing cause, and cause-in-fact of substantial harm and financial losses to Counter-Plaintiffs. For all such harm and financial losses, these Counter-Plaintiffs sue.

## IX.
## LEGAL DAMAGES

52. Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

53. For all harm and financial losses suffered by Counter-Plaintiffs and arising from wrongful and/or inequitable conduct of Counter-Defendant, these Counter-Plaintiffs now sue.

54. Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the substantial harm and financial damages suffered by Counter-Plaintiffs; to wit; compensatory damages, actual damages, consequential damages, restitution damages, disgorgement damages, and other damages. Counter-Plaintiffs claims asserted herein are for substantial harm and financial losses greatly in excess of $1,000,000.00.

55. Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; attorneys' fees.

56.	Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; prejudgment and post-judgment interests — as allowed by law.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs pray for all relief as requested herein, for costs of court in addition thereto, and for such other and further relief to which Counter-Plaintiffs may show themselves justly entitled as against Counter-Defendant.

Respectfully submitted,

**LAW OFFICE OF DOUGLAS ALLISON**

By: */s/ Douglas A. Allison*
    Douglas A. Allison
    State Bar No. 01083500
    doug@dallisonlaw.com
    403 N. Tancahua Street
    Corpus Christi, Texas 78401
    Telephone: (361) 888-6002
    Facsimile: (361) 888-6651

    ATTORNEY FOR MARTY BERRY, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 23rd day of January 2024, a true and correct copy of the above was served upon the attorneys of record in the above entitled and numbered cause, via e-service.

    */s/ Douglas A. Allison*
    Douglas A. Allison

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim Brunkenhoefer on behalf of Douglas Allison
Bar No. 1083500
kim@dallisonlaw.com
Envelope ID: 83703677
Filing Code Description: Counter Claim/Cross Action/Interpleader/Intervention/Third Party
Filing Description: Counter-Plaintiffs' Original Petition Asserting Counter-Claim
Status as of 1/23/2024 3:56 PM CST

Associated Case Party: Lawrence Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 1/23/2024 3:18:01 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 1/23/2024 3:18:01 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 1/23/2024 3:18:01 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 1/23/2024 3:18:01 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 1/23/2024 3:18:01 PM | SENT |
| Sherry Rakestraw | | srakestraw@gibbsbruns.com | 1/23/2024 3:18:01 PM | SENT |
| Butch Boyd | | butchboyd@butchboydlawfirm.com | 1/23/2024 3:18:01 PM | SENT |

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas  Allison | | doug@dallisonlaw.com | 1/23/2024 3:18:01 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 1/23/2024 3:18:01 PM | SENT |
| Susan  Gonzales | | susan@dallisonlaw.com | 1/23/2024 3:18:01 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Stephanie  Jennings | | sjennings@porterhedges.com | 1/23/2024 3:18:01 PM | SENT |
| Cheri Deason | | cdeason@porterhedges.com | 1/23/2024 3:18:01 PM | SENT |
| Shanna Gohlke | | gohlkes@bayltd.com | 1/23/2024 3:18:01 PM | SENT |

Associated Case Party: Robert Rickett

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim Brunkenhoefer on behalf of Douglas Allison
Bar No. 1083500
kim@dallisonlaw.com
Envelope ID: 83703677
Filing Code Description: Counter Claim/Cross Action/Interpleader/Intervention/Third Party
Filing Description: Counter-Plaintiffs' Original Petition Asserting Counter-Claim
Status as of 1/23/2024 3:56 PM CST

Associated Case Party: Robert Rickett

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Van Huseman | | vhuseman@husemanlawfirm.com | 1/23/2024 3:18:01 PM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 1/23/2024 3:18:01 PM | SENT |

Associated Case Party: Robert Powers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Clay Steely | | csteely@porterhedges.com | 1/23/2024 3:18:01 PM | SENT |
| William Stukenberg | | wstukenberg@porterhedges.com | 1/23/2024 3:18:01 PM | SENT |

Associated Case Party: Michael Hummell

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Van Huseman | | vhuseman@husemanlawfirm.com | 1/23/2024 3:18:01 PM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 1/23/2024 3:18:01 PM | SENT |

# EXHIBIT 2

CAUSE NO. 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| BERRY GP, INC., | § § | |
| Nominal Plaintiff, | § § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP | § § § § § § | |
| Defendants. | § | 94TH JUDICIAL DISTRICT |

## COUNTER-PLAINTIFFS' SECOND AMENDED ORIGINAL PETITION ASSERTING COUNTER-CLAIMS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Berry GP Inc., Berry Operating Company LLC, Berry Contracting LP, and Marty Berry, sometimes collectively referred to as Counter-Plaintiffs, and make and file this Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims complaining of A. Lawrence Berry, in his personal capacity and as Trustee of the Allen Lawrence Berry Trust, sometimes referred to as Counter-Defendants, and in support of same would show:

I.

**PARTIES**

1.      Berry GP Inc. ("Berry GP") is a Texas corporation with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP is one of the "Berry Entities" as may be referenced herein.

1

2.     Berry Operating Company LLC ("Berry Operating") is a Texas limited liability company with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Berry Operating is one of the "Berry Entities" as may be referenced herein.

3.     Berry Contracting LP (d/b/a Bay Ltd. ("Bay Ltd.")) is a Texas limited partnership with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409.  Bay Ltd. is one of the "Berry Entities" as may be referenced herein.

4.     Marty Berry ("M.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd.  Marty Berry resides in Nueces County, Texas.

5.     A. Lawrence Berry ("L.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd.  A. Lawrence Berry resides in Harris County, Texas.  A. Lawrence Berry may and shall be served by notice of these proceedings upon legal counsel for A. Lawrence Berry:  Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002.  Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6.     Allen Lawrence Berry, as Trustee of the Allen Lawrence Berry Trust ("ALB Trust") is a trust wherein Allen Lawrence Berry serves as trustee of the ALB Trust, and is – along with others – a beneficiary of the Trust.  ALB Trust has already appeared in these proceedings, and thus this Counter-Plaintiffs First Amended Original Petition Asserting Counter-Claims will be served upon Allen Lawrence Berry, Trustee, and the Trust by service upon their attorney:  Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002.  Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6.     Berry GP, Berry Operating, Bay Ltd., Marty Berry, and A. Lawrence Berry may be sometimes referred to as the "Parties," or any one of them referred to as a "Party."

7.     L.Berry is the original Plaintiff in this legal action by having filed Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Verified Petition"). The legal action initiated by Plaintiffs' Verified Petition was filed in Harris County, Texas, but promptly transferred to Nueces County, Texas. A Counter-Plaintiffs' Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' Verified Petition in compliance with Texas Rule of Civil Procedure ("TRCP") 97. L.Berry, adding Lawrence Berry in his capacity as trustee of the Allen Lawrence Berry Trust ("Trust"), then filed Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction. The Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction in compliance with Texas Rule of Civil Procedure ("TRCP") 97.

## II.

### JURISDICTION AND VENUE

8.     This Court has jurisdiction over all Parties. Specifically, Berry GP, Berry Operating, and Bay Ltd. are legal entities formed in Texas that maintain their principal offices in Texas. M.Berry and L.Berry reside in Texas. As such, all Parties have sufficient contacts with the State of Texas and, therefore, are subject to the jurisdiction of this Court.

9.     Venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.002(a)(1) inasmuch as Nueces County is the location where all or a substantial part of the events or omissions giving rise to the claims occurred; and section 15.011 inasmuch as Counter-Plaintiffs seek to recover an interest in and/or quiet title to real property. See Exhibit C (with attachment).

3

Moreover, venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.063(3).  See Exhibit B.

## III.

## DISCOVERY

10.    Discovery should be conducted in accordance with Level 3, as permitted by TRCP 109.4.

## IV.

## EXECUTIVE SUMMARY

11.    Counter-Plaintiffs file this amended counter-petition asserting claims against L.Berry and the Trust for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, fraud, and other causes of action.  Counter-Plaintiffs' causes of action pleaded against and complaining of L.Berry and Trust are directly responsive to L.Berry's claims for self-dealing and breach of fiduciary duty filed against one or more Counter-Plaintiffs.  For all claims referenced in this Counter-Plaintiffs' Second Amended Original Petition Asserting Counter-Claims, Counter-Plaintiffs now sue Counter-Defendants.

## VI.

## FACTUAL BACKGROUND

12.    The Berry Entities and Berry-Related Entities are a large organization of companies engaged in various businesses throughout the United States and have successfully done so since the 1950s.

13.    Marvin Berry had four (4) sons:  Marty Berry (M.Berry), Dennis Berry (D.Berry), A. Lawrence Berry (L.Berry), and Kenneth Berry.  After Marvin Berry passed in 1997, control of the Berry Entities shifted to Laura Berry (Marvin's wife), and then to their (Marvin's and Laura's) sons — M.Berry, D.Berry, and L.Berry.  LDMA LP ("LDMA") sits at the top of the Berry Entities.

4

LDMA's 3% general partner is Beacon Inc. which is owned by M.Berry, D.Berry, and L.Berry. LDMA owns Berry GP which, through a series of legal entities, own Berry Operating and Bay Ltd. The Board of Directors of Berry GP (M.Berry, Bonnie Berry, L.Berry, and Chrissy Hinojosa Phd.) — in accordance with the by-laws of Berry GP — primarily govern Berry GP, the Berry Entities, and some of the other affiliated entities (indirectly). All considered (generally), ownership of the Berry Entities is vested with M.Berry, Bonnie Berry, [1] and L.Berry (shareholders); and control of the Berry Entities (generally, at a policy level) is with M.Berry, Bonnie Berry, and Chrissy Hinojosa, Phd. (all serving as directors of Berry GP).[2]

14.    For purposes of this pleading, the Berry Entities refers to Berry GP, Berry Operating, and Bay Ltd. For purposes of this pleading, the Berry-Related Entities[3] refer to the Allen Lawrence Berry 2007 Trust, Redfish Bay Terminals Inc. ("RBT"), Orca Assets GP LLC ("Orca"), Inner Channel Investments Inc. ("ICI"), Orca ICI Development ("Orca ICI," a Texas partnership), Orca ICI Development JV, Orca Petroleum Ltd., Orca Properties LLC (a/k/a Orca Specialty Equipment LLC, Providence Plantation, and/or Casa de Juego), West 17th Resources LLC, Gansevoort Investments LLC, Axis Midstream Holdings LLC (TX), Lone Star Ports LLC (TX), Midway Junction Properties LLC (TX), Halcon Mineral Interest LLC, Zilker Acquisitions LLC, Three Rivers Pipe and Rental LLC, Southern Comfort Equipment, Ridgefield Energy Investments LLC, Ridgefield Energy Operating LLC, Ridgefield Eagle Ford LLC, Ridgefield Eagle Ford Minerals LLC, Ridgefield Permian LLC, Ridgefield Permian Minerals LLC, Ridgefield Energy Partners LLC, CEC Ridgefield Holdings LLC, Blue Wagon Energy Investments LLC, Alamo Resources

---

[1] Successor in interest to Dennis Berry, recently deceased.
[2] In mid-2024, L.Berry was removed as director of Berry GP.
[3] Please note that the definition of Berry-Related Entities in this Nueces County, Texas, legal action was broadened to include Axis Midstream Holdings LLC, Lone Star Ports LLC, Midway Junction Properties LLC, and Redfish Bay Terminals Inc. in May, 2024 (approximately six (6) months in advance of Allied Ports LLC's filing of a competing lawsuit in Harris County, Texas).

IV JV LLC, B.B.I. Inc., Escopeta Oil & Gas Corporation, Furie Operating Alaska LLC, Helios Power Capital LLC, Danskammer Energy LLC, Berry Y&V Fabricators LLC (and related companies). The Berry Entities and Berry-Related Entities may be sometimes referred to as the "Berry Companies."

15. The Berry-Related Entities, except for the Trust and RBT, are and have been started up, owned (legally and/or beneficially), held in trust, managed, developed, operated, and/or controlled at various times by and through Berry GP, and/or by and through (in part) M.Berry, D.Berry, and/or L.Berry (one or all of them), since the 2000s. Such business practices are investments for one or more of the Berry Entities and/or their owners/shareholders.

16. As an example of how Berry Entities invested, Counter-Plaintiffs invested substantially in ICI, ICI Orca, and Orca (related companies). Berry Entities/Counter-Plaintiffs also substantially invested in Axis and LSP (related companies). Specifically, Counter-Plaintiffs seeded capital (money, assets, manpower) to Orca/Axis (et al) to start-up, manage, develop, operate, and/or control an investments— which, in turn, became seed-money/assets (including mineral/real property interests as assets) for several of the Berry-Related Entities (the "Investment").

17. From time to time, M.Berry, D.Berry, and/or L.Berry (or all of them) had meetings to discuss how to manage the Investment, whether to sell or continue with the Investment, and other business-type meetings/discussions.

18. Seeded capital money/assets from Counter-Plaintiffs to some Berry-Related Entities involved an agreement/contract as between these legal entities requiring payment-in-full for the base value of the seeded money/assets received. In contravention of such agreement/contract, L.Berry, individually and as trustee for the Trust, has very recently refused to pay and/or transfer rights as required by the agreement/contract.

6

19.     Seeded capital money/assets from Counter-Plaintiffs to some Berry-Related Entities also included the agreement/contract that L.Berry/Trust (all or in part) would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment in trust and for the benefit of Counter-Plaintiffs. In contravention of such agreement/contract, L.Berry/Trust (all or in part) has engaged a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs.

20.     Specifically, L.Berry/Trust has participated in self-dealing transactions involving the Investment (and the Investment's earnings) — taking of seeded money and assets of value (wealth) for personal benefit, and not for the benefit of any one or more of the Counter-Plaintiffs. This on-going practice by L.Berry/Trust of self-dealing transactions and ultra vires transactions violates the fiduciary obligations owed by L.Berry, individually and as trustee of the Trust, to Counter-Plaintiffs (and others).

21.     In furtherance of L.Berry's/Trust's wrongful conduct, L.Berry/Trust has intentionally obscured self-dealing transactions by transfers of money/assets of substantial value to and/or through the Berry-Related Entities. All such transactions constitute L.Berry's, individually and as trustee for the Trust, wrongful taking of money and assets belonging to, held in trust for, and held for the benefit of Counter-Plaintiffs. L.Berry, individually and as trustee for the Trust, has and is engaged in wrongful takings, and also has failed to disclose same (as is required by his (L.Berry's, individually and as trustee of the Trust) fiduciary duties owed).

22.     L.Berry's (individually and as trustee of the Trust) wrongful conduct (as described herein) continues to-date. Counter-Plaintiffs file this legal action to demand L.Berry (individually and as trustee of the Trust) provide financial information as shall be requested through the legal discovery

process. Counter-Plaintiffs now plead the following claims and causes of action against L.Berry (individually and as trustee of the Trust) and the Trust: conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, and fraud.

## VII.
## CAUSES OF ACTION
### Count 1
### Conversion

23. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 1 in their entirety.

24. Counter-Plaintiffs would show that L.Berry (individually and as trustee of the Trust, Counter-Defendants) are liable to Counter-Plaintiffs for conversion of Counter-Plaintiffs' Investment (+ earnings). Specifically, Counter-Plaintiffs seeded capital (money, assets) to L.Berry/Trust (and their benefit) to start-up, manage, develop, operate, and/or control Investment — which, in turn, became seed-money/assets for several of the Berry-Related Entities (the Investment). L.Berry and the Trust were to hold the Investment (+ earnings) in trust for Counter-Plaintiffs.[4] Wrongfully, L.Berry and the Trust have absconded with the Investment (+ earnings) through a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/directors of Counter-Plaintiffs. L.Berry's/Trust's wrongful conduct is a conversion of Counter-Plaintiffs' Investment (+ earnings).

25. The elements of conversion are: 1) claimants (Counter-Plaintiffs) owned or were entitled to possession of property; 2) another assumes or exercises control of the property in an unauthorized manner to the exclusion of the claimants; and 3) the claimants' demand for return of

---

[4] Although some monies have been paid by L.Berry or one of his legal entities to one or more Counter-Plaintiffs as part of these transactions, the amounts of money paid have only been a partial repayment of monies owed to Counter-Plaintiffs — still in disregard for that which was agreed to be held in trust by L.Berry/Trust for Counter-Plaintiffs.

the property is refused. By this Counter-Plaintiffs' Second Amended Counter-Claim these Counter-Plaintiffs continue to request return of all converted assets. In this case, Counter-Plaintiffs clearly own and are entitled to possession of the Investment (+ earnings). Such Investment (+ earnings) were supposed to be held in trust by L.Berry, individually and as trustee for the Trust (the sole person in control of such Investment (+ earnings)) for Counter-Plaintiffs. Counter-Defendants have wrongfully assumed and exercised control over such Investment (+ earnings), and done so in a manner unauthorized by Counter-Plaintiffs and to the exclusion of Counter-Plaintiffs. Further, and in disregard of requests from Counter-Plaintiffs, Counter-Defendants have failed and refused to return the Investment (+ earnings) to Counter-Plaintiffs. This is a wrongful conversion of such Investment (+ earnings) — the money/assets — belonging to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

26.     Counter-Defendants' wrongful conversion of Counter-Plaintiffs' Investment (+ earnings) has caused substantial financial harm and losses to Counter-Plaintiffs. Counter-Plaintiffs now sue for the return of such Investment (+ earnings), or alternatively for the value of such Investment (+ earnings).

**Count 2**
**Breach of Fiduciary Duty**

27.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 2 in their entirety.

28.     Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times. Counter-Defendants held the Investment (+ earnings) in trust for Counter-Plaintiffs all relevant times. As such, Counter-Defendants owe fiduciary duties to Counter-Plaintiffs for all relevant times. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs include, but are not limited to, the duty of loyalty, duty of utmost good faith and

9

fair dealing, and duty of fairness and honesty. The fiduciary duties owed by Counter-Defendants to Counter-Plaintiffs further include putting Counter-Plaintiffs' interest before his (L.Berry's, individually and as trustee of the Trust) own interest, inclusive of devoting full time and efforts in favor of Counter-Plaintiffs' best interests — not L.Berry's own or just the Trust's interests. These duties that Counter-Defendants owe to Counter-Plaintiffs encompass obligations and/or duties to refrain from self-dealing transactions and to make full disclosures of information.

29. While owing fiduciary duties to Counter-Plaintiffs, Counter-Defendants have engaged in, directed, approved, and/or taken actions in contravention of fiduciary duties owed, including but without limited to the following:

   a. L.Berry/Trust took substantial money/assets from Counter-Plaintiffs, and failed to invest same in the name of and/or for the benefit of Counter-Plaintiffs (thereby putting their own financial interest ahead of Counter-Plaintiffs' financial interest). By way of example, L.Berry and Trust took Counter-Plaintiffs money/assets yet wrongfully placed things of value (mineral leases) into Orca (a legal entity that ultimately (later) was determined to be 100% for the benefit of Trust). L.Berry and Trust took Counter-Plaintiffs money/assets for Axis/LSP, yet wrongfully purport to have transferred some of this interest to others (e.g., Allied Ports LLC); and other. This breach of fiduciary duty caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

   b. L.Berry/Trust were supposed to hold the Investment (+ earnings) in trust for Counter-Plaintiffs, yet L.Berry/Trust refuses to account for and surrender such Investment (+ earnings) in favor of Counter-Plaintiffs — but rather appears

10

to have absconded with the Investment (+ earnings). This failure to hold, account for, and then surrender the Investment (+ earnings) for the benefit of Counter-Plaintiffs is self-dealing — and a breach of fiduciary duty. This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

c.    L.Berry/Trust took the Investment (+ earnings) for their own benefit (as set forth above), and did so without full disclosure of details of the Investment (and earnings) to Counter-Plaintiffs. Rather than comply with Counter-Defendants' fiduciary duties owed, Counter-Defendants have engaged a series of transactions to obscure Counter-Plaintiffs' rights to its Investment (+ earnings). This lack of full disclosure is L.Berry's and Trust's breach of fiduciary duty of full disclosure and candor owed to Counter-Plaintiffs. This breach of fiduciary duty has caused substantial financial harm and losses to Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

d.    L.Berry/Trust have used Counter-Plaintiffs money/assets to promote and make profit for their own businesses in various manners and locations. This is more self-dealing, and a breach of the fiduciary duty owed by L.Berry/Trust to the Counter-Plaintiffs. This breach of fiduciary duty has caused substantial financial harm and losses to the Counter-Plaintiffs, and for which Counter-Plaintiffs now sue.

e.    There are additional transactions / ventures by Counter-Defendants that are a breach of fiduciary duties owed to Counter-Plaintiffs, and all of

11

which have caused substantial financial harm and losses to Counter-Plaintiffs.

For same, Counter-Plaintiffs now sue.

30.     Counter-Defendants have taken money/assets/manpower from one or more of the Counter-Plaintiffs; the Investment (+ earnings) from one or more of Counter-Plaintiffs; misappropriated equipment, personnel, and other assets from one or more of the Counter-Plaintiffs; and all to the detriment of one or more of the Counter-Plaintiffs — while only benefiting Counter-Defendants. This is self-dealing.  All such conduct described herein evidences Counter-Defendants' breaches of fiduciary duties owed; that is, self-dealing, advancing their (L.Berry's/Trust's) own interest rather than Counter-Plaintiffs' interest, breaches of loyalty to the Counter-Plaintiffs, breaches of good faith and fair dealing owed to Counter-Plaintiffs, breaches of full disclosure and candor owed to Counter-Plaintiffs, and more.  Counter-Defendants' misconduct has been and continues to be designed as a subterfuge of obligations to the Counter-Plaintiffs (whereas other shareholders who may have received benefits account for same to the Berry Entities).  Counter-Defendants' breaches of fiduciary duties owed to Counter-Plaintiffs have caused substantial financial harm and losses to Counter-Plaintiffs, for which Counter-Plaintiffs now sue.

**Count 3**
**Breach of Contract**

31.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 3  in their entirety.

32.     As noted herein, seeded capital money/assets from Counter-Plaintiffs included the agreement/contract that L.Berry, individually and as trustee of the Trust, would initiate the Investment (start-up); manage, develop, operate, and control the Investment, and hold the Investment (+ earnings) in trust and for the benefit of Counter-Plaintiffs.  In contravention of such agreement/contract, L.Berry, individually and as trustee of the Trust, have refused to perform as

promised, but rather engaged a series of self-dealing transactions designed to allow L.Berry and the Trust to keep all (or some) of the Investment (+ earnings) for himself (L.Berry) and/or the Trust.

33.     Counter-Defendants' refusals to abide by the agreement/contract is a breach of agreement/contract. Counter-Defendants' breach of the agreement/contract has caused Counter-Plaintiffs substantial financial harm and losses, and for such substantial financial harm and losses Counter-Plaintiffs now sue.

## Count 4
## Unjust Enrichment

34.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 4 in their entirety.

35.     Recent events now give rise to a concern on Counter-Plaintiffs' behalf that Counter-Defendants may deny the agreement/contract (and/or some terms of the agreement/contract) as between Counter-Plaintiffs and Counter-Defendants — all in an effort by Counter-Defendants to wrongfully abscond with Counter-Plaintiffs' Investment + earnings. Such a result would be inequitable, and unjustly enrich Counter-Defendants.

36.     Counter-Plaintiffs would show that Counter-Plaintiffs did, in fact, provide seed capital money/assets from Counter-Plaintiffs to Orca/ICI /Orca and Axis/LSP as a benefit to Counter-Defendants, and to allow Counter-Defendants to invest (again, the Investment). This benefit to Counter-Defendants was provided by Counter-Plaintiffs, and it will cause a substantial detriment to Counter-Plaintiffs if the Investment + earnings are not returned to Counter-Plaintiffs. As such, equity demands that the Investment + earnings be returned to Counter-Plaintiffs or compensation for value.

13

37.     For these reasons set forth herein, Counter-Plaintiffs now sue Counter-Defendants for unjust enrichment, as fairness demands Counter-Plaintiffs be made whole by: (1) return of all Investment (+ earnings); or (2) the value of all Investment (+ earnings) be paid by Counter-Defendants to Counter-Plaintiffs.

## Count 5
## Breach of Constructive Trust

38.     Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 5 in their entirety.

39.     As noted above, Counter-Defendant L.Berry has been a shareholder, officer, and director of Counter-Plaintiffs for all relevant times. Counter-Defendant L.Berry held the Investment (+ earnings) in trust for Counter-Plaintiffs for all relevant times. L.Berry, as trustee for the Trust, held the Investment (+ earnings) in trust for the Counter-Plaintiffs for all relevant times. As such, Counter-Defendants owed and owe fiduciary duties to Counter-Plaintiffs for all relevant times.

40.     Counter-Plaintiffs made transfer of monies/assets to Counter-Defendants (money, manpower, and assets). Counter-Plaintiffs made these transfers of monies/assets in reliance upon Counter-Defendants' promise to protect and deliver Counter-Plaintiffs' share of the Investment (+ earnings) to Counter-Plaintiffs.

41.     Counter-Defendants now refuse to perform upon Counter-Defendants' promise (but rather now wants to keep for L.Berry's and his Trust's own gain/profit all of the Investment (+ earnings)). As such, Counter-Defendants will be unjustly enriched. Given these facts, Counter-Plaintiffs now sue for breach of constructive trust for the Investment (+ earnings) and related, traceable monies/assets. All such monies and assets should be placed in a constructive trust for the benefit of Counter-Plaintiffs or distributed to same.

14

## Count 6
## Fraud

42. Counter-Plaintiffs incorporate all paragraphs herein as if set forth within Count 6 in their entirety.

43. As noted above, Counter-Plaintiffs invested heavily ($millions$, the Investment) in ICI/Orca ICI/Orca and Axis/LSP, and other Berry-Related Entities for the benefit of Counter-Plaintiffs. Such Investment was seed-money/assets for — and investment in — Berry-Related Companies.

44. Counter-Plaintiffs invested the millions of dollars/assets based specifically upon Counter-Defendants' representations/promises to start-up, manage, develop, operate, and/or control Investmentsfor the benefit of Counter-Plaintiffs (which is also for the benefit of L.Berry and his Trust, in part).

45. More specifically, and to induce the Investment, Counter-Defendants promised to re-pay the original value of the Investment ($millions$) to the Counter-Plaintiffs; and further promised that the Investment would be for the benefit of the Counter-Plaintiffs (and understandably so given that L.Berry and the Trust would still share substantially in the benefits/profits).

46. Instead, Counter-Defendants — although Counter-Defendants have paid some interest-only payments from time to time — have absconded with all or a substantial portion of the value of the Investment monies/assets + earnings. On information and belief, Counter-Defendants apparently made interest payments to prolong the process (run out the clock) — all the while never intending to re-pay the original value of the Investment; and all the while never intending to deliver such Investment (+ earnings) to Counter-Plaintiffs.

15

47.     Presently, Counter-Defendants have gone dark on this discussion, and thereby indicated that L.Berry, individually and as trustee for the Trust, never intended to abide by the representations/promises designed to induce the Investment.

48.     Counter-Defendants' fraud/fraud in the inducement has resulted in substantial, unearned profits for Counter-Defendants, personally and for the Trust; and great financial losses to the Counter-Plaintiffs.

49.     The above-described conduct constitutes fraud and fraud in the inducement, and thus is actionable in favor of one or more of the Counter-Plaintiffs.  For such fraud and fraud in the inducement, the Counter-Plaintiffs now file and assert all such claims and causes of action against Counter-Defendants.

## VIII.
## CAUSATION

50.     Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

51.     Counter-Plaintiffs would show that all causes of action/claims set forth herein have been the cause, proximate cause, producing cause, and cause-in-fact of substantial harm and financial losses to Counter-Plaintiffs.  For all such harm and financial losses, these Counter-Plaintiffs sue.

## IX.
## LEGAL DAMAGES / REMEDIES

52.     Counter-Plaintiffs incorporate all above paragraphs as if set forth herein in their entirety.

53.     For all harm and financial losses suffered by Counter-Plaintiffs and arising from wrongful and/or inequitable conduct of Counter-Defendants, these Counter-Plaintiffs now sue.

54.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the substantial harm and financial damages suffered by Counter-Plaintiffs; to wit; compensatory damages, actual damages, consequential damages, restitution damages,

16

disgorgement damages, and other damages. Counter-Plaintiffs claims asserted herein are for substantial harm and financial losses greatly in excess of $1,000,000.00.

55.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; attorneys' fees.

56.     Counter-Plaintiffs file all causes of action/claims as set forth herein to recover monetary relief for the harm and financial damages suffered by Counter-Plaintiffs; to wit; prejudgment and post-judgment interests — as allowed by law.

57.     Counter-Plaintiffs, pursuant to Texas Civil Practice & Remedies Code ("TCPRC") section 37.004, seek declaration that transfers / conveyances / contracts / Manager appointments executed/ accepted by Counter-Defendant L.Berry (e.g., purportedly involving Orca Assets GP LLC, and/or Axis Midstream Holdings LLC (as wholly owned/Managed by Berry GP and/or  Redfish Bay Terminal Inc.), and/or others)) without majority Board of Directors approval are void, void ab initio, voidable, invalid, and/or of no legal force or effect.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs pray for all relief as requested herein, for costs of court in addition thereto, and for such other and further relief to which Counter-Plaintiffs may show themselves justly entitled as against Counter-Defendants (L.Berry and the ALB Trust).

Respectfully submitted,

**LAW OFFICE OF DOUGLAS ALLISON**

By: */s/ Douglas A. Allison*
　　Douglas A. Allison
　　State Bar No. 01083500
　　doug@dallisonlaw.com
　　403 N. Tancahua Street
　　Corpus Christi, Texas 78401
　　Telephone: (361) 888-6002
　　Facsimile: (361) 888-6651

　　ATTORNEY FOR MARTY BERRY,
　　BERRY GP, INC., BERRY
　　OPERATING COMPANY, LLC and
　　BERRY CONTRACTING LOP

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December 3, 2024, a true and correct copy of the above was served upon the attorneys of record in the above entitled and numbered cause, via e-service.

　　*/s/ Douglas A. Allison*
　　Douglas A. Allison

18

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim Brunkenhoefer on behalf of Douglas Allison
Bar No. 1083500
kim@dallisonlaw.com
Envelope ID: 94865876
Filing Code Description: Amended Filing
Filing Description: Counter-Plaintiff's Second Amended Original Petition Asserting Counter-Claims
Status as of 12/16/2024 11:42 AM CST

Associated Case Party: Lawrence Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 12/3/2024 10:13:02 AM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 12/3/2024 10:13:02 AM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 12/3/2024 10:13:02 AM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 12/3/2024 10:13:02 AM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 12/3/2024 10:13:02 AM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 12/3/2024 10:13:02 AM | SENT |
| Butch Boyd | | butchboyd@butchboydlawfirm.com | 12/3/2024 10:13:02 AM | SENT |
| Katrina Chamblee-Boyd | | katrinaboyd@butchboydlawfirm.com | 12/3/2024 10:13:02 AM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 12/3/2024 10:13:02 AM | SENT |
| Cameron Roth | | CRoth@gibbsbruns.com | 12/3/2024 10:13:02 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Shanna Gohlke | | gohlkes@bayltd.com | 12/3/2024 10:13:02 AM | SENT |

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas  Allison | | doug@dallisonlaw.com | 12/3/2024 10:13:02 AM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 12/3/2024 10:13:02 AM | SENT |
| Susan  Gonzales | | susan@dallisonlaw.com | 12/3/2024 10:13:02 AM | SENT |

Associated Case Party: Michael Hummell

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim Brunkenhoefer on behalf of Douglas Allison
Bar No. 1083500
kim@dallisonlaw.com
Envelope ID: 94865876
Filing Code Description: Amended Filing
Filing Description: Counter-Plaintiff's Second Amended Original Petition Asserting Counter-Claims
Status as of 12/16/2024 11:42 AM CST

Associated Case Party: Michael Hummell

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Van  Huseman | | vhuseman@husemanlawfirm.com | 12/3/2024 10:13:02 AM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 12/3/2024 10:13:02 AM | SENT |

# EXHIBIT 3

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| BERRY GP, INC., | § § | |
| Nominal Plaintiff, | § § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP | § § § § § § § | |
| Defendants. | § | 94TH JUDICIAL DISTRICT |

## COUNTER-PLAINTIFF BERRY GP's SUPPLEMENTAL, and THIRD PARTY PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Berry GP Inc. ("Berry GP"), Defendant and Counter-Plaintiff herein, and makes and files this Counter-Plaintiff Berry GP's Supplemental and Third-Party Petition complaining of Lone Star Ports Enterprises LLC ("Lone Star"), and in support of same would show:

I.

## PARTIES

1. Berry GP Inc. ("Berry GP") is a Texas corporation with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP is one of the "Berry Entities" as may be referenced herein.

1

2. Berry Operating Company LLC ("Berry Operating") is a Texas limited liability company with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry Operating is one of the "Berry Entities" as may be referenced herein.

3. Berry Contracting LP (d/b/a Bay Ltd. ("Bay Ltd.")) is a Texas limited partnership with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Bay Ltd. is one of the "Berry Entities" as may be referenced herein.

4. Marty Berry ("M.Berry") is a natural person who is presently an Officer, Director, and shareholder of Berry GP, Berry Operating, and Bay Ltd. Marty Berry resides in Nueces County, Texas.

5. A. Lawrence Berry ("L.Berry") is a natural person who resides in Harris County, Texas. A. Lawrence Berry has already appeared in these proceedings and thus notice of these further proceedings and this filing will be serv ed upon legal counsel for ALB Trust: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002. Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6. Allen Lawrence Berry, as Trustee of the Allen Lawrence Berry (2007) Trust ("ALB Trust") is a trust wherein Allen Lawrence Berry serves as trustee of the ALB Trust and is – along with others – a beneficiary of the Trust. ALB Trust has already appeared in these proceedings and thus notice of these proceedings and this filing will be served upon legal counsel for ALB Trust: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002. Service shall be by electronic means, and in such manner as complies with the Texas Rules of Civil Procedure.

6. Lone Star Ports Enterprises LLC ("LSPE") is a Delaware limited liability company with its principal office at 16192 Coastal Highway, Lewes, Delaware 19958. Defendant Lone Star Ports

2

Enterprises LLC is being added as a third-party defendant in this matter since Lone Star Ports Enterprises LLC has claimed an ownership interest in Axis Midstream Holdings LLC. Defendant LSPE may be given notice of these proceedings and this third-party petition by service upon Defendant LSPE's registered agent for service. Service shall in registered mail upon this registered agent, return receipt requested, and in such manner as complies with the Texas Rules of Civil Procedure. Service is requested at this time.

6. Berry GP, Berry Operating, Bay Ltd., Marty Berry, A. Lawrence Berry, ALB Trust, and Lone Star Ports Enterprises LLC may be sometimes referred to as the "Parties," or any one of them referred to as a "Party."

7. L.Berry is the original Plaintiff in this legal action by having filed Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Verified Petition"). The legal action initiated by Plaintiffs' Verified Petition was filed in Harris County, Texas, but promptly transferred to Nueces County, Texas. A Counter-Plaintiffs' Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' Verified Petition in compliance with Texas Rule of Civil Procedure ("TRCP") 97. L.Berry, adding Lawrence Berry in his capacity as trustee of the Allen Lawrence Berry Trust ("Trust"), then filed Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction. The Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims was filed as counter-claim to Plaintiffs' First Amended Verified Petition and Application for Temporary Injunction in compliance with Texas Rule of Civil Procedure ("TRCP") 97. At this time, Counter-Plaintiff Berry GP files this supplemental and third-party petition to add Defendant LSPE given Berry GP is owner of Axis Midstream Holdings LLC – but Defendant LSPE apparently claims otherwise.

3

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all Parties.  Specifically, Berry GP, Berry Operating, and Bay Ltd. are legal entities formed in Texas that maintain their principal offices in Texas.  M.Berry and L.Berry reside in Texas.  All Parties have sufficient contacts with the State of Texas and, therefore, are subject to the jurisdiction of this Court.

9.     Venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.002(a)(1) as Nueces County is the location where all or a substantial part of the events or omissions giving rise to the claims occurred; and section 15.011 inasmuch as Counter-Plaintiffs seek to recover an interest in and/or quiet title to real property. See Exhibit C (with attachment). Moreover, venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.063(3).  See Exhibit B.

## III.

## DISCOVERY

10.     Discovery should be conducted in accordance with Level 3, as permitted by TRCP 109.4.

## IV.

## ADDITIONAL, SUPPLEMENTAL FACTS

11.  Axis Midstream Holdings LLC ("Axis") was formed by Allen Lawrence Berry ("Lawrence") on September 12, 2017.  In September 2017, control and ownership of Axis was transferred by Lawrence to the Allen Lawrence Berry (2007) Trust ("ALB Trust").  Thereafter, control and ownership of Axis was transferred by ALB Trust to Gansevoort Investments LLC. On or about November 30, 2017, all control and all ownership of Axis was transferred to Berry GP.  None of these transactions (from Lawrence to Trust to Gansevoort to Berry GP) are in dispute, and all of

these transactions ultimately caused Berry GP to be the sole Member of Axis, and the sole Manager of Axis beginning November 30, 2017. Simply stated, Axis Midstream Holdings LLC – as is true of almost all Berry Companies – became one of the several Berry Companies owned by Berry GP, controlled by Berry GP, and invested in by Berry GP (millions of dollars invested, some directly and some by other Berry Companies). A more detailed review confirms Berry GP's ownership and control of Axis Midstream Holdings LLC:

- November 30, 2017: All of Axis' membership interest and control of Axis transferred to Berry GP. (restated, and not in dispute).

- December 1, 2017: Axis' bank account established at IBC Bank (same bank used by Berry GP), by signatures of Marty Berry, Lawrence Berry, and Ed Martin (then-CEO of Berry GP). This bank account continued to exist for all years pertinent to this dispute

- December 6, 2017: Change in Registered Office/Agent filed with Texas Secretary of State, naming Charles A. Vanaman (Berry Entity employee) as new registered agent for Axis; and identifying 1414 Valero Way, Corpus Christi, Texas as new business address for Axis (same as Berry GP's business address).

- February 28, 2018: Berry GP, through Berry Entities, began making payments in support of project for which Axis sought (and has since acquired) United States Army Corps of Engineers ("USACE") permit allowing for project development (supported by millions of dollars in investment from Berry GP and related entities).

- 2018 Texas Franchise Tax Public Information Report evidencing: (1) Axis' principal office is 1414 Corn Product Road (now Valero Way), Corpus Christi, Texas (also Berry GP's principal office address); (2) Axis' principal place of

5

business is 1414 Corn Product Road, Corpus Christi, Texas (also Berry GP's principal place of business); (3) Axis' President is Lawrence, and Vice-Presidents are Marty and Dennis; (4) that "Name of owned (parent) corporation . . ." is "Berry GP Inc." ("Percentage of Ownership – 100.00"); (5) Axis' registered agent is Charles Vanaman (Berry Entity employee); and (6) all signed by Diane Decou (Berry Entity employee).

- February 4, 2020: Change in Registered Office/Agent filed with Texas Secretary of State, naming Mike Hummell (Berry GP General Counsel) as new registered agent for Axis; and no change in the business address of Axis (1414 Valero Way, Corpus Christi, Texas).

- Year End October 31, 2021 (Report Year 2022)

  o Texas Franchise Tax Report filing for Berry GP and subsidiaries show "Axis Midstream Holdings LLC" as an "affiliate" of Berry GP – as such Berry GP is performing compliance reporting for "Axis Midstream Holdings LLC;"

  o Same Texas Franchise Tax Report document shows Berry GP's "Percentage of Ownership" of "Axis Midstream Holdings LLC" is "100.000."

  o Same Texas Franchise Tax Report document shows Axis Midstream Holdings LLC's business address as 1414 Valero Way, Corpus Christi, Texas (also Berry GP's business address), and list three (3) Managers:

Lawrence, Marty, and Dennis – and, again, identify "Berry GP Inc." as having a "Percentage of Ownership" of "100.000."

- o Finally, the footnote on the Texas Franchise Tax Report states (Year 2022): "AXIS MIDSTREAM (FEIN: 82-XXXX615) IS OWNED 100% BY BERRY GP, INC. . . . ."

- 2021 Texas Franchise Tax Public Information Report evidencing: (1) Axis' principal office at 1414 Valero Way, Corpus Christi, Texas (also Berry GP's principal office address); (2) Axis' principal place of business at 1414 Valero Way, Corpus Christi, Texas (also Berry GP's principal place of business); (3) Axis' President is Lawrence, and Vice-Presidents are Marty and Dennis; (4) that "Name of owned (parent) corporation . . ." is "Berry GP Inc." ("Percentage of Ownership – 100.000"); (5) Axis' registered agent is Mike Hummell (Berry GP's and Axis' General Counsel); and (6) all signed by Diane Decou (Berry Entity employee).

- Year End October 31, 2022 (Report Year 2023)

  - o Texas Franchise Tax Report filing for Berry GP and subsidiaries shows "Axis Midstream Holdings LLC" as an "affiliate" of Berry GP – as such, Berry GP is performing compliance reporting for "Axis Midstream Holdings LLC;"

  - o Same Texas Franchise Tax Report document shows Berry GP's "Percentage of Ownership" of "Axis Midstream Holdings LLC" is "100.000."

  - o Same Texas Franchise Tax Report document shows Axis' business address is 1414 Valero Way, Corpus Christi, Texas (same Berry GP's business

7

address), and list three (3) Managers: Lawrence, Marty, and Dennis – and, again, identify "Berry GP Inc." as having a "Percentage of Ownership" of "100.000."

- o Finally, the footnote on the Texas Franchise Tax Report states (Report Year 2023): "AXIS MIDSTREAM (FEIN: 82-XXXX615) IS OWNED 100% BY BERRY GP, INC. . . . ."

- November 29, 2022, Tonya Fulghum emailed Mike Hummell (General Counsel for Axis and Berry GP) to "correct" Texas Secretary of State paperwork for Axis Midstream Holdings LLC (email exchanges making clear that Tonya believes Axis is a Berry GP owned company).

- December 13, 2022: "Certificate of Amendment" naming Lawrence as President; Dennis, Marty, Jim Klein, Mike Hummell, and Robert Powers as Vice-Presidents; Jim Klein as CFO; Mike Hummell as General Counsel; and Crissy Hinojosa as Secretary, of Axis Midstream Holdings LLC.

- 2022 Texas Franchise Tax Public Information Report (signed January 24, 2023) evidencing: (1) Axis' principal office at 1414 Valero Way, Corpus Christi, Texas (also Berry GP's principal office address); (2) Axis' principal place of business at 1414 Valero Way, Corpus Christi, Texas (also Berry GP's principal place of business); (3) Axis' President is Lawrence, and Vice-Presidents are Marty, Dennis, Jim Klein, Robert Powers, and Mike Hummell (the last three (3) are Berry Entity employees); (4) that Mike Hummell is General Counsel, Jim Klein is CFO, and Crissy Hinojosa is Secretary (all Berry Entity employees); (5) that the "Name of owned (parent) corporation . . ." is "Berry GP Inc." ("Percentage of Ownership –

100.0"); (5) Axis' registered agent is Mike Hummell (Berry GP's and Axis' General Counsel); and (6) all signed by Emily Smith (Berry Entity employee).

- 2023 Texas Franchise Tax Public Information Report evidencing (signed November 15, 2023): (1) Axis' principal office at 1414 Valero Way, Corpus Christi, Texas (also Berry GP's principal office address); (2) Axis' principal place of business at 1414 Valero Way, Corpus Christi, Texas (also Berry GP's principal place of business address); (3) Axis' President is Lawrence, and Vice-Presidents are Marty, Dennis, Jim Klein, Robert Powers, and Mike Hummell (the last three (3) are Berry Entity employees); (4) that Mike Hummell is General Counsel, and Jim Klein is CFO (both Berry Entity employees); (5) that the "Name of owned (parent) corporation . . ." is "Berry GP Inc." ("Percentage of Ownership – 100.000"); (5) Axis' registered agent is Mike Hummell (Berry GP's and Axis' General Counsel); and (6) all signed by James Klein (Berry Entity employee).

- January 2024: IBC Bank account records show Axis Midstream Holdings LLC's address as 1414 Valero Way, Corpus Christi, Texas (same as Berry GP's address), and reconciliation of

IBC account record accomplished by Berry Entity employees (further confirming Axis is a Berry GP owned company).

- April 3, 2024: Texas Secretary of State document confirming Axis' officers: Lawrence as President; Dennis, Marty, Robert Powers, Mike Hummell, and James Klein as Vice-Presidents; James Klein as CFO; and Mike Hummell as General Counsel.

- November 4, 2024: Texas Secretary of State document confirming Mike Hummell (General Counsel for Berry GP and Axis) as registered agent for Axis.

Berry GP would show the evidentiary record is overwhelming. Since transfer of ownership and control of Axis Midstream Holdings LLC to Berry GP (November 30, 2017), the *status quo* has been that Berry GP is owner of Axis Midstream Holdings LLC and controlled by Berry GP by and though Axis' Managers selected by Berry GP. Axis' bank accounts (2017 – 2024) confirm that ownership and control rests with Berry GP. Axis' legal filings with the Texas Secretary of State in 2017, 2018, 2020, 2021, 2022, 2023, and 2024 repeatedly and consistently confirm that ownership and control of Axis rests with Berry GP (inclusive of express language that Berry GP is 100% owner of Axis Midstream Holdings LLC). Texas Franchise Tax Reports show that Berry GP is paying taxes owed for itself and its affiliated companies, including Axis Midstream Holdings LLC (these reports also with express language that Berry GP is 100% owner of Axis Midstream Holdings LLC). And Berry GP would show that Berry GP's actions speak louder than words, and that Berry GP's (and related Berry Entities') paying millions of dollars in support of Axis' permit (and the Lone Star Ports project, generally) evidence an emphatic understanding that Berry GP

owns Axis Midstream Holdings LLC. Berry GP would show by these allegations and evidence in support that Berry GP is 100% owner of Axis Midstream Holdings LLC.

12. Berry GP would show that Berry GP's seven (7) years of quiet ownership and control of Axis Midstream Holdings LLC has been interrupted by Defendant LSPE. Defendant LSPE now claims that Berry GP no longer owns or controls Axis Midstream Holdings LLC. Defendant LSPE now claims that Axis is owned by Lone Star Ports Enterprises LLC, by reliance upon two (2) documents:

(1) "Transfer of Interest and Change of Manager Agreement" from Berry GP to Redfish Bay Terminals Inc. ("RBT") – **a document whose execution would require both Berry GP Board of Directors' approval by majority vote and RBT Board of Directors' approval by majority vote (which neither Board of Directors approved, and no one contends otherwise);** and

(2) "Transfer of Interests and Change of Manager Agreement" from RBT to Lone Star Ports Holdings LLC (intermediary to Lone Star Ports Enterprises LLC) – **a document whose execution would, at a minimum, require RBT Board of Directors' approval by majority vote (which never occurred, and no one contends otherwise).**

Berry GP's petition already on file makes clear that both the above-reference purported transfers of ownership interest and control are invalid.[1] *It makes no sense whatsoever that Berry GP, or RBT, would invest millions of dollars in Axis only to give it away to Defendant LSPE.* As of November 2024, Berry GP learned of the two (2) documents referenced above. As of December

---

[1] Berry GP's Petition, pursuant to Texas Civil Practice & Remedies Code ("TCPRC") section 37.004, seek declaration that transfers / conveyances / contracts / Manager appointments executed/accepted by Lawrence (e.g., purportedly involving Axis Midstream Holdings LLC, wholly owned/Managed by Berry GP and/or Redfish Bay Terminal Inc.) without majority Board of Directors' approval are void, void ab initio, voidable, invalid, and/or of no legal force or effect.

2024, Berry GP learned of a new "Certificate of Amendment" document apparently filed November 19, 2024, with the Texas Secretary of State – purportedly on behalf of Axis Midstream Holdings LLC – to completely reverse what has been Axis Midstream Holdings LLC's *status quo* of ownership and control for the past seven (7) years.  Specifically, the filing by or on behalf of Defendant LSPE of the new "Certificate of Amendment" endeavor to:  (1) remove Mike Hummell as registered agent of Axis, and replace him (Mike) with Gretchen Reed (Lawrence's employee); (2) change Axis' long-standing business address from 1414 Valero Way, Corpus Christi, Texas (Axis' and Berry GP's business address) to 5005 Riverway Drive, Houston, Texas (Lawrence's business address); (3) remove Marty, Dennis, Jim Klein, Mike Hummell, and Robert Powers as Vice-Presidents of Axis (casting-aside their service in support of Axis since 2017, for most of them), and remove Mike Hummell as General Counsel of Axis, and remove James Klein as CFO and remove Crissy Hinojosa as Secretary of Axis; and (5) name Lone Star Ports Enterprises LLC "as the Sole Member and Manager" of Axis.  Defendant LSPE's claim of ownership and control of Axis Midstream Holdings LLC is a false claim, and this petition now adds Defendant LSPE so that the transfer documents identified above may be declared void – and so that Berry GP's ownership of Axis Midstream Holdings LLC is judicially confirmed.

## VIII.
## DECLARATORY ACTION

13.    Counter-Plaintiff Berry GP, pursuant to Texas Civil Practice & Remedies Code ("TCPRC") section 37.004, seeks declaration that transfers / conveyances / contracts / Manager appointments executed/accepted by Counter-Defendant L.Berry (e.g., purportedly involving Orca Assets GP LLC, and/or Axis Midstream Holdings LLC (as wholly owned/Managed by Berry GP and/or  Redfish Bay Terminal Inc.), and/or others)) without majority Board of Directors approval are void, void ab initio, voidable, invalid, and/or of no legal force or effect.

12

14.     This Counter-Plaintiff Berry GP Supplemental and Third-Party Petition is a supplemental pleading, not an amended pleading, and Berry GP thus seeks all relief requested herein in addition to all relief pray for in its current petition on file.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiffs pray for all relief as requested herein and all relief as requested in other pleadings/petition on file, for costs of court in addition thereto, and for such other and further relief – both at law and in equity – to which Counter-Plaintiff Berry GP may show themselves justly entitled as against Counter-Defendants (L.Berry and the ALB Trust) and Defendant LSPE.

Respectfully submitted,

**LAW OFFICE OF DOUGLAS ALLISON**

By: */s/ Douglas A. Allison*
    Douglas A. Allison
    State Bar No. 01083500
    doug@dallisonlaw.com
    403 N. Tancahua Street
    Corpus Christi, Texas 78401
    Telephone: (361) 888-6002
    Facsimile: (361) 888-6651

    ATTORNEY FOR MARTY BERRY,
    BERRY GP, INC., BERRY
    OPERATING COMPANY, LLC and
    BERRY CONTRACTING LOP

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of January 2025, a true and correct copy of the above was served upon the attorneys of record in the above entitled and numbered cause, via e-service.

    */s/ Douglas A. Allison*
    Douglas A. Allison

13

# EXHIBIT 4

## CAUSE NO. 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| BERRY GP, INC., | § § | |
| Nominal Plaintiff, | § § § | NUECES COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LOP | § § § § § § § | |
| Defendants. | § | 94TH JUDICIAL DISTRICT |

## INTERVENORS' ORIGINAL PETITION IN INTERVENTION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Redfish Bay Terminals Inc. ("RFB") and Canada Project Holdings Inc. ("CPH"), Intervenors herein, and make and file this Intervenors' Original Petition in Intervention complaining of Lone Star Ports Enterprises, LLC ("LSPE"), Redfish Bay Properties, LLC ("RBP"), and Harbor Island Properties, LLC ("HIP"), and in support of same would show:

I.

## PARTIES

1.      Redfish Bay Terminals Inc. ("RFB") is a Texas corporation with its principal office at 1414 Corn Products Road (aka 1414 Valero Way), Corpus Christi, Texas 78409.  RFB is 100% owned by Berry GP Inc. ("Berry GP"), an entity already a party to these proceedings.  As such, RFB is

1

one of the "Berry Entities" as may be referenced herein. RFB owns certain real property interests near Aransas Pass, Texas, and these real property interests are the subject of this intervention.

2. Canada Projects Holdings Inc. ("CPH") is a Texas corporation with its principal office at 1414 Valero Way, Corpus Christi, Texas 78409. CPH holds a lease on a tract of land located on Harbor Island, Nueces County, Texas, and this leasehold interest is the subject of this intervention.

3. Berry GP Inc. ("Berry GP") is a Texas corporation with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP is one of the "Berry Entities" as may be referenced herein. Berry GP is already a party to these legal proceedings and will be given notice of the filing of this Intervenors' Original Petition in Intervention by service through Nueces County's electronic service system.

4. Berry Operating Company LLC ("Berry Operating") is a Texas limited liability company with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry Operating is one of the "Berry Entities" as may be referenced herein. Berry Operating is already a party to these legal proceedings and will be given notice of the filing of this Intervenors' Original Petition in Intervention by service through Nueces County's electronic service system.

5. Berry Contracting LP (d/b/a Bay Ltd. ("Bay Ltd.")) is a Texas limited partnership with its principal office at 1414 Corn Products Road, Corpus Christi, Texas 78409. Bay Ltd. is one of the "Berry Entities" as may be referenced herein. Bay Ltd. is already a party to these legal proceedings and will be given notice of the filing of this Intervenors' Original Petition in Intervention by service through Nueces County's electronic service system.

6. Marty Berry ("M.Berry" or "Marty") is a natural person who is presently a Director and Officer of Berry GP, Berry Operating, Bay Ltd., and RFB. Marty Berry resides in Nueces County, Texas. Marty Berry has already answered and appeared in these legal proceedings. As such,

2

notice of the filing of this Intervenors' Original Petition in Intervention will be given by service upon Marty's legal counsel of record through the Nueces County electronic service system.

7. Allen Lawrence Berry ("L.Berry" or "Lawrence") is a natural person who resides in Harris County, Texas. Allen Lawrence Berry has already answered and appeared in these legal proceedings. As such, notice of the filing of this Intervenors' Original Petition in Intervention will be given by service upon Lawrence's legal counsel of record through the Nueces County electronic service system: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002.

8. Allen Lawrence Berry (2007) Trust ("ALB Trust" or "Trust") is a duly formed trust with Allen Lawrence Berry as its trustee. The ALB Trust has already answered and appeared in these legal proceedings. As such, notice of the filing of this Intervenors' Original Petition in Intervention will be given by service upon the ALB Trust's legal counsel of record through the Nueces County electronic service system: Mr. Barrett Reasoner, Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002.

9. Lone Star Ports Enterprises LLC ("LSPE") is a Delaware limited liability company with its principal office at 16192 Coastal Highway, Lewes, Delaware 19958. Defendant Lone Star Ports Enterprises LLC has claimed an ownership interest in Axis Midstream Holdings LLC and thus is named as a Defendant in this lawsuit. Defendant LSPE may be given notice of these proceedings and the filing of this Intervenors' Original Petition in Intervention through its registered agent for service: Harvard Business Services, Inc., 16192 Coastal Hwy., Lewes, DE 19958, by personal service. As such, Lone Star Ports Enterprises LLC ("LSPE") may be served with notice of these proceedings by issuance of citation and service of process — with a copy of this Intervenors' Original Petition in Intervention attached thereto — upon its registered agent for service at the

3

address indicated and, in such manner, as complies with the Texas Rules of Civil Procedure. Service is requested at this time.

10. Redfish Bay Properties LLC ("RBP") is a Delaware limited liability company with its principal place of business at 5005 Riverway Drive, Suite 440, Houston, Texas 77056. Defendant Redfish Bay Properties LLC wrongfully claims an interest in real property owned by RFB near Aransas Pass, Texas, and thus is named as a Defendant in this lawsuit. Defendant RBP may be given notice of these proceedings and the filing of this Intervenors' Original Petition in Intervention through its registered agent for service: Harvard Business Services, Inc., 16192 Coastal Hwy., Lewes, DE 19958, by personal service. As such, Redfish Bay Properties LLC ("RBP") may be served with notice of these proceedings by issuance of citation and service of process — with a copy of this Intervenors' Original Petition in Intervention attached thereto — upon its registered agent for service at the address indicated and, in such manner, as complies with the Texas Rules of Civil Procedure. Service is requested at this time.

11. Harbor Island Properties LLC ("HIP") is a Delaware limited liability company with its principal place of business at 5005 Riverway Drive, Suite 440, Houston, Texas 77056. Defendant Harbor Island Properties LLC wrongfully claims right to CPH's leasehold interest in a tract of land on Harbor Island, Nueces County, Texas, and thus is named as a Defendant in this lawsuit. Defendant HIP may be given notice of these proceedings and the filing of this Intervenors' Original Petition in Intervention through its registered agent for service: Harvard Business Services, Inc., 16192 Coastal Hwy., Lewes, DE 19958, by personal service. As such, Harbor Island Properties LLC ("HIP") may be served with notice of these proceedings by issuance of citation and service of process — with a copy of this Intervenors' Original Petition in Intervention attached thereto —

4

upon its registered agent for service at the address indicated and, in such manner, as complies with the Texas Rules of Civil Procedure. Service is requested at this time.

12.     Intervenors have only recently learned that other legal entities (LSPE, RBP, and HIP) claim ownership and/or control of assets owned and controlled by Berry GP and/or Intervenors. As such, Intervenors file this Intervenors' Original Petition in Intervention seeking a declaration pursuant to Texas Civil Practice & Remedies Code ("TCPRC"), Chapter 37, of Intervenors' rights, status, and other legal relations to RFB's real property interests[1] and CPH's leasehold interest.[2]

## II.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all parties. All parties have sufficient contacts with the State of Texas and, therefore, are subject to the jurisdiction of this Court.

14.     Venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.002(a)(1) as Nueces County is the location where all or a substantial part of the events or omissions giving rise to the claims occurred; and section 15.011 as Intervenors seek to recover an interest in and/or quiet title to real property. Moreover, venue is proper in Nueces County, Texas, pursuant to TCPRC Chapter 15, section 15.063(3).

## III.

## DISCOVERY

15.     Discovery should be conducted in accordance with Level 3, as permitted by TRCP 190.4.

## IV.

---

[1] To the extent any legal action taken or relief requested herein may be characterized as a trespass to try title lawsuit, then Intervenors hereby assert all such claims and request all such relief – inclusive of those claims that may be brought pursuant to Texas Property Code Chapter 22.

[2] Per Texas Civil Practice & Remedies Code, section 37.006, "all persons who have or claim any interest that would be affected by the declaration must be made parties." Thus, RBP and HIP are being added as parties to this lawsuit by this Intervenors' Original Petition in Intervention. The inclusion of all such parties is also required by Texas Rule of Civil Procedure 39.

## ADDITIONAL FACTS

16. For many years, RFB has enjoyed quiet ownership and control of real property located near Aransas Pass, Texas (more than 200 acres) on and near the intercoastal waterway, the "RFB Land"). RFB recently learned that RBP now claims ownership and/or control of the RFB Land. Worse yet, RBP's claim of ownership/control is part of a larger scheme by Lawrence and others to solicit hundreds of millions of dollars to develop a project – *using RFB's Land which RBP does not own or control.* This must stop, and RFB's ownership/control of the RFB Land is properly confirmed by declaration pursuant to TCPRC Chapter 37. Alternatively, this action may proceed as a trespass to try title claim by RFB.

17. For several years, CPH has enjoyed quiet access and control of its leasehold interest in real property located on Harbor Island, Nueces County, Texas (a lease for approximately 62 acres on Harbor Island, Texas (the "CPH Lease Tract")). CPH recently learned that HIP now claims right to and/or control of the CPH Lease Tract. Worse yet, HIP's claim of right and control is part of a larger scheme by Lawrence and others to solicit hundreds of millions of dollars to develop a project – *using the CPH Lease Tract which HIP does not hold or control.* This must stop, and CPH's right to and control of the leasehold estate in the CPH Lease Tract is properly confirmed by declaration pursuant to TCPRC Chapter 37. Alternatively, this action may proceed as a trespass to try title claim by CPH.

## V.
## DECLARATORY ACTION

18. Intervenor RFB, pursuant to Texas Civil Practice & Remedies Code ("TCPRC"), Chapter 37, seeks declaration that the RFB Land for which RFB is record title owner be confirmed as RFB owned real property; and that further declaration confirm RBP has no right, title, or interest whatsoever in the RFB Land. Intervenor RFB, also pursuant to TCPRC, seeks declaration that

6

any transfer/conveyance/contract/Manager appointment executed/accepted by Lawrence, in whole or in part, related to Axis Midstream Holdings LLC without Berry GP and RFB majority Board of Directors' approval are void, void ab initio, voidable, invalid, and/or of no legal force or effect.

19. Intervenor CPH, pursuant to TCPRC Chapter 37, seeks declaration that CPH's leasehold interest in the CPH Lease Tract be confirmed as a leasehold interested held by CPH; and that further declaration confirm HIP has no right, title, or interest (including any leasehold interest) whatsoever in the CPH Lease Tract.

WHEREFORE, PREMISES CONSIDERED, Redfish Bay Terminals Inc. and Canada Projects Holdings Inc. pray for all relief as requested herein, for costs of court in addition thereto, attorneys' fees, and for such other and further relief – both at law and in equity – to which these Intervenors may show themselves justly entitled as against Lawrence, the ALB Trust, RBP, HIP, and LSPE.

Respectfully submitted,

**LAW OFFICE OF DOUGLAS ALLISON**

By: */s/ Douglas A. Allison*
    Douglas A. Allison
    State Bar No. 01083500
    doug@dallisonlaw.com
    403 N. Tancahua Street
    Corpus Christi, Texas 78401
    Telephone: (361) 888-6002
    Facsimile: (361) 888-6651

    ATTORNEY FOR REDFISH BAY
    TERMINALS INC., AND CANADA
    PROJECTS HOLDINGS INC.

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February 2025, a true and correct copy of the above was served upon the attorneys of record in the above entitled and numbered cause, via e-service.

_/s/ Douglas A. Allison_
Douglas A. Allison

# EXHIBIT 5

Certified Document Number: 111508476 - Page 1 of 27

11/27/2023 11:34 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 81947481
By: Monica Jackson
Filed: 11/27/2023 11:14 AM

**2023-81703 / Court: 333**

CAUSE NO.: _____

| | |
|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC., | § IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § § |
| BERRY GP, INC., | § § |
| *Nominal Plaintiff,* | § § |
| v. | § § HARRIS COUNTY, TEXAS |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY LLC, and BERRY CONTRACTING LP, | § § § § § § |
| *Defendants.* | § _____ JUDICIAL DISTRICT |

**PLAINTIFFS' ORIGINAL VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

**JURY TRIAL DEMANDED**

TO THE HONORABLE JUDGE OF THIS COURT:

Lawrence Berry ("Lawrence" or "Plaintiff"), on his own behalf and derivatively on behalf of Berry GP, Inc. (with Lawrence, "Plaintiffs"), files this Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction against Marty Berry, Robert Rickett ("Rickett"), Robert "Rob" Powers ("Powers"), Michael "Mike" Hummell ("Hummell"), Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP (collectively, "Defendants"). Plaintiffs assert claims for breach of fiduciary duty, a demand for an equitable accounting, a demand for books and records, and an application for temporary restraining order and temporary injunction as described herein. In support of these claims, Plaintiffs respectfully show as follows:

1

## I. INTRODUCTION

1. This action concerns the management and finances of several Texas companies—Berry GP, Inc.; Berry Operating Company LLC; and Berry Contracting LP (collectively, the "Berry Entities")—which are majority owned in equal shares by Plaintiff Lawrence Berry and his two brothers, Marty Berry ("Marty") and Dennis Berry ("Dennis"). In the past several months, it has become apparent that the Berry Entities have been unlawfully usurped, controlled, and mismanaged in secret by Defendants Marty Berry; Marty's son-in-law, Robert Rickett; Rob Powers, the President and Chief Executive Officer of Berry GP, Inc; and Mike Hummell, Berry GP, Inc.'s Vice President and General Counsel.

2. The Berry Entities operate a large organization of companies engaged in the construction, fabrication, and maintenance contracting industries throughout the United States, and have successfully done so since the 1950s. While the Berry Entities were founded and originally controlled by Lawrence's father, ownership passed to Lawrence and his brothers beginning in the 1990s.

3. In recent months, Lawrence—an officer, director, and shareholder of the Berry Entities—has come to learn that Marty Berry, with assistance from Robert Rickett, Rob Powers, and Mike Hummell, has been mismanaging the Berry Entities' finances such that he imperiled a long-standing line of credit that represented the Berry Entities' primary source of operational funding, causing that line of credit to be placed in default. Further, Powers and Hummell colluded in secret to authorize a self-dealing loan agreement from Marty and Dennis—themselves officers, directors, and shareholders of the Berry Entities—to the Berry Entities without notice or consultation with the other officers and directors. Finally, presumably in an attempt to repay their self-interested loan, Defendants have recently begun secretly attempting to sell the company's real

2

property, including an important and valuable dock facility, without notice to or authorization from the Board of Directors. This type of undisclosed engagement in self-dealing and ultra vires transactions violates the fiduciary obligations and Texas law.

4. When Lawrence inquired about this mismanagement and apparent covert self-dealing through valid requests for books and records information, his requests went ignored, in further violation of Texas law.

5. Lawrence, both directly and derivatively on behalf of the Berry Entities, brings this lawsuit against Marty Berry, Rickett, Powers, Hummell, and the Berry Entities, to recover damages, enforce his rights to inspect the Berry Entities' books and records, and to demand an accounting of the Berry Entities' finances.

## II. DISCOVERY LEVEL

6. Discovery should be conducted in accordance with a Level 3 tailored discovery control plan under Rule 190.4 of the Texas Rules of Civil Procedure.

## III. JURISDICTION AND VENUE

7. Plaintiffs seek monetary relief of over $1,000,000, including damages, penalties, costs, expenses, pre- and post-judgment interest, and attorney fees, as well as non-monetary relief. The relief sought by Plaintiffs is within the jurisdiction of this Court.

8. The Court has subject matter jurisdiction to hear this matter because the amount in controversy exceeds the jurisdictional minimum of this Court.

9. This Court has personal jurisdiction over Defendant Marty Berry because he is a resident of Texas and Plaintiffs' claims against him arise directly from his contacts with and activities in this state.

3

Certified Document Number: 111508476 - Page 3 of 27

10. This Court has personal jurisdiction over Defendant Robert Rickett because he is a resident of Texas and Plaintiffs' claims against him arise directly from his contacts with and activities in this state.

11. This Court has personal jurisdiction over Defendant Robert Powers because he is a resident of Texas and Plaintiffs' claims against him arise directly from his contacts with and activities in this state.

12. This Court has personal jurisdiction over Defendant Michael Hummell because he is a resident of Texas and Plaintiffs' claims against him arise directly from his contacts with and activities in this state.

13. This Court has personal jurisdiction over Defendant Berry Contracting LP because it is a Texas limited partnership headquartered in this state.

14. This Court has personal jurisdiction over Berry GP, Inc. because it is a Texas corporation headquartered in this state.

15. This Court has personal jurisdiction over Defendant Berry Operating Company LLC because it is a Texas limited liability corporation headquartered in this state.

16. Venue is proper in Harris County, Texas because Harris County, Texas is the county where a substantial part of the events or omissions giving rise to this suit occurred. TEX. CIV. PRAC. & REM. CODE §§ 15.002 & 15.005.

IV. PARTIES AND SERVICE

17. Plaintiff Lawrence Berry is an individual residing in Harris County, Texas. At all relevant times, Lawrence has owned shares of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP individually, through a series of holding companies. Lawrence is also the beneficial owner of the shares in those companies held in the Allen Lawrence Berry Trust.

4

Finally, at all relevant times, Lawrence has been an Officer, Director, and/or shareholder of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP.

18. Defendant Berry Contracting LP, doing business as Bay Ltd., is a Texas limited partnership with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP, Inc. is its registered agent for service of process and can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

19. Defendant Berry Operating Company LLC is a Texas limited liability company with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

20. Defendant Berry GP, Inc. is a Texas corporation with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

21. Defendant Marty Berry is a natural person. Marty Berry is an Officer, Director, and shareholder of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and he maintains custody and control over the corporate records of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. Marty Berry can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

22. Defendant Robert Rickett is a natural person. He is Marty Berry's son-in-law, and an employee of the Berry Entities. He can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

23. Defendant Robert Powers is a natural person. He is the President and Chief Executive Officer of Berry GP, Inc. and he maintains custody and control over the corporate

Certified Document Number: 111508476 - Page 5 of 27

records of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. Mr. Powers can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

24.     Defendant Mike Hummell is a natural person. He is the Vice President and General Counsel of Berry GP, Inc. Mr. Hummell can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

## V.     FACTUAL BACKGROUND

### A.     The Berry Entities are a family operation.

25.     The Berry Entities and their subsidiaries are a group of companies focused on the construction, fabrication, and maintenance contracting industries throughout the United States. The Berry Entities were founded in the 1950s by Lawrence Berry's father, Marvin Berry, who ran the organization for several decades.

26.     Marvin Berry had four sons: Plaintiff Lawrence Berry, Marty Berry, Dennis Berry, and Kenneth Berry. When Marvin passed away in 1997, control of the Berry Entities began shifting to his sons, although the other brothers bought Kenneth out several years ago. LDMA Limited Partnership ("LDMA") sits at the top of the Berry organization. LDMA's 3% general partner is Becon, Inc., which is owned in equal shares by Lawrence, Marty, and Dennis. Lawrence, Marty, and Dennis are each direct 19% limited partners of LDMA, and each is also a beneficial owner of trusts which are 11 2/3% limited partners of LDMA. The remaining 5% limited partner of LDMA is Lone Star Equipment, Inc., which is a subsidiary of Berry Contracting LP.

27.     LDMA owns Berry GP, Inc., which in turn owns several holding companies which own Berry Operating Company LLC, which in turn functions as the 1% owner and general partner of Berry Contracting LP.

6

28. An organizational chart reflecting the structure and ownership of the various entities at issue is attached hereto as Exhibit A.

29. While the Berry Entities employ several officers who are not members of the Berry Family—including Defendant Powers, who serves as President and Chief Executive Officer of Berry GP, Inc., and Defendant Hummell, who serves as Vice President and General Counsel of Berry GP, Inc.—ownership and primary control of the Berry Entities is vested with Lawrence and his two brothers.

30. The Berry Entities are primarily governed by the Board of Directors of Berry GP, Inc. (the "Board"), in accordance with the Bylaws of Berry GP, Inc., which are attached hereto as Exhibit B. The Board consists of directors Lawrence, Marty, and Dennis.

**B. Defendants have excluded Lawrence from key decisions related to the Berry Entities, including improper self-interested transactions.**

31. Despite Marvin Berry's wishes that the Berry Entities operate as a family business, it has become clear that Marty, with the assistance of Rickett, Powers, and Hummell, has gone behind Lawrence's back to exclude him from key decisions related to the Berry Entities, instead choosing to engage in self-dealing and attempt major corporate transactions without informing the other officers and directors of his actions.

32. For instance, in the past several years, Defendants have, among many other things:

- Purported to approve the acquisition of major equipment such as cranes and "yellow iron" without Board discussion or authorization;

- Bought "rolling stock" equipment such as motor cranes through a company unaffiliated with the Berry Entities without first presenting the opportunity to the Board or the Berry Entities, then leased the cranes back to the Berry Entities in a self-dealing transaction without approval from the Board;

- Negotiated and purported to approve terms with major equipment lenders that include significant potential negative impacts to the Berry Entities without Board discussion or authorization;

7

- Marketed corporate aircraft owned by the Berry Entities for resale without Board discussion or authorization;

- Acquired property in key economic development zones or property adjacent to Berry Entities' property in Robert Rickett's name, using Berry Entities' funds, without first discussing with or seeking authorization from the Board, and without any apparent effort to transfer title to the Berry Entities; and

- Deliberately dissolved the largest revenue producing division of the Berry Entities by systematically terminating key individuals material to that division's structure and revenue development.

33. Of particular concern, Lawrence recently came to learn that Marty, Rickett, Powers, and Hummell have engaged in improper self-dealing transactions with the Berry Entities.

34. Specifically, it appears that Powers and Hummell approved and executed a loan agreement between Marty and Dennis, on the one hand, and one of the Berry Entities, on the other, by which Marty and Dennis loaned a total of approximately $75 million to the Berry Entities (the "Berry Loan"). Although Powers has thus far refused to provide the loan documents despite requests from Lawrence, Lawrence has been informed that Marty loaned $45 million and Dennis loaned $30 million to one or more of the Berry Entities.

35. Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was never directly informed about the Berry Loan, never consulted about its propriety, and never asked to vote on it as an officer, director, or shareholder. Nor has Lawrence been informed about the terms of the Berry Loan; what, if any, collateral secures the notes; how the proceeds of the Berry Loan were used; or how, when, and to what extent Marty and Dennis expect repayment from the Berry Entities with respect to the Berry Loan.

36. Review of the limited financial information to which Lawrence has been privy indicates that the Berry Entities have made payments to Marty and Dennis, which presumably represent payments in service of the Berry Loan. However, because the self-dealing loans were

8

made without Board authorization and Defendants have refused to provide the requested documentation to Lawrence, the extent of those improper payments is presently unclear.

37. The Berry Loan transaction was never discussed by the directors of Berry GP, Inc., was not voted on at any meeting of the directors, and does not appear in any minutes of Board meetings. In fact, it appears that Powers, Hummell, Marty, and Dennis were the only individuals at the Berry Entities who were aware that they were encumbering the Berry Entities with this $75 million unauthorized debt.

38. Plaintiffs recently learned that Defendants Marty Berry, Rickett, Powers, and Hummell have offered to sell some of the Berry Entities' vital real property assets, including a dock facility and adjacent real property that generates tens of thousands of dollars in monthly revenue, presumably in an effort to repay the unauthorized and self-interested loans. Plaintiffs believe that Marty, Rickett, Powers, and Hummell intend to sell the Berry real property to raise funds for additional unauthorized self-dealing payments to Marty and Dennis in service of the Berry Loans.

39. Plaintiffs recently were made aware that in or around late May 2023, Defendants began an effort to sell the dock facility and other real property to at least one third party. In their communications to that third party, Defendants falsely represented that "the principals at Berry G.P. have decided to open two strategic properties to the marketplace." *See* Ex. C (May 30, 2023 Letter from Berry G.P. to Port of Corpus Christi). In truth, the decision to sell significant company assets was made unilaterally by Marty and without calling a Board meeting and without discussion with or notice to Lawrence.

9

**C.     Marty, Dennis, and Powers have threatened the financial operations of the Berry Entities.**

40.     Until recently, the Berry Entities relied on a $50,000,000.00 revolving line of credit (the "LOC") with International Bank of Commerce ("IBC") for general operations. This LOC was governed by a loan agreement between several of the Berry Entities and IBC, dated March 31, 2019 (the "Loan Agreement").

41.     The Loan Agreement contained provisions allowing IBC to invoke default if certain conditions were not met, including particular thresholds for EBITDA and combined net profit after taxes.

42.     Under Defendants' mismanagement, the Berry Entities recently failed to meet certain of the thresholds detailed in the Loan Agreement.

43.     In fact, IBC recently made repeated requests to Powers and other members of the Berry Entities' management team for information related to standard reporting as part of the Loan Agreement covenants. This includes quarterly financials, WIP reports, financial projections, and more. It appears as if the management team either refused or was unable to produce this information to IBC. Further, when IBC made an effort to schedule a meeting to discuss the status of the Berry Entities in person, Powers and Marty did not show up, imperiling the 30-year banking relationship with IBC. Lawrence was never informed that IBC was sending repeated requests for information, that the Berry Entities were struggling to produce accurate or timely reporting, or that IBC had attempted to schedule meetings to discuss the problems in person.

44.     Accordingly, on March 13, 2023, IBC sent a letter to Powers informing him that IBC had placed the LOC in default. IBC asserted that the Berry Entities had failed to achieve the minimum EBITDA and net profits targets for the 2022 fiscal year. Powers did not share this letter with Lawrence at the time.

10

45. Because of these claimed defaults, IBC (1) elected to limit future advances to the Berry Entities on the LOC to $30 million rather than the full $50 million, and (2) accelerated maturation of the LOC to March 31, 2023, at which time IBC was going to require the entire balance to be due and payable.

46. Following this March 13, 2023 letter, IBC and counsel for the Berry Entities engaged in additional correspondence regarding the extension of the LOC. On March 28, 2023, IBC proposed an extension of the LOC to October 1, 2023, pursuant to several terms, including a reduction of the LOC from $50 million to $30 million and a requirement that the $75 million debt purportedly owed by the Berry Entities to Marty and Dennis be subordinated to the LOC debt owed to IBC. On March 30, 2023, counsel for the Berry Entities responded and rejected many of these terms, including the subordination proposal. Lawrence was not consulted regarding these decisions, nor was he made aware of the IBC proposal at the time.

47. As a result of the March 30, 2023 rejection letter from the Berry Entities, IBC appears to have placed the LOC into default. Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was not informed of the precise status of the LOC with IBC, nor of the Berry Entities' plan for ensuring sufficient liquidity to fund its operations. Powers has apparently decided, presumably in coordination with Marty, to keep Lawrence in the dark regarding the Berry Entities' financial status.

48. Following the collapse of the IBC banking relationship, Powers has been in negotiations with Frost Bank to obtain a new revolving line of credit. Plaintiffs understand that as part of these negotiations, Powers is contemplating pledging the Berry Entities' real property as collateral, including the Entities' commercial property in Corpus Christi. Lawrence has not been

Certified Document Number: 111508476 - Page 11 of 27

fully apprised of the situation with Frost Bank, nor has he been consulted about or asked to approve the collateralization of any of the Berry Entities' real property.

49. Indeed, as part of the negotiations with Frost Bank, Powers and Marty executed a "Certificate of Corporate Resolutions" that purports to set forth "resolutions duly adopted either: (a) at a meeting of [Berry GP, Inc.'s] Board of Directors duly called and held, at which meeting a quorum was present and acting throughout, or (b) by unanimous written consent of the Board of Directors of [Berry GP, Inc.], which resolutions save not in any way been amended or modified[.]". *See* Ex. D. No such Board meeting was ever held, and Lawrence was never notified of or asked to approve any written consents adopting the purported resolutions contained in this "Certificate of Corporate Resolutions."

### D. Powers refuses to honor Lawrence's legitimate requests for information related to the Berry Entities.

50. On April 18, 2023, Lawrence sent an email to Powers and Jim Klein—CFO of Berry GP, Inc.—copying Marty and Dennis. This email attached a memorandum of "Key Concerns" that the Berry Entities apparently received from IBC and requested information from Powers and Klein related to the financial condition of the Berry Entities.

51. Lawrence sent the information request so that he could better understand the Berry Entities' present financial condition and what may have caused the Berry Entities to purportedly fail to meet the thresholds included in the Loan Agreement with IBC. Lawrence also requested information related to the Berry Loan, since he has still been kept in the dark as to the nature and terms of that debt.

52. As an officer, director, and shareholder of the Berry Entities, Lawrence is entitled to inspect the books and records of the Berry Entities, and a valid request such as the April 18,

12

2023 email should have been honored. However, Lawrence never received a response to his April 18, 2023 request, much less access to any of the books and records he requested.

## VI.    CAUSES OF ACTION

### COUNT 1
### Breach of Fiduciary Duty
### (against Marty Berry, Rob Powers, and Mike Hummell)

53.    Plaintiffs incorporate the above paragraphs as if set forth herein in their entirety.

54.    Defendant Marty Berry has been a shareholder, officer, and director of Berry GP, Inc. at all relevant times. Defendant Rob Powers has served as President and Chief Executive Officer of Berry GP, Inc. at all relevant times. Defendant Mike Hummell has served as Vice President and Chief Executive Officer of Berry GP, Inc. at all relevant times. In those positions, Marty, Powers, and Hummell owe certain fiduciary duties to the Berry Entities, including the duty of loyalty and the duty of utmost good faith, fairness, and honesty. These duties that Marty, Powers, and Hummell owe to the Berry Entities encompass obligations and/or duties to refrain from allowing self-dealing and to make full disclosure of information.

55.    While serving in their respective positions, Marty, Powers, and Hummell have engaged in, directed, approved, and/or taken actions in contravention of the fiduciary duties they owe to the Berry Entities, including without limitation the following willful and intentional misconduct:

A.    Self-Dealing

   i.   Marty, Powers, and Hummell approved and directed at least one of the Berry Entities to enter into a loan agreement with Marty and Dennis—who are themselves officers, directors, and shareholders of Berry GP, Inc. and the other

13

Berry Entities—without giving notice to or obtaining the consent or approval of Berry GP, Inc.'s Board;

ii. At a minimum, Marty's, Powers's, and Hummell's actions breached their fiduciary duties of loyalty to Berry GP, Inc. and amounted to self-dealing.

B. Unauthorized Acts and Failure to Make Full and Adequate Disclosure

i. Marty, Powers, and Hummell failed to disclose their unauthorized decision to sell vital company assets and the self-dealing Berry Loan and failed to properly seek or obtain board approval or approval of the sole disinterested director for those self-dealing transactions;

ii. Marty, Powers, and Hummell similarly failed to disclose the Berry Entities' financial information to Lawrence before IBC held the Berry Entities in default with respect to the LOC.

These and other actions by Marty, Powers, and Hummell amounted to breaches of their fiduciary duties of loyalty to the Berry Entities and to behave with the utmost good faith, fairness, and honesty.

56. The Berry Entities and Lawrence have been damaged by the Defendants' self-dealing, unauthorized acts, breaches of fiduciary duty, and failure to make full disclosure.

57. Because Berry GP, Inc. operates as a closely held corporation and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code § 21.563.

58. Alternatively, Plaintiffs bring these claims derivatively on behalf of Berry GP, Inc.

14

## COUNT 2
## Knowing Participation in a Breach of Fiduciary Duty
## (against Robert Rickett)

59.     Plaintiffs incorporate the above paragraphs as if set forth herein in their entirety.

60.     Defendant Robert Rickett is Marty Berry's son-in-law, and he has been an employee of the Berry Entities at all relevant times.

61.     Defendants Marty, Powers, and Hummell have fiduciary duties to Plaintiffs.

62.     As an employee of the Berry Entities, Rickett is aware of Marty's, Powers's, and Hummell's fiduciary duties to Plaintiffs.

63.     Marty, Powers, and Hummell breached their fiduciary duties to Plaintiffs, as referenced in paragraphs 53-58, above.

64.     Defendant Rickett participated in Marty's, Powers's, and Hummell's breaches of fiduciary duty by assisting in the marketing of vital company assets without first seeking or obtaining board approval, or approval of Lawrence as the sole disinterested director.

65.     Rickett had knowledge that Marty's, Powers's, and Hummell's conduct constituted a breach of their fiduciary duties, and he acted with intent to assist those breaches.

66.     Rickett's assistance with and participation in this breach is evidenced by his letter to the Port of Corpus Christi, which indicates "the principals at Berry G.P. have decided to open two strategic properties to the marketplace." *See* Ex. C. Rickett was aware that no Board meeting had taken place and that Lawrence had not approved the marketing and sale of this property.

67.     Rickett's assistance was a substantial factor in causing Marty, Powers and Hummell to breach their fiduciary duties, causing damage to Plaintiffs.

68.     Because Berry GP, Inc. operates as a closely held corporation and Defendants have concealed information and refused to share requested information with Lawrence—an officer,

15

director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code § 21.563.

69.     Alternatively, Plaintiffs bring these claims derivatively on behalf of Berry GP, Inc.

## COUNT 3
## Demand for an Equitable Accounting

70.     Plaintiffs incorporate the above paragraphs as if set forth herein in their entirety.

71.     As an officer and director of Berry GP, Inc. at all relevant times, Marty owed fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting. Additionally, as officers of Berry GP, Inc. at all relevant times, Powers and Hummell owe fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting.

72.     Defendants have provided Lawrence with almost no financial records related to the Berry Entities. The task of determining whether those records are accurate or complete, and the need to verify details about the concealment, wrongdoing, and mismanagement detailed above, is likely to be complex. Adequate relief is unlikely to be obtained at law or through traditional discovery. Performing an accurate accounting for the Berry Entities is likely to require the creation of accurate financial records where none exist, as opposed to merely granting Plaintiff access to the Berry Entities' existing records.

73.     Plaintiffs therefore seeks an order appointing an independent auditor and requiring the Berry Entities, Marty, Powers, and Hummell to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023. *See* TEX. R. CIV. P. 172.

74.     Plaintiffs bring this claim derivatively on behalf of Berry GP, Inc.

16

Certified Document Number: 111508476 - Page 16 of 27

## COUNT 4
## Demand for Books and Records

75. Plaintiffs incorporate the above paragraphs as if set forth in their entirety.

76. At all relevant times, Plaintiff Lawrence Berry has been a shareholder of at least 5% of Berry GP, Inc.

77. On April 18, 2023, Lawrence sent a good faith written demand to Powers for books and records related to Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities. However, this request was ignored, and Lawrence never received a response.

78. As a shareholder of Berry GP, Inc. for at least six months immediately preceding that April 18, 2023 demand, and as a holder of at least 5% of all of the outstanding shares in Berry GP, Inc., Lawrence is entitled to examine and copy Berry GP, Inc.'s books, records of account, minutes, and share transfer records. TEX. BUS. ORG. CODE § 21.218.

79. The Bylaws of Berry GP, Inc. do not alter or limit Lawrence's right to inspect Berry GP, Inc.'s books and records. Indeed, Section XXIV states that "the books, accounts and records of [Berry GP, Inc.] shall be open to inspection by the shareholders at all reasonable times[.]" *See* Ex. B, at 11.

80. Powers never responded to Lawrence's lawful request, let alone provided any reason why Lawrence would not be entitled to inspect the books and records of Berry GP, Inc. and its subsidiaries.

81. Plaintiff Lawrence Berry therefore seeks an order compelling the production for examination of the books and records of Berry GP, Inc. and its subsidiaries, including but not limited to the other Berry Entities, pursuant to Section 21.218(c) of the Texas Business Organizations Code.

82. Plaintiff Lawrence Berry brings this claim directly.

17

## VII. APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

83. Plaintiffs incorporate the above paragraphs as if set forth in their entirety.

84. Plaintiffs attach and incorporate by reference the Verification of Lawrence Berry, which verifies the allegations relevant to this application for injunctive relief. Plaintiffs also attach and incorporate by reference the Affidavit of Lawrence Berry, which supports the allegations relevant to this application for injunctive relief.

85. Pursuant to Rules 680 and 681 of the Texas Rules of Civil Procedure and Texas Civil Practice and Remedies Code §§ 65.011(1), (3), and (5), Plaintiffs request that the Court issue a TRO and a temporary injunction enjoining Marty Berry, Robert Rickett, Rob Powers, Mike Hummell, and the Berry Entities from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the disinterested members of the Board of Directors. Because Marty and Dennis are interested directors in any potential sale transaction by virtue of their concealed, self-dealing loan transaction with the Berry Entities, the approval of Lawrence—the sole disinterested director—is required for any such transaction. Plaintiffs further request that upon final trial on the merits, the Court award a permanent injunction against Defendants for the same activity.

86. By this filing, Plaintiffs merely seek to preserve the status quo. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("The purpose of a TRO is to preserve the status quo, which we have defined as the last, actual peaceable, non-contested status which preceded the pending controversy.") (citations and quotations omitted). At present, the Berry Entities are in negotiations to obtain a new revolving line of credit with Frost Bank, to replace the LOC with IBC. The Berry Entities have also been encumbered by $75 million worth of debt through the unauthorized and self-dealing Berry Loan. Defendants have threatened to sell, mortgage, or otherwise encumber the

18

Berry Entities' real property either to secure financing with Frost Bank or to raise money to make unauthorized payments to Marty and Dennis in service of the Berry Loan. But the Defendants are not authorized to do so absent approval from the members of the Board who are disinterested with respect to the Berry Loan—namely, Lawrence Berry. With this application for injunctive relief, Plaintiffs seek to preserve the Berry Entities' current financial status and prevent the Defendants from causing irreparable harm by selling or encumbering the Berry Entities' real property without proper authorization.

87. To obtain a TRO and temporary injunction, Plaintiffs must show a cause of action against Defendants, a probable right to relief, and probable injury. *See, e.g., Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The "probable injury" requirement has been divided into subcategories of: (1) imminent harm; (2) irreparable injury; and (3) inadequate remedy at law. *See id.* In cases involving real or personal property such as this one, the movant need not show the lack of an adequate remedy at law. TEX. CIV. PRAC. & REM. CODE § 65.011(5).

A. **Defendants have committed and threaten to commit further torts against Plaintiffs. Plaintiffs have a right to relief from such torts.**

88. Defendants are already liable for causes of action 1-4, above. If Defendants are permitted to direct the Berry Entities to sell, mortgage, or encumber the Berry Entities' real property absent authorization from the sole disinterested Director, they will continue to commit breaches of fiduciary duty and deprive the company of critical assets, causing additional damage to Plaintiffs.

89. To be entitled to a TRO and temporary injunction, Plaintiffs need not show that they will prevail at trial on these causes of action. Rather, Plaintiffs must merely plead a cause or causes of action and present some evidence that tends to sustain them. *Intercont'l Terminals Co., LLC v. Vopak North America, Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no

19

Certified Document Number: 111508476 - Page 19 of 27

pet.). The unauthorized sale or encumbrance of the Berry Entities' unique and valuable real property—especially if done in furtherance of the repayment of the self-dealing Berry Loan—would not only bolster the causes of action above but would supply all the evidence necessary for Plaintiffs to prevail on them.

90. Further, in the fiduciary self-dealing context, a "presumption of unfairness" attaches to the transactions of the fiduciary, shifting the burden to the defendant to prove the fairness of the transactions. *See Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508-09 (Tex. 1980). If that presumption cannot be rebutted at the TRO or temporary injunction stage, then the injunction should be granted if the plaintiff has presented a prima facie case of the existence of a fiduciary relationship and a probable breach of that duty. *See Health Discovery Corp. v. Williams*, 148 S.W.3d 167, 169-70 (Tex. App.—Waco 2004, no pet.). Here, Plaintiffs have made a prima facia case that Defendants owed fiduciary duties to the Berry Entities and to the other officers of the Berry Entities and that Defendants have breached those duties.

**B.     The harm facing Plaintiffs is imminent.**

91. For the purposes of obtaining an injunction, an injury is "imminent" if one has expressed "demonstrable intent to do that for which injunctive relief is sought," *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 717-18 (Tex. App.—Corpus Christi 2001, no pet.), or if the "defendant will engage in the activity sought to be enjoined." *Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no writ).

92. Defendants have already expressed an intent to pledge the Berry Entities' real property as collateral in negotiations surrounding the new line of credit with Frost Bank. Defendants have also made unauthorized offers to sell other real property belonging to the Berry Entities, including a unique and valuable commercial dock and other real property. Defendants

20

are believed to be selling such assets to raise money for further unauthorized payments in service of the self-dealing Berry Loan. Without a TRO and temporary injunction, it is exceedingly likely that Defendants will sell or encumber the Berry Entities' unique and valuable real property without first getting proper approval from Lawrence, the Berry Entities' only disinterested director, thus causing harm to Plaintiffs.

**C.    The harm facing Plaintiffs is irreparable.**

93.    If Defendants are not enjoined as requested above, the harm Plaintiffs will suffer is irreparable. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Injury is likewise irreparable if "damages [are] not presently ascertainable or readily subject to calculation." *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) (citing *Butnaru*, 84 S.W.3d at 204). Additionally, "[d]isruption to a business can be irreparable harm," and "assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy." *Intercont'l Terminals Co., LLC*, 354 S.W.3d at 896.

94.    Further, trial courts typically grant injunctive relief in "actions involving real property because real estate is generally considered unique" and "irreplaceable," such that money damages are generally inadequate. *See Chenier Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 76-77 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd) (citing cases).

95.    First, as explained above, Plaintiffs have already been damaged by Defendants' actions, but the extent of that damage is not readily ascertainable because of Defendants intentional concealment of information and the lack of clear records detailing the financial status of the Berry Entities. Additionally, Defendants actions have already caused irreparable harm to the Berry

21

Entities' decades-long banking relationship with IBC and could cause similar harm to the new banking relationship with Frost Bank. Assigning a dollar amount to remedy this kind of intangible but serious harm is not easy.

96.     Second, Plaintiffs understand that Defendants intend to pledge the Berry Entities' real property as collateral to secure an increase to the new Frost Bank line of credit, without proper authorization from the disinterested member of the Board of Directors. Should unauthorized self-dealing payments to Marty and Dennis made in service of the Berry Loan imperil the line of credit with Frost Bank such that the company's real property interests are threatened, Plaintiffs will be irreparably harmed as a result.

97.     Third, Defendants have been secretly attempting sell—without notice to or authorization from the board—other real property belonging to the Berry Entities, including the company's valuable dock facility, presumably to raise funds to make additional self-dealing payments to Marty and Dennis. The sale of any real property for that purpose must be approved by Lawrence as the only disinterested Director. If Defendants dispose of such real property without the requisite approval, Plaintiffs will be irreparably harmed.

**D.     Plaintiffs lack an adequate remedy at law, or in the alternative, are not required to prove lack of an adequate remedy at law.**

98.     Because Plaintiffs move for a TRO and temporary injunction under Section 65.011(5) of the Texas Civil Practice and Remedies Code, they are not required to prove lack of an adequate remedy at law. *See* TEX. CIV. PRAC. & REM. CODE § 65.011(5) ("A writ of injunction may be granted if: (5) irreparable injury to real or personal property is threatened, *irrespective of any remedy at law*.") (emphasis added).

99.     Alternatively, Plaintiffs have no adequate remedy at law, so a TRO and temporary injunction must issue. An irreparable injury is one that, by definition, has no adequate remedy at

22

law. *See, e.g., Kennedy v. Gulf Coast Cancer & Diag. Center at Southeast, Inc.*, 326 S.W.3d 352, 260 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("An injury is irreparable if there is no adequate remedy at law; if for example, a prevailing applicant could not be compensated adequately in damages or if damages cannot be measured by any certain pecuniary standard.") (citations omitted). As explained above, the injuries Plaintiffs will suffer—including the likely loss of unique and valuable real property belonging to the company—cannot be adequately compensated in damages, and Plaintiffs thus have no adequate remedy at law.

100. Further, to justify denial of an application for injunction, a remedy at law must be as "complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Tex. Black Iron, Inc. v. Arawak Energy Int. 'l Ltd.*, 572 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Here, the equitable relief that Plaintiffs seek is for the purpose of avoiding harm that could not be responded to fully in money damages, including threatening the status of the Berry Entities' real property interests. Damages would be an incomplete remedy at best, because the harm Defendants threatens to impose on Plaintiffs is non-monetary in part. *See RWI Constr., Inc. v. Comerica Bank*, 583 S.W.3d 269, 275 (Tex. App.—Dallas Apr. 12, 2019, no pet.) ("Generally, an adequate remedy at law exists and injunctive relief is improper where any potential harm may be adequately cured by monetary damages.").

E. **Plaintiffs are entitled to a TRO and temporary injunction and are willing to post bond.**

101. For the reasons set forth above, Plaintiffs are entitled to a TRO and temporary injunction. Plaintiffs request that upon notice and hearing, the Court enjoin Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry. Plaintiffs

23

Certified Document Number: 111508476 - Page 23 of 27

further request that upon final hearing, the Court award a permanent injunction against Defendants for the same conduct.

102. Plaintiffs stand ready willing and able to provide and file an appropriate bond as required by the Court.

## VIII. ATTORNEY'S FEES

103. Plaintiff Lawrence Berry is entitled to recover his attorneys' fees incurred in this matter pursuant to Sections 21.222 and 21.561 of the Texas Business Organizations Code.

## IX. JURY DEMAND

104. Plaintiffs hereby request a jury trial and tenders the appropriate jury fee in conjunction with filing this Original Petition.

## X. CONDITIONS PRECEDENT

105. Plaintiffs plead that all conditions precedent to the relief requested have been satisfied, waived, excused, and/or are deemed as a matter of law to have been satisfied.

## XI. PRAYER

106. Plaintiffs respectfully pray that Defendants be cited to appear and answer herein, and that the Court:

(1) Enter a temporary restraining order restraining Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry;

(2) Set a hearing for temporary injunction, and after such hearing, issue a temporary injunction enjoining Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry;

(3) Order that Plaintiffs recover from Defendants the reasonable costs and expenses Plaintiffs incurred in obtaining the temporary injunction;

24

Certified Document Number: 111508476 - Page 24 of 27

(4)     Order that Defendants produce the books and records of the Berry Entities for inspection by Plaintiff Lawrence Berry;

(5)     Order that Plaintiff Lawrence Berry recover from Defendants the reasonable costs and expenses Plaintiff incurred in obtaining the books and records;

(6)     Appoint an independent auditor and order Defendants to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023;

(7)     Set a trial date and upon final hearing enter a permanent injunction that enjoins Defendants from performing the acts described above, and order that Plaintiffs have final judgment against Defendants for breach of fiduciary duty and award:

> (i)     compensatory, actual, consequential, restitutionary, and disgorgement damages,
>
> (ii)    exemplary damages,
>
> (iii)   pre-judgment interest,
>
> (iv)    post-judgment interest,
>
> (v)     reasonable and necessary attorneys' fees and costs, and
>
> (vi)    any other relief to which Plaintiffs may show themselves justly entitled.

Dated: November 27, 2023

Respectfully submitted,

By: */s/ Barrett Reasoner*
Barrett Reasoner
State Bar No. 16641980
breasoner@gibbsbruns.com
Michael Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
L. Bruce Baldree
State Bar No. 24116064
bbaldree@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: 713.650.8805

Certified Document Number: 111508476 - Page 25 of 27

Fax: 713.750.0903

and

Butch Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
**BUTCH BOYD LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Tel: 713.589.8477

**ATTORNEYS FOR PLAINTIFF**

Certified Document Number: 111508476 - Page 26 of 27

# EXHIBIT 6

EXHIBIT 1

11/27/2023 11:34:00 AM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 81947481
By: JACKSON, MONICA
Filed: 11/27/2023 11:14:09 AM

**2023-81703 / Court: 333** E-filed in the Office of the Clerk
for the Business Court of Texas
11/20/2024 5:42 PM
Accepted by: Beverly Crumley
Case Number: 24-BC11A-0025

CAUSE NO.: _____

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC., | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § § | |
| BERRY GP, INC., | § § | |
| *Nominal Plaintiff,* | § § § | HARRIS COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY LLC, and BERRY CONTRACTING LP, | § § § § § § § § | **JURY TRIAL DEMANDED** |
| *Defendants.* | § | _____ JUDICIAL DISTRICT |

**TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS
AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION**

On this date, the Court heard Plaintiffs Lawrence Berry and Berry GP, Inc.'s application for a temporary restraining order against Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. The application was presented with notice to the Defendants. The Court, after considering Plaintiffs' TRO application, any response, the pleadings, the affidavits, any evidence submitted, and arguments of counsel, finds that the application is well-taken and should be in all things GRANTED.

In particular, the Court finds the following:

1

EXHIBIT 1

1. The evidence shows that Plaintiffs will suffer probable, imminent, and irreparable injury before the temporary injunction hearing if the Court does not issue a temporary restraining order against Defendants because Defendants have expressed an intent to pledge the Berry Entities' real property as collateral without approval from the sole disinterested Director of Berry GP, Inc., Lawrence Berry. Further, Defendants have expressed an intent to sell other real property belonging to the Berry Entities without similar approval. These actions threaten harm to the Berry Entities' real property interests such that money damages are an inadequate remedy.

2. It is necessary to enjoin the Defendants as ordered herein in order to prevent this harm.

It is therefore ORDERED that Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and any other parties acting in concert with Defendants, are immediately restrained from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry.

It is further ORDERED that the Clerk of the Court issue a writ of injunction to Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP in accordance with the terms of this Order.

It is further ORDERED the Plaintiffs Lawrence Berry and Berry GP, Inc. file a bond payable to Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP in the amount of $50,000.00 with two or more sureties as security for this temporary restraining order. The bond must be filed and approved by the Clerk of the Court before any writ of injunction may issue pursuant to this

2

EXHIBIT 1

temporary restraining order.  The Plaintiffs may post a cash deposit in lieu of a bond under Texas Rule of Civil Procedure 14c.

It is further ORDERED that Plaintiffs' application for a temporary injunction is set for hearing on the 12 day of _December_, 2023 at 10 :30 am 333rd in this Court. The purpose of the hearing is to determine whether the Court should issue a temporary injunction against Defendants as requested by Plaintiffs pending a full trial on the merits.

This Order expires on _December 12_, 2023.

EXECUTED on this ____ day of _____, 2023 at _____ o'clock ___.

Signed:
11/28/2023

12:44 pm

_____

The Honorable Judge Presiding

Unofficial Copy Office of Marilyn Burgess District Clerk

3

# EXHIBIT 7

P. 3

TRORX

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC., | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff.* | § § § | |
| BERRY GP, INC., | § § | |
| *Nominal Plaintiff,* | § § | HARRIS COUNTY, TEXAS |
| v. | § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY LLC, and BERRY CONTRACTING LP, | § § § § § § § | |
| *Defendants.* | § § | 333rd JUDICIAL DISTRICT |

**F I L E D**
Marilyn Burgess
District Clerk

DEC 07 2023

Time:_____
Harris County, Texas
By_____
Deputy

---

## AMENDED TEMPORARY RESTRAINING ORDER

---

On this date, the Court heard Plaintiffs' Motion to Modify the Temporary Restraining Order. The Court, after considering the motion, any response, the pleadings, the affidavits, any evidence submitted, arguments of counsel, and the agreement of the parties rules as follows:

In particular, the Court finds the following:

1. Plaintiffs will suffer probable, imminent, and irreparable injury before the temporary injunction hearing if the Court does not issue a temporary restraining order against Defendants.

2. It is necessary to enjoin the Defendants as follows.

It is therefore ORDERED that Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

any other parties acting in concert with Defendants, are restrained from selling any of the Berry Entities' real property.

It is further ORDERED that Defendants and any other parties acting in concert with Defendants are immediately restrained from modifying the composition of the Board of Directors of any of the Berry Entities, including but not limited to removing Lawrence Berry as a Director or diluting his vote by adding new Directors. Defendants and any other parties acting in concert are further restrained from removing Lawrence Berry from his current Officer position(s) with the Berry Entities.

It is further ORDERED that the Clerk of the Court issue a writ of injunction to Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP in accordance with the terms of this Order.

It is further ORDERED that Plaintiffs Lawrence Berry and Berry GP, Inc. have already filed sufficient bond as security for this amended temporary restraining order such that a writ of injunction may issue upon execution of this order.

The court understands that the parties have agreed to entry of a court order granting Robert Powers' and Marty Berry's Motion to Transfer Venue, and that one or more of the parties will submit a court order in support of such transfer of the case to the District Court of Nueces County, Texas. The parties agree to cooperate in the filing of any such related documents required to effectuate such transfer.

It is further ORDERED that by agreement of the parties, this amended temporary restraining order will remain in effect until the case has been transferred to Nueces County District Court and the matters raised in Plaintiffs' application for temporary injunction (including Plaintiffs' motion to modify) have been heard and ruled upon.

2

All relief requested and not granted herein in denied without prejudice.

EXECUTED on this 7th day of December, 2023 at __11:24__ o'clock _am_

_____
The Honorable Judge Tanya Garrison

Unofficial Copy Office of Marilyn Burgess District Clerk

# EXHIBIT 8

**CAUSE NO. 2023-81703**

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC. | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| BERRY GP, INC., | § § | |
| *Nominal Plaintiff,* | § § § | HARRIS COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY, LLC and BERRY CONTRACTING LP | § § § § § § | |
| *Defendants.* | § § | 333rd JUDICIAL DISTRICT |

## AGREED ORDER GRANTING DEFENDANTS MARTY BERRY'S AND ROBERT POWERS' EMERGENCY MOTIONS TO TRANSFER VENUE

On this day, the Court considered Defendants Marty Berry's and Robert Powers' Emergency Motions to Transfer Venue (the "Motions"), and after having reviewed the Motions, any response thereto (if any), the pleadings on file, affidavits on file, and the agreements as between Marty Berry, Robert Powers, and Lawrence Berry, the Court makes the following finding and rulings:

The parties stipulate and the Court finds that venue is proper in Nueces County, Texas.

Plaintiffs Lawrence Berry and Berry GP, Inc. have reached an agreement with Defendants Robert Powers and Marty Berry that venue is proper in Nueces County and to transfer venue of this case to Nueces County, Texas.

It is therefore, ORDERED that all proceedings in the above-numbered and styled cause are hereby immediately transferred to a District Court of Nueces County, Texas, and the District Clerk

and the Court's clerk are directed to and shall prepare and transfer the file immediately to Nueces County, Texas.

SIGNED this _____ day of _____, 202___.

Signed: 12/22/2023 *Dan Hinde*

JUDGE PRESIDING

Respectfully submitted,

By: */s/ Barrett Reasoner*
Barrett Reasoner
State Bar No. 16641980
breasoner@gibbsbruns.com
Michael Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
L. Bruce Baldree
State Bar No. 24116064
bbaldree@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: 713.650.8805
Fax: 713.750.0903

and

By: */s/ Butch Boyd*
Butch Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
**BUTCH BOYD LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Tel: 713.589.8477

**ATTORNEYS FOR PLAINTIFFS**

Respectfully submitted,

By: */s/ Clay Steely*
Clay M. Steely
State Bar No. 00791725
csteely@porterhedges.com
William R. Stukenberg
State Bar No. 24051397
wstukenberg@porterhedges.com
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6669

**ATTORNEYS FOR DEFENDANT ROBERT POWERS**

By: */s/ Douglas Allison*
Douglas Allison
State Bar No. 01083500
doug@dallisonlaw.com
**LAW OFFICE OF DOUGLAS ALLISON**
403 N. Tancahua Street
Corpus Christi, Texas 78401
Telephone: (361) 888-6002

**ATTORNEY FOR DEFENDANT MARTY BERRY**

2

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim Brunkenhoefer on behalf of Douglas Allison
Bar No. 1083500
kim@dallisonlaw.com
Envelope ID: 82594843
Filing Code Description: Proposed Order
Filing Description: Agreed Order Granting Defendants Marty Berry's And Robert Powers' Emergency Motions To Transfer Venue
Status as of 12/15/2023 8:32 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Sherry Rakestraw | | srakestraw@gibbsbruns.com | 12/14/2023 4:32:59 PM | SENT |
| Butch Boyd | | butchboyd@butchboydlawfirm.com | 12/14/2023 4:32:59 PM | SENT |
| Douglas AAllison | | doug@dallisonlaw.com | 12/14/2023 4:32:59 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 12/14/2023 4:32:59 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 12/14/2023 4:32:59 PM | SENT |
| William R Stukenberg | | wstukenberg@porterhedges.com | 12/14/2023 4:32:59 PM | SENT |
| Clay MSteely | | csteely@porterhedges.com | 12/14/2023 4:32:59 PM | SENT |

# EXHIBIT 9

REPORTER'S RECORD
TRIAL COURT CAUSE NO. 2024DCV-0045-C

LAWRENCE BERRY,                    )
Individually and                  ) IN THE DISTRICT COURT
Derivatively on behalf            )
Of BERRY GP, INC.                 )
                                  )
    Plaintiff                     )
                                  )
BERRY GP, INC.,                   )
    Normal Plaintiff              )
                                  )
VS.                               ) NUECES COUNTY, TEXAS
                                  )
MARTY BERRY, ROBERT               )
RICKETT;                          )
ROBERT POWERS;                    )
MICHAEL HUMMELL;                  )
BERRY GP, INC.; BERRY             )
OPERATING COMPANY, LLC;           )
and BERRY CONTRACTING,            )
LOP                               ) 94TH JUDICIAL DISTRICT


                    ------------------------------

                         JUDGE'S RULING

                    ------------------------------


    On the 25th day of March, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable BOBBY GALVAN, Judge presiding, held in Corpus Christi, Nueces, Texas;

    Proceedings reported by machine shorthand.

A P P E A R A N C E S

MR. BARRETT REASONER
SBOT NO. 16441980
MR. MICHAEL ABSMEIER
SBOT NO. 24050195
MR. BRUCE BALDTREE
SBOT NO. 24116064
Gibbs & Bruns, LLP
Houston, Texas
Telephone: (713) 650-8805

        AND

MR. BUTCH BOYD
SBOT NO. 00783694
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas 77002
Telephone: (713) 589-8744

        AND

MR. DOUGLAS A. ALLISON
SBOT NO. 01083500
Law Office of Douglas Allison
403 North Tancahua Street
Corpus Christi, Texas 78401
Telephone: (361) 888-6002

        AND

MR. VAN HUSEMAN
Huseman Law Firm
615 North Upper Broadway, Suite 2000
Corpus Christi, Texas 78401
Telephone: (361) 883-3563

        AND

MS. GABBIE S. CANALES
SBOT NO. 24012376
Law Office of Gabbie Canales
5262 South Staples, Suite 100
Corpus Christi, Texas 78411
Telephone: (361) 887-4700

P R O C E E D I N G S

March 25, 2024

(In open court.)

THE COURT: Okay. All right. So, the Court has heard evidence over a three-day period. Temporary injunction's requested. Bylaws provide for the removal and appointment of a Board of Director, so I'm not gonna interfere with that.

With regards to the second issue the Court will partially grant for any sale of real property there must be 48 hours notice to all of the Board members; whoever they may be at the time. Board members may participate by phone in the vote if they choose. This only applies to real property. Granted and rendered.

(End of requested portion.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF NUECES )

I, ALICIA BROOKS, Deputy Official Court Reporter in and for the District Courts of Nueces County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the total cost for the preparation of this Reporter's Record is $40 and was paid by Doug Allison.

WITNESS MY OFFICIAL HAND this the 26th day of March, 2024.

/S/Alicia Brooks
ALICIA BROOKS, Texas CSR #8726
Expiration Date: 03/31/2025
Deputy Official Court Reporter
Nueces County, Texas
Corpus Christi, Texas
361-888-0751

# EXHIBIT 10

EXHIBIT 2



E-filed in the Office of the Clerk
for the Business Court of Texas
11/20/2024 5:42 PM
Accepted by: Beverly Crumley
Case Number: 24-BC11A-0025

**LDMA Limited Partnership**

General Partner
Becon, Inc.
- **Dennis** – 1/3
- **Marty** – 1/3
- **Lawrence** – 1/3

Limited Partners – 97%
- **Marty, Dennis, & Lawrence** – 19% each
- **Marty, Dennis, & Lawrence Trusts** – 11 2/3% each
- **Lone Star Equipment** – 5%

**Berry GP, Inc.
(dba Berry Contracting, Inc.)**

**Bay, Inc.**

1% ownership
General Partner

**Becon Holdings, Inc. (Nevada Corp.)**

99% ownership
Limited Partner

**Berry Contracting LP
(nka) Berry Holdings, LP (Delaware)**

**Berry Operating Company LLC**

99% ownership
Limited Partner

1% ownership
General Partner

**Berry Contracting LP (Texas)
(dba Bay Ltd.)**

# EXHIBIT 11

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; ALLIED PORTS LLC, | § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § § | |
| v. | § § § | HARRIS COUNTY, TEXAS |
| AXIS MIDSTREAM HOLDINGS, LLC; ALLEN LAWRENCE BERRY; MARVIN GLENN BERRY; AND BONNIE BERRY, as successor in interest to DENNIS WAYNE BERRY | § § § § § § § | |
| *Defendants.* | § § | **___ JUDICIAL DISTRICT** |

## PLAINTIFFS' VERIFIED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

### SUMMARY OF PLAINTIFFS' CLAIMS

Plaintiffs Albert Theodore Powers ("Powers") and Allied Ports LLC ("Allied") file this lawsuit to protect their management rights and 20% interest in a crude oil delivery system and terminal project to which the Berry Defendants agreed and Plaintiffs earned. Marvin Glenn Berry ("Marty") and Bonnie Berry, as successor in interest to Dennis Wayne Berry ("Bonnie"), have made clear they will not honor their agreements even though their own brother Defendant Allen Lawrence Berry ("Lawrence") acknowledges Plaintiffs' interest. Plaintiffs need immediate assistance from the Court to restrain Defendants from conducting an unauthorized and improper purported November 6, 2024 meeting in which Marty and Bonnie intend to illegally and without authority transfer management, ownership and control of Axis Midstream Holdings, LLC ("Axis") into Berry GP, Inc., which is an entity outside the agreed to structure for the project.

1

In so doing, the Berry Defendants plan to take control of the project and deprive Plaintiffs of their management and ownership interest. If the unauthorized and improper November 6, 2024 meeting is allowed to go forward, Plaintiffs will be irreparably harmed and will have no adequate remedy for the loss of their rights and interest.

## PARTIES

1. Plaintiff Albert Theodore Powers is an individual residing in New York, New York.

2. Plaintiff Allied Ports, LLC is a Delaware limited liability company and designee of Powers' interest under the agreements with the Berry Defendants. Its registered agent's address is at 16192 Coastal Hwy, Lewes, Delaware 19958.

3. Defendant Marvin Glenn Berry is an individual residing in Nueces County, Texas. He can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever he may be found.

4. Defendant Bonnie Berry is an individual residing in Nueces County, Texas. On information and belief,[1] she is the widow and successor in interest to Dennis Wayne Berry, who is deceased. She can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever she may be found.

5. Defendant Allen Lawrence Berry is an individual residing in Harris County, Texas. He can be served at 5005 Riverway, Suite 440, Houston, Texas 77056 or wherever he may be found.

6. When appropriate, Marty, Bonnie, and Lawrence will be referred to collectively as the "Berry Defendants."

---

[1] Throughout this Petition, references to the "Berry Defendants" includes actions taken by Dennis Wayne Berry, whose interest in the Project discussed further below is now understood to be owned by his widow, Bonnie Berry.

2

7.     Defendant Axis Midstream Holdings, LLC is a Texas limited liability company.  Its sole member and manager is Lone Star Ports Enterprises, LLC.  Axis can be served through its registered agent, Mike H. Hummell, at 1414 Valero Way, Corpus Christi, Texas 78409.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction because the relief sought is within the jurisdictional limits of this Court.  At this time, Plaintiffs seek monetary and non-monetary declaratory relief and attorneys' fees and expenses.  Tex. R. Civ. P. 47.

9.     Venue is proper in this district because Powers and the Berry Defendants entered into written agreements constituting a "major transaction" providing for venue in Harris County, Texas.  Tex. Civ. Prac. & Rem. Code § 15.020.  Venue is additionally proper because one of the defendants is a citizen of Harris County, Texas, and a substantial part of the events giving rise to Plaintiffs' claims occurred in Harris County, Texas.  Tex. Civ. Prac. & Rem. Code §15.002.

## FACTS

10.     In 2018, Defendant Lawrence came up with the idea of creating a crude oil delivery and export facility in and around the Corpus Christi Port (the "Project").  Lawrence and his brothers Marty and Dennis decided to pursue the Project.  The Project has been touted by the Port of Corpus Christi as a "state-of-the-art petroleum export terminal" and the "deepest-draft safe harbor crude export facility in the nation when commissioned."[2]

11.     On October 31, 2018, Defendant Lawrence telephoned Plaintiff Powers in New York and requested him to come to Houston because he and his brothers needed Powers' expertise for the Project.  The Berry Defendants had previously worked with Powers (who was at the time of the prior engagement a business transaction lawyer).  The Berry Defendants engaged Plaintiff

---

[2] https://portofcc.com/port-of-corpus-christi-commission-approves-50-year-lease-agreement-with-carlyle-group-joint-venture/ (last accessed October 30, 2024).

3

Powers to represent them and advise them in shaping, structuring, securing financing for, and furthering development of the Project. The Berry Defendants sought Powers' expertise because they were in the process of negotiating with a private equity firm to obtain financing for the Project.

12.     Powers met with the Berry Defendants in Houston in November 2018 to, among other things, discuss his compensation in connection with his role in the Project. Powers and the Berry Defendants agreed that Powers would be paid a base compensation of $100,000 per month plus expenses.

13.     Additionally, the Berry Defendants agreed that Powers would receive a 20% interest in the Project subject to priority distributions to the Berry Defendants of $250,000,000 plus a 10% preferred return on the outstanding balance of such amount. This agreement was confirmed by the Berry Defendants at a later meeting in Houston in late November 2018 and later memorialized in a written Compensation Agreement and written Investment Agreement in 2019 (collectively, the "Agreements"). **Ex. 1**; **Ex. 2**.

14.     At first, all parties performed the Agreements. Powers spent most of his working time in Houston where he stayed in an apartment paid for by the Berry Defendants and he worked tireless hours on the Project. Powers' work involved developing and implementing a structure for the Project and trying to arrange a financing package for the Project. On behalf of the Berry Defendants and himself, Powers created several entities and drafted operating agreements for those entities. Those documents were shared and fully discussed with all of the Berry Defendants. There were various meetings (most of which took place in Houston, Texas) between Powers and the Berry Defendants to discuss the Project and the structure of the Project. In addition, Powers negotiated the terms of a potential transaction with a private equity firm on behalf of the Berry Defendants and himself. Eventually, in February 2019, Powers' efforts resulted in a signed term

4

sheet with a well-respected private equity firm, the Carlyle Group, though that transaction ultimately was not completed. As the parties had agreed, the Berry Defendants paid Powers $100,000 per month plus expenses beginning in November 2018.[3]

15. The Investment Agreement sets forth a specific process for creating and structuring the entities involved in the Project. **Ex. 2** at ¶¶ 1-2. Accordingly, Powers and the Berry Defendants set about to structure the chain of entities to hold different interests. Pursuant to the Investment Agreement, Powers formed and designated Plaintiff Allied Ports LLC to own his 20% interest.

16. In most of the documents exchanged between the parties, the agreed to corporate structure for the Project was as follows:



---

[3] In April 2020, the Berry Defendants asked Powers to defer his monthly compensation to free up cash for the Project. Knowing he had an interest in the Project, Powers agreed to do so. Since April 2020, Powers has not been paid his monthly compensation. The Berry Defendants continued to pay Powers' expenses under the agreement until June 2023. Since June 2023, Powers has neither been paid his monthly compensation nor reimbursed his expenses, in breach of the Agreements.

17.     In this agreed to structure for the Project, the five owners of the Project are listed along the top. Redfish Bay Terminals, Inc. ("Redfish") is owned by Berry GP, Inc. (the Berry Defendants' company), Capella is believed to be beneficially owned by or for the benefit of Lawrence and his family, Arcturus is believed to be beneficially owned by or for the benefit of Bonnie (through Dennis) and her family, Sirius is believed to be beneficially owned by or for the benefit of Marty and his family, and Allied Ports is owned by Powers. Thus, the Parties agreed that the Project is owned in equal percentages by the three Berry Defendants, Powers (subject to the $250 million hurdle and the 10% priority return thereon) and Redfish. This structure was reaffirmed and further memorialized in two separate written Amended and Restated Operating Agreements of Lone Star Ports Holdings, LLC (including the current Operating Agreement[4]) and has been in place for more than five years.

18.     Of the several entities formed, in particular focus in this lawsuit (and the temporary relief sought) is Defendant Axis. Axis was formed to hold intangible property of the Project, including the permitting rights associated with development of the Project. Axis's sole Member and Manager is Lone Star Ports Enterprises, LLC ("LSPE"), which through the chain of entities above is ultimately managed by Plaintiff Allied Ports, LLC.[5] Most importantly, none of the Berry Defendants (including Marty and Bonnie) have individual ownership or management rights in Axis or any other of the entities in its chain of ownership.[6]

---

[4] Lone Star Ports Holdings, LLC's applicable Operating Agreement will be provided to the Court *in camera* and separately to counsel and labeled **Exhibit 6**.

[5] LSPE's sole Member and Manager is Lone Star Ports Ventures, LLC ("LSPV"). LSPV's sole Member and Manager is Lone Star Ports Holdings, LLC ("LSPH"). LSPH has five Members, each owning 20% of the membership units. Plaintiff Allied Ports LLC is LSPH's sole Manager.

[6] Axis's applicable Operating Agreement will be provided to the Court *in camera* and separately to counsel and labeled **Exhibit 7**.

19. During the first six years of the development of the Project, almost all of the work was performed by Lawerence, Powers, staff, and third-party consultants. Very little, if any, of the work was done by Marty or Dennis Berry. However, things changed in 2024 when Marty and Bonnie sensed that the permit for the Project was about to be approved. Now, Marty and Bonnie contend that the Project is owned by the Berry Defendants and that the Plaintiffs have no ownership interest in the Project. On August 28, 2024, Mike Hummell, the General Counsel of Berry GP, Inc wrote to Lawerence expressing that the Project was only owned by the Berry Defendants:

> The Berry Companies appreciate your stated willingness to make sure that each of the companies owned jointly by you, Dennis (now Bonnie) and Marty are properly papered to reflect that ownership and management rest exclusively with the three of you. As of this writing I have not seen anything to reflect follow through on your commitment. For entities which list you as sole manager, you can make the changes without the need for any additional meetings. Some of the entities reflected involvement of people that were not or have not been approved by the Owners. Getting these matters clarified is good for everybody.

**Ex. 3**.

20. In the same letter, Hummell suggested that ownership and control of the Project should be transferred to Berry GP. *See id.* ("I suggest you, Bonnie and Marty consider consolidating ownership into a Berry entity to reflect this.").

21. In the same letter, Hummell recognized that Berry GP, Marty, or Bonnie did not own Axis and that it was instead owned by Lone Star Ports Enterprises LLC—one of the entities in the chain of ownership created as contemplated by the Investment Agreement. *Id*. The letter further requested that Lawrence provide Marty and Bonnie "with the name or names of the true owner of Axis Midstream Holdings, LLC." *Id*.

7

22.     On October 22, 2024, the Project received monumental news—the Department of the Army issued Axis a permit for construction of the Project. Almost six years of work was beginning to take shape. But just days later, Berry GP's General Counsel Hummell sent an email (acting for Berry GP, Marty, and Bonnie) indicating that he was "going to file paperwork" to change the ownership of the Axis solely to the Berry Defendants, even after he previously recognized that the Berry Defendants did not own Axis. **Ex. 4**. Changing the ownership of Axis is part of an overall plan to divest Plaintiffs of their interest by breaching the Investment Agreement by taking Axis out of the established and agreed to ownership chain of the Project now that the permit has been issued.

23.     Marty and Bonnie have purported to call a "meeting of owners" of Axis for November 6, 2024, where they intend to take action on (1) "Appointment and/or removal of Company Managers" and (2) Appointment and/or removal of Officers." **Ex. 5**. This meeting is obviously improper given Marty and Bonnie are admittedly not "owners" of Axis. Moreover, changing the ownership and management would effectively divest Allied Ports of its ownership and management rights in the Project, which constitutes a breach of the Investment Agreement.

**CAUSES OF ACTION**

**COUNT I- DECLARATORY JUDGMENT**

24.     Plaintiffs reallege and incorporate all preceding allegations.

25.     Plaintiffs seek a declaratory judgment to determine the rights, status, or other legal relations of the parties related to the ownership, the applicable operating agreements, and corporate structure of the project at issue. See Tex. Civ. Prac. & Rem. Code § 37.004(a). A dispute exists between the parties, as the Investment Agreement sets forth the proper entity structure, ownership, and management of the Project. Importantly, the Investment Agreement may be construed by the Court before there has been an actual breach. Tex. Civ. Prac. & Rem. Code 37.004.

8

26. Plaintiffs seek the following declarations:

   a. The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

   b. The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

   c. The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

   d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

**COUNT II- BREACH OF CONTRACT**

27. Plaintiffs reallege and incorporate all preceding allegations.

28. Under the Compensation Agreement and Investment Agreement, Powers is entitled to $100,000 per month plus expenses in cash compensation. Powers performed and continues to perform by providing the services set forth in the Agreements.

9

29. Lawrence, Marty, and Bonnie (through Dennis) have failed to pay Powers' compensation and expenses incurred under the Compensation Agreement and Investment Agreement, breaching the Agreements.

30. Powers has been damaged in an amount that exceeds the jurisdictional limits of this Court.

## REQUEST FOR TEMPORARY RESTRAINING ORDER

31. Plaintiffs reallege and incorporate all preceding allegations.

32. Marty and Bonnie have breached and/or intend to breach their agreements with Powers and have expressed their intent to proceed with a course of action that will result in additional breaches in the future. More specifically, if Marty and Bonnie are allowed to proceed with the purported November 6, 2024 meeting and transfer ownership, management, and control of Axis to themselves, Plaintiffs will be deprived of their agreed to and bargained for management rights and 20% interest in the Project. Indeed, "loss of management rights over a company are unique, irreplaceable, and cannot be measured by a certain pecuniary standard." *Cheniere Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd); *see also Sonwalker v. St. Luke's Sugarland P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding that termination of interest in a limited liability partnership would irreparably injure the Plaintiff because the Plaintiff would lose management rights like selecting a governing board and blocking major actions).

33. If Defendants are not immediately restrained from violating the Investment Agreement, Plaintiffs will suffer concrete, particularized and irreparable harm. Plaintiffs will lose their management rights and 20% interest, both of which are unique and cannot be purchased on the open market.

10

34. Therefore, absent Court intervention, Plaintiffs will have no adequate remedy at law. The only adequate relief, while the merits of the claims are being determined, is to maintain the status quo of ownership of Axis and all other entities and assets associated with the Project. Otherwise, Plaintiffs bargained-for rights and interest could be irreparably lost forever.

35. The injury to Plaintiffs should Defendants be allowed to proceed with breaching their agreements would greatly outweigh any injury (to the extent there is injury at all) to Defendants in delaying any change in ownership of Axis or of any other entity, property, or tangible or intangible rights associated with the Project until the Court rules on the merits of Plaintiffs' claims.

36. Accordingly, to preserve the status quo during the pendency of this action, Plaintiffs respectfully request a temporary restraining order precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions:

   a. Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

   b. Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

   c. Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

   d. Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

## REQUEST FOR TEMPORARY INJUNCTION

37. Plaintiffs reallege and incorporate all preceding allegations.

11

38.     Plaintiffs respectfully request that the Court set this application for temporary injunction for hearing.

39.     For the same reasons articulated in Plaintiffs' application for temporary restraining order, and to preserve the status quo and Plaintiffs' rights during the pendency of this action, Plaintiffs respectfully request that the Court grant and enter a temporary injunction precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions:

    a.  Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

    b.  Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

    c.  Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

    d.  Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

**CONDITIONS PRECEDENT**

40.     All conditions precedent have been performed or have been excused or waived.

**ATTORNEYS' FEES**

41.     Plaintiffs invokes and pleads Chapters 37 and 38 of the Civil Practices and Remedies Code of the State of Texas and requests an award of attorneys' fees thereunder.

12

42.     Plaintiffs had to retain the undersigned law firm to file this lawsuit and protect their rights. Plaintiffs request that this Court grant such attorney's fees as this Court may deem reasonable and necessary for representing it in this action and for any appeals thereafter.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all claims so triable.

## PRAYER FOR RELIEF

Plaintiffs request the following relief:

A.  A Declaration that:

    a.  The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

    b.  The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

    c.  The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

    d.  Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

13

B. Compensatory damages in an amount to be proven at trial;

C. Temporary and Injunctive Relief including:

    a. Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

    b. Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

    c. Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

    d. Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

D. An award of attorneys' fees in an amount to be proven at trial;

E. Pre- and post-judgment interest; and

F. All such other and further costs and relief as the Court deems just and proper.

DATED: October 31, 2024               Respectfully submitted,

                                         */s/ Alistair B. Dawson*
                                         Alistair B. Dawson
                                         State Bar No. 05596100
                                         M. Jake McClellan
                                         State Bar No. 24109525
                                         Madeline E. Gay
                                         State Bar No. 24138681
                                         E-mail: adawson@beckredden.com
                                         E-mail: jmcclellan@beckredden.com
                                         E-mail: mgay@beckredden.com
                                       1221 McKinney Street, Suite 4500
                                         Houston, Texas 77010-2010
                                         Telephone:    (713) 951-3700
                                         Telecopier:    (713) 951-3720

                                         **ATTORNEYS FOR PLAINTIFFS**

14

CAUSE NO. _____

| | | |
|---|---|---|
| **ALBERT THEODORE POWERS;** | § | **IN THE DISTRICT COURT** |
| **ALLIED PORTS LLC,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **AXIS MIDSTREAM HOLDINGS,** | § | |
| **LLC; ALLEN LAWRENCE BERRY;** | § | |
| **MARVIN GLEN BERRY; AND** | § | |
| **BONNIE BERRY, as successor in** | § | |
| **interest to DENNIS WAYNE BERRY** | § | |
| | § | |
| *Defendants.* | § | **\_\_\_ JUDICIAL DISTRICT** |

## <u>VERIFICATION</u>

| | |
|---|---|
| STATE OF NEW YORK | § |
| | § |
| COUNTY OF WESTCHESTER | § |

"My name is Albert Theodore Powers. I am over twenty-one (21) years of age and have never been convicted of a felony or crime of moral turpitude. I am of sound mind and am competent and capable of making this verification. I have read this Plaintiff's Verified Original Petition and Application for Temporary Restraining Order and Temporary Injunction (the "Petition"). The facts stated in the Petition are true and correct and based on my personal knowledge."

"My name is Albert Theodore Powers, my date of birth is February 11, 1953, and my address is 205 West 57th Street, Apartment 4C, New York, United States of America 10019. I declare under penalty of perjury that the foregoing is true and correct."

Executed in Westchester County, State of New York, on the 31st day of October, 2024.

*Albert Theodore Powers*
Albert Theodore Powers

Exhibit 1

# AGREEMENT

**THIS AGREEMENT** is made and entered into as of the 1st day of November, 2018 by and among Allen Lawrence Berry, Marvin Glen Berry, and Dennis Wayne Berry (collectively, the "**Berrys**"), and Albert Theodore Powers ("**Powers**") (each of the Berrys and Powers being referred to herein individually as a "**Party**" and collectively as the "**Parties**").

## RECITALS:

**WHEREAS**, the Berrys intend to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys (collectively, the "**Project**"); and

**WHEREAS**, the Berrys intend to finance the Project through a combination of contributions of cash and tangible and intangible property from their own resources, third party debt financing, government grants and/or subsidies, and equity contributions from outside investors; and

**WHEREAS**, the Berrys have been engaged for several months in discussions with The Carlyle Group regarding the Project and The Carlyle Group potentially providing a substantial equity investment in the Project; and

**WHEREAS**, the Berrys wish to appoint Powers to represent them and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services, upon and subject to the terms and conditions of this Agreement; and

**WHEREAS**, Powers is willing to represent the Berrys and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services upon and subject to the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1. **Appointment**. The Berrys hereby appoint Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services. It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group. In performing his duties under this Agreement, Powers shall at all times act as agent for the Berrys and shall have no power to conclude any financing arrangement for all or any portion of the Project without the express consent of the Berrys, in their sole discretion.

2. **Term of Appointment**. The term of Powers's appointment under this Agreement shall commence on the date first set forth above and shall continue until the Project is fully financed or until either the Berrys or Powers terminates this Agreement by providing at least three (3) month's written notice to the other Parties.

3. **Compensation**. As compensation for his services as representative and chief negotiator for the financing of the Project, the Berrys hereby agree to pay Powers compensation and to reimburse his expenses, as follows:

   (a) **Compensation**. The Berrys shall pay to Powers, Allied Pacific Group Limited, or such other individual or entity designated by Powers from time to time fixed ordinary compensation in the amount of One Hundred Thousand United States Dollars (US$100,000) per month during the term of his appointment under this Agreement ("**Compensation**"). Powers shall provide to the Berrys monthly invoices during the term which shall designate the account or accounts to which payments of Ordinary Compensation shall be made.

   (b) **Expenses**. In addition to Compensation, the Berrys shall promptly reimburse Powers for his actual out-of-pocket expenses incurred in performing his services pursuant to this Agreement, including without limitation travel and transportation expenses. Powers shall provide to the Berrys invoices which shall indicate the expense amounts to be reimbursed and the account or accounts to which reimbursement payments shall be made.

2

(c)    **Interest on Late Payments.** All amounts payable under this agreement shall be paid promptly and in cash or by wire transfer to such accounts as shall be designated from time to time by Powers. In the event that any amounts are not paid promptly when due, the Party liable for making such payment shall pay such amounts, plus interest thereon, at the rate of ten percent (10%) per annum on the overdue amount, without prior demand or notice.

(d)    **No Offset.** All payments of Compensation, reimbursements, and interest made pursuant to this Agreement shall be made in cash or by wire transfer to such accounts as shall be designated from time to time by Powers, without withholding or offsets of any kind, shall be non-refundable, and shall be free and clear of any and all encumbrances of any type or nature.

4.    **Investment Agreement.** In addition to the Compensation and other matters described in this Agreement, the Berrys and Powers are simultaneously with this Agreement entering into another agreement (the "**Investment Agreement**") relating to the investment by Powers or an entity designated by him in one or more limited liability companies or other entities that will hold all of the Berrys' interests in the Project and its major components in exchange for a twenty percent (20%) overall carried interest and profits interest in such limited liability companies or entities after priority distributions to the Berrys of Two Hundred Fifty Million United States Dollars (US$250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. The ownership of such limited liability companies or other entities and the entitlement to distributions from such limited liability companies or other entities shall be governed by the Investment Agreement and the governing documents of such limited liability companies or other entities.

5.    **Miscellaneous Provisions.**

(a)    **Governing Law, Jurisdiction, and Venue.** This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any

3

such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

      **(b)**     **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

      Mailing and delivery address for Allen Lawrence Berry, Marvin Glen Berry, Dennis Wayne Berry, Bay Ltd, and all Berry entities:

        Berry Group
        5005 Riverway
        Suite 440
        Houston, Texas 77056

        Email address for Lawrence Allen Berry:
        alb@riverway.us

        Email address for Marvin Glen Berry:
        captberry@aol.com

        Email address for Dennis Wayne Berry:
        berryd@bayltd.com

      Mailing and delivery address for Albert Theodore Powers, Allied Pacific Group Limited, and all Powers entities:

Albert Theodore Powers
205 West 57th Street
Apartment 4C
New York, New York 10019

Email address for Albert Theodore Powers
atpowers@allied-pacific-group.com

(c)     **Delays or Omissions**. No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

(d)     **Amendment, Waiver, and Termination**. This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

(e)     **Assignment of Rights**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berrys' interests in the Project, including any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos

5

or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

      **(f)**    **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

      **(g)**    **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

      **(h)**    **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

      **(i)**    **Specific Performance**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

      **(j)**    **No Partnership**. This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

      **(k)**    **Advice of Counsel**. Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

(l)    **Entire Agreement**.  This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

**IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

_____
ALLEN LAWRENCE BERRY

_____
MARVIN GLEN BERRY

_____
DENNIS WAYNE BERRY

_____
ALBERT THEODORE POWERS

7

Exhibit 2

# INVESTMENT AGREEMENT

**THIS INVESTMENT AGREEMENT** (the "**Agreement**") is made and entered into as of the 1st day of November, 2018 by and among Marvin Glen Berry, Dennis Wayne Berry, and Allen Lawrence Berry (collectively, the "**Berrys**"), and Albert Theodore Powers ("**Powers**") (each of the Berrys and Powers being referred to herein individually as a "**Party**" and collectively as the "**Parties**").

## RECITALS:

**WHEREAS**, the Berrys have devised a plan to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys and others at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys and others (collectively, the "**Project**"); and

**WHEREAS**, simultaneously with this Agreement, the Parties are entering into another Agreement, pursuant to which the Berrys are appointing Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services.  It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group; and

**WHEREAS**, the Berrys and Powers wish to cooperate to (a) devise an ownership structure for directly and indirectly holding the Project and each of its major components, (b) secure third party financing for the Project, and (c) own and hold a portion of all interests in the Project, upon and subject to the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1.     **Creation of Holding Structure and Contribution of Project and Project Interests**.  On or before May 31, 2019 (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees will form one or more corporations, limited liability companies, or other tax efficient limited liability entities (each a "**Project Company**" and, collectively, the "**Project Companies**) to collectively own and hold one hundred percent (100%) of all equity interests in the Project and its major components, (b) the Berrys will transfer to the Project Companies one hundred percent (100%) of their interests in the Project and each of its major components in exchange for one hundred percent (100%) of the equity interests in the Project Companies, (c) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Holding Company**") to hold all equity interests in the Project Companies, (d) the Berrys will contribute to Holding Company all equity interests in the Project Companies in exchange for one hundred percent (100%) of the equity interests in Holding Company, (e) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Investment Company**") to hold all equity interests in Holding Company, and (f) the Berrys will contribute to Investment Company all equity interests in Holding Company in exchange for one hundred percent (100%) of the equity interests in Investment Company.

2.     **Investment By Manager in Investment Company.**  Within fifteen (15) days after (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees have formed the Project Companies and transferred one hundred percent (100%) of their interests in the Project and each of its major components to the Project Companies, (b) all equity interests in the Project Companies have been contributed to Holding Company, (c) all equity interests in Holding Company have been contributed to Investment Company, and (d) the Berrys or their designees have received all equity interests in Investment Company (i) Powers will form a  limited liability company or other tax efficient limited liability entity that is wholly owned by, or for the benefit of, Powers or his designees ("**Manager**"), (ii) Powers will contribute Five Thousand United States Dollars (US$5,000.00) to Manager in exchange for one hundred percent (100%) of Manager's operating interests and other ownership rights and interests, and (iii) Manager will contribute Five Thousand United States Dollars ($5,000) to Investment Company in exchange for a twenty percent (20%) overall carried interest and future profits interest in Investment Company after priority distributions to the Berrys or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. Except for the Five Thousand United States Dollar ($5,000) contribution to Manager and Investment Company described above, none of Manager, Powers, or any of their respective designees shall have any other obligation to contribute any other amounts to Investment Company, Holding Company, or any Project Company.  The governing documents of Investment Company will reflect the respective interests of the Berrys, including their entitlement to priority distributions and preferred returns, and Investment Manager's twenty percent (20%) overall carried interest and future profits interest in Investment Company. Until the Berrys receive a priority return from Investment Company, Holding Company, and/or the Project Companies of Two

2

Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount, all gross amounts received by, or distributions made to, or on behalf of, Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and none of such amounts shall be paid or payable to or for the benefit of Manager or its designees. After the Berrys or their designees have received their priority distributions of Two Hundred Fifty Million United States Dollars plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount and Manager has received catch-up distributions from the Investment Company, eighty percent (80%) of all gross amounts received by, or distributions made to, or on behalf of Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and twenty percent (20%) of such amounts shall be paid or payable to or for the benefit of Manager or its designees. It is intended that the interests of Manager in Investment Company will qualify (i) as a carried interest within the meaning of Section 1061 of the United States Internal Revenue Code, and (ii) as a future profits interest within the meaning of Revenue Procedure 93-27, and that the governing documents of Investment Company will be drafted to reflect this intent. It is also intended that the capital accounts to be established and maintened by Investment Company will comply with the requirements of Treasury Regulations §1.704-1(b)(2)(iv) or any successor provision, and that such provisions will be interpreted and applied in a manner consistent with such Treasury Regulations or successor provisions and that the targeted allocations to be made to such capital accounts will reflect the Members' interests in the Company and have substantial economic effect. On or before the fifth (5th) day of each month, the Berrys shall provide to Manager a statement setting forth the total amounts of preferred return and priority distributions, if any, that have been received by them from Investment Company, Holding Company, and the Project Companies. Manager shall review each such statement and either confirm its agreement with the amounts shown on such statement or provide an alternative calculation of such amounts. If the Berrys and Manager do not agree on such calculation, they shall meet and attempt to reconcile their differences in the calculation of such amounts before resorting to any other remedy.

3. **Financing of Project**. To finance the development of the Project, it is anticipated that Investment Company will transfer its equity interests in Holding Company and/or one or more Project Companies to one or more other corporations, limited liability companies, or other tax efficient limited liability entities (each, a "**Project Entity**" and. collectively, the "**Project Entities**") that will be jointly owned by Investment Company and other investors that will contribute equity capital for the development of the Project. In exchange for contributing its interests in Holding Company and/or one or more of the Project Companies to such Project Entities, it is anticipated that Investment Company will receive (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive

3

interests, incentive units, or other benefits in or from the Project Entities, and (c) other amounts directly or indirectly received, or distributions made, in respect of the Project Entities, including without limitation earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, and other receipts of any type or nature in respect of or relating to the Project or any Project Company (collectively, "**Project Interests**").

      **4.**    **Distributions From Project Entities**. All (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive interests, incentive units, or other benefits in or from the Project Entities, and (c) Project Interests shall be distributed to and held by Investment Company. Distributions shall be made from Investment Company in accordance with the governing documents of Investment Company, which shall reflect the interests of the Berrys, including their entitlement to priority distributions and preferred returns, and the twenty percent (20%) carried interest and future profits interest of Manager.

      **5.**    **Miscellaneous Provisions**.

      **(a)**    **Governing Law, Jurisdiction, and Venue**. This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

      **(b)**    **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after

4

having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

Mailing and delivery address for Marvin Glen Berry, Dennis Wayne Berry, Allen Lawrence Berry, Bay Ltd, and all Berry entities:

Berry Group
5005 Riverway
Suite 440
Houston, Texas 77056

Email address for Allen Lawrence Berry:
alb@riverway.us

Email address for Marvin Glen Berry:
captberry@aol.com

Email address for Dennis Wayne Berry:
berryd@bayltd.com

Mailing and delivery address for Albert Theodore Powers and Manager:

Albert Theodore Powers
205 West 57th Street
Apartment 4C
New York, New York 10019

Email address for Albert Theodore Powers
atpowers@allied-pacific-group.com

(c) **Delays or Omissions**. No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any

5

waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

     **(d)**    **Amendment, Waiver, and Termination**. This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

     **(e)**    **Assignment of Rights**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berry Interests, including without limitation any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

     **(f)**    **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

     **(g)**    **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

     **(h)**    **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which

6

together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

      **(i)**     **Specific Performance**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

      **(j)**     **No Partnership**. This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

      **(k)**     **Advice of Counsel**. Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

      **(l)**     **Entire Agreement**. This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

      **IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

_____
ALLEN LAWRENCE BERRY

_____
MARVIN GLEN BERRY

BERRY-POWERS INVESTMENT AGREEMENT_110118.DOCX

_____
DENNIS WAYNE BERRY


_____
ALBERT THEODORE POWERS

8

Exhibit 3



P.O. Box 4858
1414 Valero Way
Corpus Christi, Texas
78469-4858
Bus: (361) 693-2100

August 28, 2024

Lawrence Berry
5005 Riverway, Ste 440
Houston, Texas 77056

    **Re:    Harbor Island Project**

Lawrence:

The Berry Companies appreciate your stated willingness to make sure that each of the companies owned jointly by you, Dennis (now Bonnie) and Marty are properly papered to reflect that ownership and management rest exclusively with the three of you. As of this writing I have not seen anything to reflect follow through on your commitment. For entities which list you as sole manager, you can make the changes without the need for any additional meetings. Some of the entities reflected involvement of people that were not or have not been approved by the Owners. Getting these matters clarified is good for everybody.

As you might imagine, the Berry Companies are anxious to recover their investment in the oil terminal project. With the recent activity regarding the Corp of Engineers permit, there is a chance for renewed interest from potential investors. At this point the Berry Companies have in excess of $18,000,000 contributed to this effort, and we remain anxious to recover these funds, or have our interest in this project recognized on paper.

You have reported that Axis Midstream Holdings LLC, the permit applicant, is owned and controlled by an entity called Lone Star Ports Enterprises LLC. The Secretary of State website reflects that entity does not exist, and is only a name reservation, by your attorney Butch Boyd. This needs to be resolved. Please advise the attorney who created your ownership tree to provide me with the name or names of the true owner of Axis Midstream Holdings, LLC.

As you know, Midway Junction, the Taft property, is owned by Lone Star Ports Holdings, LLC. Redfish Bay Terminal is owned by Berry GP, Inc. The lease at Harbor Island is owned by Canada Projects Holdings, Inc which is owned and controlled by the Trusts owned and controlled by you, Bonnie, and Marty. While this scattered structure of different entities may have been helpful at some point in time, any value in retaining it is not apparent.

With the exception of the trust contributions to the Midway Junction purchase, the Berry Companies have been the life blood for this project. I suggest you, Bonnie and Marty consider consolidating ownership into a Berry entity to reflect this. The lease at Harbor Island has been paid by us, even though it is held in another entity. It is time to recognize the company contribution.

Sincerely,

*Mike Hummell*

Mike Hummell
Vice President/General Counsel
SBN: 10271100
1414 Valero Way
Corpus Christi, TX 78409
Hummellm@bayltd.com
(361) 693-2909

MH/sg

Exhibit 4

| | |
|---|---|
| **From:** | Hummell, Mike <HummellM@bayltd.com> |
| **Sent:** | Wednesday, October 23, 2024 5:35 PM |
| **To:** | Berry, Bonnie; ALB; Tonja Fulghum Riverway |
| **Cc:** | Marty Berry AOL |
| **Subject:** | RE: Axis Midstream Holdings LLC |

I spoke with Marty and he says Berry GP ownership is fine by him. Lawrence, if that works for you then we will file the paperwork. If not, we can schedule a meeting and take a vote. Seems like an unnecessary step, but either way works.

*Mike Hummell*
*Vice President/General Counsel*
*Bay Ltd.*
Office: 361.693.2909
1414 Valero Way, Corpus Christi, TX 78409
Hummellm@Bayltd.com / www.bayltd.com



**From:** bkbathome <bkbathome@aol.com>
**Sent:** Wednesday, October 23, 2024 5:15 PM
**To:** Hummell, Mike <HummellM@bayltd.com>; ALB <alb@riverway.us>; Tonja Fulghum Riverway <TFulghum@riverway.us>
**Cc:** Marty Berry AOL <captberry@aol.com>
**Subject:** RE: Axis Midstream Holdings LLC

> **Caution:** This is an external email and has a suspicious subject or content. Please take care when clicking links or opening attachments. When in doubt, contact your IT Department

It is my understanding that Berry GP has funded this project since its inception. Therefore I belive the ownership should be reflected through Berry GP.

If this is not the case, please advise.
Bonnie

Sent from my T-Mobile 5G Device

-------- Original message --------
From: "Hummell, Mike" <HummellM@bayltd.com>
Date: 10/23/24 9:17 AM (GMT-06:00)
To: ALB <alb@riverway.us>, Tonja Fulghum Riverway <TFulghum@riverway.us>

1

Lawrence, Bonnie and Marty, I am going to file the paperwork to reflect the ownership of Axis Midstream lies in equal shares with all 3 of you. Rather than wait for a meeting I thought it most expeditious to see if we can do it by acclamation. How would you like to have ownership reflected? Individually? Through the company? The company has all the money in the permit process, and you each own equal shares. I am not sure of the difference in the filing, except to the extent it might impact taxes way on down the road. It might be best to have ownership in the company for now, and then to break it out later if need be.

*Mike Hummell*

*Vice President/General Counsel*

*Bay Ltd.*

Office: 361.693.2909
1414 Valero Way, Corpus Christi, TX 78409

Hummellm@Bayltd.com / www.bayltd.com



Exhibit 5

**NOTICE OF MEETING OF OWNERS OF**
**AXIS MIDSTREAM HOLDINGS, LLC**

**OBJECTIVE**:  Meeting of Owners

---

Notice is now given that a Meeting of the Owners has been called by Marty Berry and Bonnie Berry and will be held on Wednesday, November 6, 2024 at 10:00 a.m. located at 1414 Valero Way, Corpus Christi, Texas 78409. The following matters in particular are to be presented to the Owners for action and approval:

1.  Appointment and/or removal of Company Managers.

2.  Appointment and/or removal of Officers.

Bonnie Berry (The Estate of Dennis Berry)
1414 Valero Way, Corpus Christ, Texas 78409
1000 Shares

Marty Berry
1414 Valero Way, Corpus Christi, Texas 78409
1000 Shares

Lawrence Berry
1414 Valero Way, Corpus Christi, Texas 78409
1000 Shares

| | | |
|---|---|---|
| **ALBERT THEODORE POWERS;** | § | **IN THE DISTRICT COURT** |
| **ALLIED PORTS LLC,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **AXIS MIDSTREAM HOLDINGS,** | § | |
| **LLC; ALLEN LAWRENCE BERRY;** | § | |
| **MARVIN GLENN BERRY; AND** | § | |
| **BONNIE BERRY, as successor in** | § | |
| **interest to DENNIS WAYNE BERRY** | § | |
| | § | |
| *Defendants.* | § | **\_\_\_ JUDICIAL DISTRICT** |

## TEMPORARY RESTRAINING ORDER

On this day, Plaintiffs appeared before this Court requesting that a Temporary Restraining Order be issued against Defendants Axis Midstream Holdings, LLC, Allen Lawrence Berry, Marvin Glenn Berry, and Bonnie Berry. The Court considered Plaintiff's Application for a Temporary Restraining Order ("Application") and the verification in support, and it appears from the specific facts set forth in said Application that immediate and irreparable injury, loss, and harm will result to Plaintiffs without entry of this Temporary Restraining Order. The Court finds that should the November 6, 2024 Axis Midstream Holdings, LLC meeting go forward and Defendants were to change, alter, or transfer the management and/or ownership of Axis Midstream Holdings, LLC, and such disposition would cause irreparable harm to Plaintiffs as the management and ownership interest of Plaintiffs would not likely be recovered.

**IT IS, THEREFORE, ORDERED**, that this Temporary Restraining Order shall continue in effect until the conclusion of the hearing on the Temporary Injunction hereinafter set, or until further order of this Court, restraining and enjoining Defendants Allen Lawrence Berry, Marvin

1

Glenn Berry, Bonnie Berry, Axis Midstream Holdings, LLC, their employees, agents, representatives, and any others acting on their behalf from:

    a.  Holding the "Meeting of Owners" of Axis noticed for November 6, 2024;

    b.  Holding any meetings that in any way seek to affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project until further order of the Court;

    c.  Changing, altering, or transferring in any way the management of Axis or any other entity associated with the Project until further order of the Court;

    d.  Changing, altering, or transferring in any way the ownership, property, or tangible or intangible rights of any entity associated with the Project until further order of the Court.

**IT IS FURTHER ORDERED** that Plaintiffs post a bond in the amount of $_____.

This Order shall remain in effect until a hearing may be had on the Application for Temporary Injunction.

It is ORDERED that Defendants Allen Lawrence Berry, Marvin Glenn Berry, Bonnie Berry, Axis Midstream Holdings, LLC appeal on _____ at _____ a.m./p.m. for a hearing on Plaintiff's Application for a Temporary Injunction. The purpose of the hearing will be to determine whether this temporary restraining order should be made a temporary injunction pending a full trial on the merits.

Signed this _____ day of October, 2024 at _____ a.m./p.m.

_____
Judge Presiding

2

# EXHIBIT 12

11/27/2023 11:34:00 AM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 81947481
By: JACKSON, MONICA J
Filed: 11/27/2023 11:14:09 AM

Pgs-3

TRORX
STBNX
CASO

CAUSE NO.: _____

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and derivatively on behalf of BERRY GP, INC., | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § § | |
| BERRY GP, INC., | § § § | |
| *Nominal Plaintiff,* | § § § | HARRIS COUNTY, TEXAS |
| v. | § § § | |
| MARTY BERRY, ROBERT RICKETT, ROBERT POWERS, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY LLC, and BERRY CONTRACTING LP, | § § § § § § § | **JURY TRIAL DEMANDED** |
| *Defendants.* | § § | _____ JUDICIAL DISTRICT |

## TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION

On this date, the Court heard Plaintiffs Lawrence Berry and Berry GP, Inc.'s application for a temporary restraining order against Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. The application was presented with notice to the Defendants. The Court, after considering Plaintiffs' TRO application, any response, the pleadings, the affidavits, any evidence submitted, and arguments of counsel, finds that the application is well-taken and should be in all things GRANTED.

In particular, the Court finds the following:

1

1. The evidence shows that Plaintiffs will suffer probable, imminent, and irreparable injury before the temporary injunction hearing if the Court does not issue a temporary restraining order against Defendants because Defendants have expressed an intent to pledge the Berry Entities' real property as collateral without approval from the sole disinterested Director of Berry GP, Inc., Lawrence Berry. Further, Defendants have expressed an intent to sell other real property belonging to the Berry Entities without similar approval. These actions threaten harm to the Berry Entities' real property interests such that money damages are an inadequate remedy.

2. It is necessary to enjoin the Defendants as ordered herein in order to prevent this harm.

It is therefore ORDERED that Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and any other parties acting in concert with Defendants, are immediately restrained from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the sole disinterested member of the Board of Directors, Lawrence Berry.

It is further ORDERED that the Clerk of the Court issue a writ of injunction to Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP in accordance with the terms of this Order.

It is further ORDERED the Plaintiffs Lawrence Berry and Berry GP, Inc. file a bond payable to Defendants Marty Berry, Robert Rickett, Robert Powers, Michael Hummell, Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP in the amount of $50,000.00 with two or more sureties as security for this temporary restraining order. The bond must be filed and approved by the Clerk of the Court before any writ of injunction may issue pursuant to this

2

temporary restraining order.  The Plaintiffs may post a cash deposit in lieu of a bond under Texas Rule of Civil Procedure 14c.

It is further ORDERED that Plaintiffs' application for a temporary injunction is set for hearing on the 12 day of ___December___, 2023 at _10_ :30 am  333rd in this Court. The purpose of the hearing is to determine whether the Court should issue a temporary injunction against Defendants as requested by Plaintiffs pending a full trial on the merits.

This Order expires on __December 12__, 2023.

EXECUTED on this ____ day of _____, 2023 at _____ o'clock ___.

Unofficial Copy Office of Marilyn Burgess District Clerk

Signed:
11/28/2023                12:44 pm

_____

The Honorable Judge Presiding

3

# EXHIBIT 13

E-filed in the Office of the Clerk
for the Business Court of Texas
11/27/2024 1:23 PM
Accepted by: Beverly Crumley
Case Number: 24-BC11A-0025

CAUSE NO. 24-BC11A-0025

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; ALLIED PORTS LLC, | § § § | IN THE BUSINESS COURT |
| *Plaintiffs,* | § § | |
| v. | § § | ELEVENTH DIVISION |
| AXIS MIDSTREAM HOLDINGS, LLC; ALLEN LAWRENCE BERRY; MARVIN GLENN BERRY; AND BONNIE BERRY, as successor in interest to DENNIS WAYNE BERRY | § § § § § § | |
| *Defendants.* | § § § | HARRIS COUNTY, TEXAS |

**PLAINTIFFS' VERIFIED THIRD AMENDED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

## SUMMARY OF PLAINTIFFS' CLAIMS

Plaintiffs Albert Theodore Powers ("Powers") and Allied Ports LLC ("Allied") file this lawsuit to protect their management rights and 20% interest in a crude oil delivery system and terminal project. The three Berry brothers entered into agreements with Powers wherein he and/or Allied was entitled to, among other things, a 20% ownership interest in a company called Lone Star Ports Holdings, LLC in connection with what is referred to as the Lone Star Ports Project. After working for years on the Project – and with the Project on the verge of taking off, Defendants Marvin Glenn Berry ("Marty") and Bonnie Berry, as successor in interest to Dennis Wayne Berry ("Bonnie"), have made clear they will not honor their agreements or acknowledge Allied's ownership interest in Lone Star Ports Holdings, LLC even though their own brother Defendant Allen Lawrence Berry ("Lawrence") acknowledges Plaintiffs' interest. Further, as set forth below, Marty and Bonnie are improperly trying to take control of Defendant Axis Midstream Holdings,

1

LLC ("Axis") by improperly and without authority purporting to call a meeting of Axis for the purpose of changing the Manager and officers of Axis and otherwise taking control of Axis for their own benefit to the exclusion of the Plaintiffs. In so doing, Marty and Bonnie are improperly interfering with the governance of Axis. Plaintiffs need immediate assistance from the Court to enjoin Defendants from conducting any unauthorized and improper meetings in which Marty and Bonnie intend to illegally and without authority transfer management, ownership and control of Axis into Berry GP, Inc. or another Berry-controlled entity outside the agreed holding structure for the Project and/or transfer the ownership, assets, tangible or intangible rights, or permits for the Project to another Berry controlled interest or otherwise interfere with the governance of Axis. What limited documents have been obtained thus far confirm that the Berry Defendants plan to take control of the Project and deprive Plaintiffs of their management and ownership interests. Without the Court's intervention, Plaintiffs will be irreparably harmed and will have no adequate remedy for the loss of their rights and interest.

**PARTIES**

1.     Plaintiff Albert Theodore Powers is an individual residing in New York, New York. At the time of the events that are the subject of this lawsuit, he was a resident of New York, New York.

2.     Plaintiff Allied Ports, LLC is a Delaware limited liability company and designee of Powers' interest under the agreements with the Berry Defendants. Its registered agent's address is 16192 Coastal Hwy, Lewes, Delaware 19958.

3.     Defendant Marvin Glenn Berry is an individual residing in Nueces County, Texas. He can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever he may be found.

2

Defendant Marvin Glenn Berry may also be served through his counsel Doug Allison, Law Office of Douglas Allison,403 N. Tancahua St., Corpus Christi, Texas 78401.

4.  Defendant Bonnie Berry is an individual residing in Nueces County, Texas. On information and belief,[1] she is the widow and successor in interest to Dennis Wayne Berry, who is deceased. She can be served at 1414 Corn Products Road, Corpus Christi, Texas or wherever she may be found. Defendant Bonnie Berry may also be served through her counsel Doug Allison, Law Office of Douglas Allison,403 N. Tancahua St., Corpus Christi, Texas 78401.

5.  Defendant Allen Lawrence Berry is an individual residing in Harris County, Texas. He can be served at 5005 Riverway, Suite 440, Houston, Texas 77056 or wherever he may be found. Defendant Allen Lawrence Berry may also be served through his counsel Barrett Reasoner, Gibbs & Bruns, 1100 Louisiana Street, Suite 5300 Houston, Texas 77002.

6.  When appropriate, Marty, Bonnie, and Lawrence will be referred to collectively as the "Berry Defendants."

7.  Defendant Axis Midstream Holdings, LLC is a Texas limited liability company. Its sole member and manager is Lone Star Ports Enterprises, LLC. Axis has already been served through its alleged registered agent, Mike H. Hummell, at 1414 Valero Way, Corpus Christi, Texas 78409.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction because the relief sought is within the jurisdictional limits of this Court. At this time, Plaintiffs seek monetary and non-monetary declaratory relief and attorneys' fees and expenses in excess of $10,000,000. Tex. R. Civ. P. 47; Tex. Gov't Code 25A.001(14) (Qualified Transaction).

---

[1] Throughout this Petition, references to the "Berry Defendants" includes actions taken by Dennis Wayne Berry, whose interest in the Project discussed further below is now understood to be owned by his widow, Bonnie Berry.

3

9.     Venue is proper in this district because Powers, a citizen of New York, and the Berry Defendants, citizens of Texas, entered into agreements with a mandatory forum selection clause wherein each party consented to "exclusive jurisdiction" in Harris County, Texas to the exclusion of other courts and waived objections to Harris County as the forum and venue for the claims asserted in this lawsuit and others that may arise under the agreements. *See* **Ex. 2** (the "Investment Agreement") at § 5(a). Alternatively, the written agreements underlying Plaintiffs' claims constitute a "major transaction" providing for venue in Harris County, Texas. Tex. Civ. Prac. & Rem. Code § 15.020.[2] Venue is additionally proper because one of the defendants is a citizen of Harris County, Texas, and a substantial part of the events giving rise to Plaintiffs' claims occurred in Harris County, Texas. Tex. Civ. Prac. & Rem. Code §15.002.

## FACTS

10.     In 2018, Defendant Lawrence came up with the idea of creating a crude oil delivery and export facility in and around the Corpus Christi Port (the "Project"). Lawrence and his brothers Marty and Dennis decided to pursue the Project. The Project has been touted by the Port of Corpus Christi as a "state-of-the-art petroleum export terminal" and the "deepest-draft safe harbor crude export facility in the nation when commissioned."[3]

11.     On October 31, 2018, Defendant Lawrence telephoned Plaintiff Powers in New York and requested him to come to Houston because he and his brothers needed Powers' expertise for the Project. The Berry Defendants had previously worked with Powers (who was at the time of the prior engagement a business transaction lawyer). The Berry Defendants engaged Plaintiff

---

[2] While this lawsuit is based on agreements between Plaintiffs and the Berry Defendants, Plaintiffs are aware of a separate lawsuit pending in Corpus Christi among several members of the Berry family and employees of some of the companies that the Berry Defendants jointly own together. Plaintiffs are not parties to that lawsuit and do not seek to adjudicate any of the claims and issues being decided in that lawsuit.

[3] https://portofcc.com/port-of-corpus-christi-commission-approves-50-year-lease-agreement-with-carlyle-group-joint-venture/ (last accessed October 30, 2024).

4

Powers to represent them and advise them in shaping, structuring, securing financing for, and furthering development of the Project. The Berry Defendants sought Powers' expertise because they were in the process of negotiating with a private equity firm to obtain financing for the Project.

12.     Powers met with Lawrence Berry in Houston in November 2018 to, among other things, discuss Powers' compensation in connection with his role in the Project. They agreed that Powers would be paid a base compensation of $100,000 per month plus expenses and receive a 20% interest in the Project subject to priority distributions to the Berry Defendants. This agreement was confirmed by the Berry Defendants at a later meeting in early December 2018.

13.     This agreement was later memorialized in a written Compensation Agreement and written Investment Agreement in 2019 (collectively, the "Agreements"), confirming the compensation of $100,000 per month plus expenses and a 20% interest in the Project subject to priority distributions to the Berry Defendants of $250,000,000 plus a 10% preferred return on the outstanding balance of such amount. **Ex. 1**; **Ex. 2**. At the time that the Agreements were executed by the parties, Powers believed that the Project had a value in excess of $400,000,000. Thus, the value of Powers' ownership interest in the Project was in excess of $80,000.000.

14.     At first, all parties performed the Agreements. Powers spent most of his working time in Houston where he stayed in an apartment paid for by the Berry Defendants, and he worked tireless hours on the Project. In addition, Powers was paid the $100,000 monthly stipend for his work for eighteen months and was reimbursed for expenses as set forth in the Agreements.[4] Powers has been paid more than $2,000,000 by the Berry Defendants under the Agreements.

---

[4] In January 2020, the Berry Defendants terminated the monthly compensation portion of the Compensation Agreement effective April 30, 2020, but requested that Powers continue to work on the Project. The Berry Defendants agreed that they would continue to reimburse Powers for his expenses incurred. Knowing he had an ownership interest in the Project, Powers agreed to do so. In response to the communication from the Berry Defendants, Powers confirmed that the termination of the monthly payment had no impact on the ownership interest in the Project under the terms of the Investment Agreement. The Berry Defendants continued to pay Powers' expenses under the agreement until June 2023, when the last payment from the Berry Defendants was received.

5

15. Powers' work involved developing and implementing a structure for the Project and trying to arrange a financing package for the Project. On behalf of the Berry Defendants and himself, Powers created several entities for the Project. The formation of these entities was paid for by the Berry Defendants. Powers also drafted operating agreements for those entities. Those documents were shared and fully discussed with all of the Berry Defendants. Never once did any of the Berry Defendants ever complain or assert that the holding structure being created and put in place by Powers was wrong or inconsistent with the agreement of the parties. In addition, there were various meetings (many of which took place in Houston, Texas) between Powers and the Berry Defendants to discuss the Project and the structure of the Project. In addition, Powers negotiated the terms of a potential transaction with a private equity firm on behalf of the Berry Defendants and himself. Eventually, in February 2019, Powers' efforts resulted in a signed term sheet with a well-respected private equity firm, the Carlyle Group, though that transaction ultimately was not completed. The term sheet with the Carlyle Group values the interest of the Berry Defendants in the Project at a minimum of $400,000,000 meaning that Plaintiffs' ownership interest in Lone Star Holdings, LLC and in the Project is worth at least $80,000,000. Under the terms of the Carlyle term sheet, the Berry Defendants were to receive at least $320,000,000 for their interest in the Project.

16. The Investment Agreement anticipates that Powers would create and structure the entities involved in the Project. **Ex. 2** at ¶¶ 1-2. Accordingly, Powers and the Berry Defendants set about to structure the chain of entities to hold different interests. Pursuant to the Investment Agreement, Powers formed and designated Plaintiff Allied Ports LLC to own his 20% interest. In

6

most of the documents exchanged between the parties, the agreed holding structure for the Project was as follows:



17.     In this agreed structure for the Project, the five owners of the Project are listed along the top. Redfish Bay Terminals, Inc. ("Redfish") is believed to be owned or beneficially owned by Berry GP, Inc. (the Berry Defendants' company), Capella is believed to be beneficially owned by or for the benefit of Lawrence and his family, Arcturus is believed to be beneficially owned by or for the benefit of Bonnie (through Dennis) and her family, Sirius is believed to be beneficially owned by or for the benefit of Marty and his family, and Allied Ports is owned by Powers. Thus, the Parties agreed that the Project is owned in equal percentages by the three Berry Defendants, Powers (subject to the $250 million hurdle and the 10% priority return thereon) and Redfish. This structure was reaffirmed and further memorialized in two separate written Amended and Restated Operating Agreements of Lone Star Ports Holdings, LLC (including the current Operating Agreement) and has been in place for more than five years. Now that the permit for the Project has been obtained from the U.S. Army Corps of Engineers, the Project is worth significantly more

7

than when the Carlyle Group entered into its term sheet. Indeed, counsel for Marty and Bonnie Berry recently announced to Judge Palmer in the 215th District Court that the Project has a value in excess of $1 billion. Using that valuation (and the true value may be more), the value of Plaintiffs' ownership interest in Lone Star Holdings, LLC and in the Project is worth more than $200 million.

18. Of the several entities formed, in particular focus in this lawsuit (and the temporary relief sought) is Defendant Axis. Axis holds intangible property of the Project, including the permitting rights associated with development of the Project. Axis's sole Member and Manager is Lone Star Ports Enterprises, LLC ("LSPE"), which through the chain of entities above is ultimately managed by Plaintiffs.[5] Most importantly, none of the Berry Defendants (including Marty and Bonnie) have individual ownership or management rights in Axis. Relevant to this dispute, only LSPE has the right to call a meeting of Axis – and Marty and Bonnie have no right to call such a meeting.

19. During the first six years of the development of the Project, almost all of the work was performed by Lawerence, Powers, staff, and third-party consultants. Very little, if any, of the work was done by Marty or Dennis Berry. However, things changed in 2024 when Marty and Bonnie sensed that the most important Federal permit for the Project was about to be approved. Now, Marty and Bonnie contend that the Project is owned by the Berry Defendants and that the Plaintiffs have no ownership interest in the Project. On July 26, 2024, Powers was alerted that a meeting was being called of the "Shareholders, Directors and Owners" of some of the entities involved in the Project, including Axis. *See* **Ex. 6**. Notably, none of the owners of Axis actually

---

[5] LSPE's sole Member and Manager is Lone Star Ports Ventures, LLC ("LSPV"). LSPV's sole Member and Manager is Lone Star Ports Holdings, LLC ("LSPH"). LSPH has five Members, each owning 20% of the membership units. Plaintiff Allied Ports LLC is LSPH's sole Manager. Plaintiff Powers is the sole Manager of Allied Ports LLC.

called the meeting and those who purported to call the meeting are not owners or managers of Axis and have no legal authority to call such a meeting. In response to the attempt to call this meeting, Powers notified the Berry Defendants that he was a 20% owner of the Project and that he wanted to attend any meetings that involved the Project. *See* **Ex. 7**. Powers did attend the meeting that took place on August 6, 2024. During the course of that meeting, Powers once again described the holding structure for the Project, that Allied Ports LLC owned 20% of Lone Star Ports Holdings, LLC and that Axis was owned and managed by Lone Star Ports Enterprises, LLC. None of the Berry Defendants challenged Plaintiffs' ownership interest in the Project (or in Lone Star Ports Holdings, LLC) and none of the Berry Defendants disputed Powers' description of the holding structure for the Project. Nor did any of the Berry Defendants object to Powers' request to be notified of any future meetings to discuss or address any aspect of the Project.

20.    Despite the information that was shared with the Berry Defendants at the August 6, 2024 meeting setting forth the holding structure for the Project, on August 28, 2024, Mike Hummell, the General Counsel of Berry GP, Inc. wrote to Lawerence expressing that the Project was ***only*** owned by the Berry Defendants:

> The Berry Companies appreciate your stated willingness to make sure that each of the companies owned jointly by you, Dennis (now Bonnie) and Marty are properly papered to reflect that ownership and management rest exclusively with the three of you. As of this writing I have not seen anything to reflect follow through on your commitment. For entities which list you as sole manager, you can make the changes without the need for any additional meetings. Some of the entities reflected involvement of people that were not or have not been approved by the Owners. Getting these matters clarified is good for everybody.

9

**Ex. 3**. Stated differently, the Berry Companies were now trying to proceed with the Project without including Plaintiffs and were seeking to deprive the Plaintiffs of the ownership that they had earned.

21. In the same letter, Hummell suggested that ownership and control of the Project should be transferred to Berry GP or any Berry-owned entity. *See id.* ("I suggest you, Bonnie and Marty consider consolidating ownership into a Berry entity to reflect this.").

22. In the same letter, Hummell recognized that Berry GP, Marty, or Bonnie did not own Axis and that it was instead owned by Lone Star Ports Enterprises LLC—one of the entities in the chain of ownership created as contemplated by the Investment Agreement. *Id*. The letter further requested that Lawrence provide Marty and Bonnie "with the name or names of the true owner of Axis Midstream Holdings, LLC." *Id*.

23. On October 22, 2024, the Project received monumental news—the Department of the Army issued Axis a permit for construction of the Project. Almost six years of work was beginning to take shape. But just one day later, Berry GP's General Counsel Hummell sent an email (acting for Berry GP, Marty, and Bonnie) indicating that he was "going to file paperwork" to change the ownership of Axis *solely* to the Berry Defendants, even after he previously recognized that the Berry Defendants did not own Axis. **Ex. 4**. Changing the ownership of Axis is part of an overall plan to divest Plaintiffs of their interest by breaching the Investment Agreement by taking Axis out of the established and agreed ownership chain of the Project now that the permit has been issued.

24. Marty and Bonnie purported to call a "meeting of owners" of Axis for November 6, 2024, where they intended to take action on (1) "Appointment and/or removal of Company Managers" and (2) Appointment and/or removal of Officers." **Ex. 5**. This meeting was obviously

10

improper given Marty and Bonnie are admittedly not "owners" of Axis. Further, Marty and Bonnie intentionally did not provide notice of this meeting to Powers as he had previously requested. Moreover, changing the ownership and management would effectively divest Plaintiffs of their ownership and management rights in the Project, which constitutes a breach of the Investment Agreement. Moreover, the purported meeting of Axis violates the governing documents of Axis which give the sole right to call such a meeting to LSPE. As such, the action of Defendants Marty and Bonnie Berry affect the internal affairs of Axis. On October 31, 2024, Judge Reeder, sitting as the Ancillary Judge for Harris County, issued a Temporary Restraining Order that, among other things, restrained the November 6, 2024 meeting from moving forward. For the reasons set forth below, Plaintiffs assert their causes of action and seek the Court's assistance to enjoin the defendants from interfering with their ownership rights in the Project, interfering with the appropriate governance and internal affairs of Axis or otherwise interfering with the Project.

## CAUSES OF ACTION
### COUNT I- DECLARATORY JUDGMENT

25.     Plaintiffs reallege and incorporate all preceding allegations.

26.     Plaintiffs seek a declaratory judgment to determine the rights, status, or other legal relations of the parties related to the ownership, the applicable operating agreements, and holding structure of the project at issue. See Tex. Civ. Prac. & Rem. Code § 37.004(a). A dispute exists between the parties, as the Investment Agreement sets forth the proper entity structure, ownership, and management of the Project. Importantly, the Investment Agreement may be construed by the Court before there has been an actual breach. Tex. Civ. Prac. & Rem. Code 37.004.

27.     Plaintiffs seek the following declarations:

11

a. The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

b. The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

c. The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

**COUNT II- BREACH OF CONTRACT**

28. Plaintiffs reallege and incorporate all preceding allegations.

29. Under the Compensation Agreement, Powers is entitled to be paid for the expenses he has incurred and continues to incur in connection with this work on the Project. Powers performed and continues to perform by providing the services set forth in the Agreements.

30. Lawrence, Marty, and Bonnie (through Dennis) have failed to pay Powers' expenses incurred under the Compensation Agreement breaching the Agreements.

31.   Powers has been damaged in an amount that exceeds the jurisdictional limits of this Court.

### REQUEST FOR TEMPORARY INJUNCTION

32.   Plaintiffs reallege and incorporate all preceding allegations.

33.   Marty and Bonnie have breached and/or intend to breach their agreements with Plaintiffs and have expressed their intent to proceed with a course of action that will result in additional breaches in the future.  More specifically, Marty and Bonnie have expressed (through the General Counsel of their company) their intent to take the Project for the three Berry Defendants and to deprive Plaintiffs of their ownership interest.  As part of this plan to steal Plaintiffs' interest in the Project, Marty and Bonnie have devised a plan to either transfer Axis to another Berry entity or transfer assets held by Axis to another Berry entity.  If Marty and Bonnie are allowed to proceed to transfer ownership, management, and control of Axis to themselves, Plaintiffs will be deprived of their agreed to and bargained for management rights and 20% interest in the Project.  Indeed, "loss of management rights over a company are unique, irreplaceable, and cannot be measured by a certain pecuniary standard." *Cheniere Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd); *see also Sonwalker v. St. Luke's Sugarland P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding that termination of interest in a limited liability partnership would irreparably injure the Plaintiff because the Plaintiff would lose management rights like selecting a governing board and blocking major actions).

34.   If Defendants are not immediately enjoined from violating the Investment Agreement, Plaintiffs will suffer concrete, particularized and irreparable harm.  Plaintiffs will lose

13

their management rights and 20% interest, both of which are unique and cannot be purchased on the open market.

35. Therefore, absent Court intervention, Plaintiffs will have no adequate remedy at law. The only adequate relief, while the merits of the claims are being determined, is to maintain the status quo of ownership of Axis and all other entities and assets associated with the Project. Otherwise, Plaintiffs bargained-for rights and interest could be irreparably lost forever.

36. The injury to Plaintiffs should Defendants be allowed to proceed with breaching their agreements would greatly outweigh any injury (to the extent there is injury at all) to Defendants in delaying any change in ownership of Axis or of any other entity, property, or tangible or intangible rights associated with the Project until the Court rules on the merits of Plaintiffs' claims.

37. To preserve the status quo and Plaintiffs' rights during the pendency of this action, Plaintiffs respectfully request that the Court grant and enter a temporary injunction precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:

   a. Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC;

   b. Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis;

   c. Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis;

14

d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;

e. Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project;

f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project;

## CONDITIONS PRECEDENT

38. All conditions precedent have been performed or have been excused or waived.

## ATTORNEYS' FEES

39. Plaintiffs invokes and pleads Chapters 37 and 38 of the Civil Practices and Remedies Code of the State of Texas and requests an award of attorneys' fees thereunder.

40. Plaintiffs had to retain the undersigned law firm to file this lawsuit and protect their rights. Plaintiffs request that this Court grant such attorney's fees as this Court may deem reasonable and necessary for representing it in this action and for any appeals thereafter.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all claims so triable.

## PRAYER FOR RELIEF

Plaintiffs request the following relief:

A. A Declaration that:

a. The Compensation Agreement is a valid, enforceable, agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

b. The Investment Agreement is a valid, enforceable agreement against Lawrence Berry, Marty Berry, and Bonnie Berry (as successor to Dennis Berry);

c. The Investment Agreement provides that Plaintiff Powers owns, through his designee, Allied Ports, LLC, a twenty percent (20%) interest in the Project (as defined in the Investment Agreement) subject to "priority distributions to the Berry Defendants or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount."

d. Transferring ownership, management, and control of Axis or any other interest of the entities involved in the Project inconsistent with the entity structure provided under the Investment Agreement constitutes a breach of the Investment Agreement.

B. Compensatory damages in an amount to be proven at trial;

C. Temporary and Injunctive Relief precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:

a. Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC;

b. Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis;

16

c. Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis;

d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;

e. Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project;

f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project;

D. An award of attorneys' fees in an amount to be proven at trial;

E. Pre- and post-judgment interest; and

F. All such other and further costs and relief as the Court deems just and proper.

17

DATED: November 27, 2024   Respectfully submitted,

*/s/ Alistair B. Dawson*
Alistair B. Dawson
State Bar No. 05596100
M. Jake McClellan
State Bar No. 24109525
Madeline E. Gay
State Bar No. 24138681
E-mail: adawson@beckredden.com
E-mail: jmcclellan@beckredden.com
E-mail: mgay@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Telecopier: (713) 951-3720

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document was served on counsel of record in this matter in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 27th day of November, 2024.

*/s/ M. Jake McClellan*
M. Jake McClellan

18

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lisa Verm on behalf of Alistair Dawson
Bar No. 5596100
lverm@beckredden.com
Envelope ID: 94778675
Filing Code Description: Amended Filing
Filing Description: Plaintiffs' Verified Third Amended Petition and Application for Temporary Restraining Order and Temporary Injunction
Status as of 11/27/2024 2:07 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Douglas Allison | 1083500 | doug@dallisonlaw.com | 11/27/2024 1:23:20 PM | SENT |
| Alistair Dawson | 5596100 | adawson@beckredden.com | 11/27/2024 1:23:20 PM | SENT |
| Michael Hummell | 10271100 | hummellm@bayltd.com | 11/27/2024 1:23:20 PM | SENT |
| Michael McClellan | 24109525 | jmcclellan@beckredden.com | 11/27/2024 1:23:20 PM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Madeline Gay | | mgay@beckredden.com | 11/27/2024 1:23:20 PM | SENT |
| Business Court 11A | | BCDivision11A@txcourts.gov | 11/27/2024 1:23:20 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 11/27/2024 1:23:20 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 11/27/2024 1:23:20 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 11/27/2024 1:23:20 PM | SENT |

# EXHIBIT 14

E-filed in the Office of the Clerk
for the Business Court of Texas
1/17/2025 7:25 PM
Accepted by: Beverly Crumley
Case Number: 24-BC11A-0025



## THE BUSINESS COURT OF TEXAS
### ELEVENTH DIVISION

| | | |
|---|---|---|
| Albert Theodore Powers; Allied Ports LLC, | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Cause No. 24-BC11A-0025 |
| Axis Midstream Holdings, LLC; Allen Lawrence Berry; Marvin Glenn Berry; and Bonnie Berry as successor in interest to Dennis Wayne Berry, | § § § § § | |
| *Defendants.* | § § | |

## ORDER

On December 6, 2024, came to be heard Marvin Glenn Berry's Plea in Abatement and Motion to Abate; Movants' Motion to Remand, Dismiss and/or Transfer Venue; and Axis Midstream Holdings, LLC's Motion to Transfer Venue (the "Motions"). At this juncture, having considered the Motions; Defendant Lawrence Berry's Response to Motion to Remand, Dismiss, or Transfer Venue; Plaintiffs' Response to Defendants' Motion to Transfer Venue and Motion to Remand/Dismiss/Transfer; Plaintiffs' Response to Defendant's Plea in Abatement and Motion to Remand, Dismiss, and/or Transfer;

1

Plaintiffs' Notice Regarding Defendant Axis Midstream Holdings, LLC's Motion to Transfer Venue; Defendants' Combined Reply to Plaintiffs'/Lawrence's Response to Plea in Abatement; Defendants Marvin Glenn Berry and Bonnie Berry's Brief [filed January 9, 2025]; Responding Parties' Brief on the Moving Parties' Signature Claim; the evidence presented; the arguments of counsel; and the current status of the law, the Court **ORDERS** that the Motions are **DENIED**.

SO ORDERED.

SIGNED: January 17, 2025

_____
Hon. Sofia Adrogué
Texas Business Court, Eleventh Division

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 96382657
Filing Code Description: No Fee Documents
Filing Description: Signed Order
Status as of 1/18/2025 3:10 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 1/17/2025 7:25:52 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 1/17/2025 7:25:52 PM | SENT |
| Stephanie Sanchez | | sanchezst@gtlaw.com | 1/17/2025 7:25:52 PM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 1/17/2025 7:25:52 PM | SENT |
| Douglas Allison | 1083500 | doug@dallisonlaw.com | 1/17/2025 7:25:52 PM | SENT |
| Alistair Dawson | 5596100 | adawson@beckredden.com | 1/17/2025 7:25:52 PM | SENT |
| Roland Garcia | 7645250 | garciar@gtlaw.com | 1/17/2025 7:25:52 PM | SENT |
| Michael Hummell | 10271100 | hummellm@bayltd.com | 1/17/2025 7:25:52 PM | SENT |
| Michael McClellan | 24109525 | jmcclellan@beckredden.com | 1/17/2025 7:25:52 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 1/17/2025 7:25:52 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 1/17/2025 7:25:52 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 1/17/2025 7:25:52 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 1/17/2025 7:25:52 PM | SENT |
| Steven Higginbotham | | higginbothams@gtlaw.com | 1/17/2025 7:25:52 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 1/17/2025 7:25:52 PM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 1/17/2025 7:25:52 PM | SENT |
| Becky Young | | Becky.Young@gtlaw.com | 1/17/2025 7:25:52 PM | SENT |
| Madeline Gay | | mgay@beckredden.com | 1/17/2025 7:25:52 PM | SENT |
| Business Court 11A | | BCDivision11A@txcourts.gov | 1/17/2025 7:25:52 PM | SENT |
| Liz Poirrier | | epoirrier@beckredden.com | 1/17/2025 7:25:52 PM | SENT |
| Vanessa Gilmore | | vg@robertsmarkland.com | 1/17/2025 7:25:52 PM | SENT |
| Liz Poirrier | | epoirrier@beckredden.com | 1/17/2025 7:25:52 PM | SENT |

# EXHIBIT 15

**CAUSE NO. 2024-76060**

| | | |
|---|---|---|
| **ALBERT THEODORE POWERS;** | § | **IN THE DISTRICT COURT** |
| **ALLIED PORTS LLC,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **AXIS MIDSTREAM HOLDINGS LLC;** | § | |
| **ALLEN LAWRENCE BERRY;** | § | |
| **MARVIN GLENN BERRY; and** | § | |
| **BONNIE BERRY, as successor in** | § | |
| **interest to DENNIS WAYNE BERRY** | § | |
| | § | |
| *Defendants.* | § | **215TH JUDICIAL DISTRICT** |

## PLEA IN ABATEMENT
## MOTION TO ABATE

NOW COMES Marvin Glenn Berry ("M.Berry") and makes and files this Plea in Abatement / Motion to Abate ("M.Berry's Motion") – subject to M.Berry's Motion to Transfer Venue previously filed – and in this lawsuit (the "Second Harris County Lawsuit") would respectfully show unto this Honorable Court as follows:

### I.
### Executive Summary

1. On November 27, 2023, Lawrence Berry ("L.Berry") filed a lawsuit against M.Berry (his brother) in Harris County, Texas (Cause No. 2023-81703, 333rd Judicial District Court; the "First Harris County Lawsuit").

2. On December 6, 2023, M. Berry filed his Emergency Motion to Transfer Venue, Emergency Motion for Leave for Expedited Hearing on Motion to Transfer Venue, and Original Answer, and the matter was transferred to Nueces County, Texas, by agreement of the parties (this First Harris County Lawsuit now referred to as the "Nueces County Lawsuit" (***first-filed***)).

3. After the First Harris County Lawsuit (now the Nueces County Lawsuit) was transferred to Nueces County, Texas, M.Berry and the Berry Entities counter-sued L.Berry.

4. On October 31, 2024, approximately a year after the first-filed Nueces County Lawsuit, Albert Theodore Powers and Allied Ports LLC ("Plaintiffs") filed the instant matter in Harris County, Texas (Cause No. 2024-76060, 215TH Judicial District Court; the "Second Harris County Lawsuit").

5. Both the Nueces County Lawsuit and Second Harris County Lawsuit relate to the on-going dispute between three (3) brothers: M.Berry, L.Berry, and Dennis Berry ("D.Berry," now Bonnie Berry, surviving wife ("B.Berry")). M.Berry, L.Berry, and D.Berry may be sometimes collectively referred to as the "Berry Brothers."

6. Texas law abhors jurisdictional fights as between members of its judiciary. The rule in Texas is quite clear: the first-filed matter (the Nueces County Lawsuit) enjoys dominant jurisdiction of all matters (and interrelated matters) in dispute, and the second-filed case (the Second Filed Harris County Lawsuit) must be properly abated.

## II.
## Texas Law

7. In modern times, the seminal case discussing dominant jurisdiction is *Wyatt v. Shaw Plumbing Company,* 760 S.W.2d 245 (Tex. 1988). The *Wyatt* case affirms long-standing legal principles articulated in *Cleveland v. Ward,* 285 S.W. 1063 (Tex. 1926). With regards to the subject matter of dominant jurisdiction, the law is quite steady and consistent. The general rule is well established. **"It is well settled that when suit would be proper in more than one county, the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other courts."** *Wyatt,* at p. 248 (relying upon *Cleveland v. Ward*). As always in law, there

2

are exceptions to the general rule,[1] but none that apply to the circumstances of the present dispute. As such, this Second Harris County Lawsuit is properly abated.

8. The *Cleveland* case provides a great deal of clarity regarding the reasoning behind the long-standing rule that the first filed lawsuit acquires dominant jurisdiction. Rather than paraphrasing *Cleveland's* powerful language, please consider the following excerpts:

> "Jurisdiction is power to hear and determine the matter in controversy according to established rules of law, and to carry the sentence or judgment of the court into execution."[2]

> "When suit was filed in the Johnson County district court, the jurisdiction of that court attached, with power on the part of the court to permit the pleadings to be amended and amplified, new parties to be made, to determine all essential questions, and to do any and all things with reference thereto authorized by the Constitution and statutes, or permitted district courts under established principles of law."[3]

> "The district court of Johnson County, then, in permitting the pleadings in that court to be amended so as to bring in parties interested in and to be affected by the decree sought, acted clearly within its express statutory jurisdiction and power to permit additional parties to be made 'when they are necessary or proper parties to the suit.'"

> "The case therefore stands in that court, in so far as any jurisdictional question is concerned, precisely upon the same basis as if the original pleading filed had embraced fully the declarations of the last amendment, and had made all of those who are now parties to the suit parties in the

---

[1] There are three exceptions to the general rule articulated in *Cleveland v. Ward.* A moving party may be estopped from asserting prior active jurisdiction. The general rule may not apply if its application makes it impossible for some of the necessary parties to be brought before a court's jurisdiction. The general rule may not apply if there is a lack of intent by the parties to prosecute the first filed legal action. See *Wyatt,* at p. 248.

[2] *Cleveland* at p. 1069, citing *Banton v. Wilson*, 4 Tex. 400, 402; *Withers v. Patterson*, 27 Tex. 491, 496; *G.T. & W. Ry. Co. v. Lunn,* 141 S.W.538, 541 (Tex.Civ.App.); *Swift & Co. v. Memphis Cold Storage Warehouse Co.*, 158 S.W.480, 485.

[3] *Cleveland*, at p. 1069, citing *Reagan v. Copeland,* 78 Tex. 551, 14 S. W. 1031; *Jolley v. Oliver*, 106 S. W. 1152 (Tex. Civ. App.); *I. & G. N. Ry. Co. v. Howell,* 105 S.W. 560 (Tex. Civ. App.); *Hartford Fire Ins. Co. v. City of Houston,* 110 S.W. 973, 102 Tex. 317, 116 S. W. 36 (Tex. Civ. App.); *Latham v. Tombs*, 32 Tex. Civ. App. 270, 73 S. W. 1060; *Taylor v. Hulett,* 15 Idaho 265, 97 P. 37;, *Lanes v. Squyres*, 45 Tex. 382; *Foster v. Wright,* 217 S.W. 1091, 1092 (Tex. Civ. App.); see also *Benson v. Fulmore,* 269 S.W. 71 (Tex. Comm. App.); *Bailey v. Fly*, 97 Tex. 425, 79 S. W. 299; *Reed v. Harris*, 37 Tex. 167; *Connoly v. Hammond,* 58 Tex. 11*; McDannell v. Cherry,* 64 Tex. 177;*; Foster v. Wright, 2*17 S.W. 1090, 1092 (Tex. Civ. App.).

first instance."

"Since jurisdiction attached upon filing the suit in Johnson County, the rule is elementary that it could not be taken away or arrested by the subsequent proceedings in another court."[4]

"The Johnson County court, having first acquired jurisdiction, may exercise it to dispose of the whole subject-matter of the litigation and adjust all the equities between the parties and is entitled to do so."[5]

9. Simply stated: A court's jurisdiction is established once a first filed lawsuit is filed of record. This first filed petition has power to hear the lawsuit, including the power to hear all claims set forth in amended pleadings and all claims set forth against parties later added to the lawsuit. Jurisdiction attaches at the time of the filing of the first lawsuit, and this first filed dominant jurisdiction cannot be taken away by a subsequently filed lawsuit. The lawsuit filed later-in-time is "abated" by the filing of the first filed lawsuit.[6]

10. Texas judicial authority speaks for itself (and does so more eloquently than might ever the undersigned attorney). Please consider further judicial authority:

"The reason of the abatement of the subsequent suit by the first, where the latter is filed in a court of competent jurisdiction, and that jurisdiction has attached, is that, when the suit is brought, it is thereby segregated as it were from the general class to which it belonged, and withdrawn from the authority and jurisdiction of all other courts of coordinate power."[7]

"It is a doctrine of law too long established to require a citation of

---

[4] *Cleveland,* at p. 1070, citing *Palestine Water & P. Co. v. City of Palestine*, 91 Tex. 540, 44 S. W. 814,; *Waters-Pierce Oil Co. v. State*, 47 Tex. Civ. App. 162, 103 S. W. 836; *Arthur v. Batte,* 42 Tex. 159; *Burdett v. State*, 9 Tex. 43, 44; *Goggan & Bros. v. Morrison,* 163 S.W. 119, 120 (Tex. Civ. App); *Neill v. Johnson,* 234 S.W. 147, 150 (Tex. Civ. App.); *Phelps v. Mutual Reserve Fund Life Ass'n,* 112 F.453; *Beardslee v. Ingraham,* 183 N.Y. 411, 76 N.E. 476.

[5] *Cleveland,* at p. 1070, citing Black on Rescission and Cancellation, vol. 2, section 689; *Chambers v. Cannon*, 62 Tex. 293, 294; *Pioneer Savings & Loan Co. v. Peck,* 20 Tex. Civ. App. 111, 49 S.W. 160, 169 (writ refused).

[6] See *Cleveland*, at p. 1070 (". . . it follows that the Dallas County [second filed] case is abated by the Johnson county suit [first filed lawsuit]).

[7] *Cleveland,* at p. 1071, citing *State v. Reynolds,* 15 L. R. A. (N. S.) 963, 967; 7 Ruling Case Law, p. 1067, section 105; *Peck v. Jenness,* 7 How. 612, 624, 12 L.Ed. 841; *French v. Hay,* 22 L.Ed. 857; Freeman on Judgments (5th Ed.) vol. 1, pp. 672, 673, section 335; *Burdett v. State*, 9 Tex. 43, 44; *Maclean v. Speed*, 52 Mich. 258, 18 N. W. 396.

4

authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and, whether its decision be correct or otherwise, its judgment, till reversed, is regarded as binding in every other court; and that, where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. These rules have their foundation, not merely in comity, but on necessity. For, if one may enjoin, the other may retort by injunction, and thus the parties be without remedy; being liable to a process for contempt in one, if they dare to proceed in the other."[8]

"Having the possession and jurisdiction of the case, that jurisdiction embraced everything in the case, and every question arising which could be determined in it until it reached its termination and the jurisdiction was exhausted. While the jurisdiction lasted it was exclusive, and could not be trenched upon by any other tribunal."[9]

"Since the Dallas county district court [second filed lawsuit] had no jurisdiction of this particular case, what was done therein was necessarily void, for judicial action without jurisdiction is void.[10]

"It seems impossible that two courts can, at the same time, possess the power to make a final determination of the same controversy between the same parties. If either has authority to act, its action must necessarily be exclusive, and therefore it is our judgment that whenever either the state or the national courts acquire jurisdiction of an action and the parties thereto, this jurisdiction cannot be destroyed, diminished, or suspended by one of the parties bringing an action in another court, and that any judgment or order of the latter court is void so far as it conflicts with any judgment or order of the court first acquiring jurisdiction."[11]

"This extract from *Freeman* we believe states the sound rule, and the only rule which will prevent races from court to court by vigilant counsel, such as this record discloses, and that conflict in the exercise of judicial power in evidence here, which we believe was never contemplated under our judicial system. Courts are erected to settle controversies, not to multiply them.[12]

---

[8] *Cleveland*, at p. 1071.
[9] *Cleveland,* at p. 1071.
[10] *Cleveland,* at p. 1071.
[11] *Cleveland,* at p. 1071.

11. The logic and clarity of the Texas Supreme Court opinion in the *Cleveland* case is undeniable. The first filed case establishes jurisdiction of the entire controversy. A second filed case cannot take away, destroy, or diminish the jurisdiction of the first filed case. The second filed case is properly abated. Any rulings in the second filed case are "void."[13] **"Courts are erected to settle controversies, not to multiply them."**[14] (emphasis added).

12. The Texas Supreme Court confirmed the *Cleveland* opinion in 1988.[15] In *Wyatt*, the first filed lawsuit was filed in Duval County, and a second filed lawsuit was filed in Nueces County.[16] In its *Wyatt* opinion, the Texas Supreme Court confirmed:

> "Because there was a difference in both issues and parties, Shaw argues that the Nueces County district court was not obliged to grant the plea in abatement. We disagree. . . . When an inherent interrelation of the subject matter exists in two pending lawsuits, a plea in abatement in the second action must be granted. It is not required that the exact issues and all the parties be included in the first action before the second is filed, provided that the claim in the first suit may be amended to bring in all necessary and proper parties and issues. . . . In determining whether an inherent interrelationship exists, courts should be guided by the rule governing persons to be joined if feasible and the compulsory counter-claim rule."[17]
>
> " . . . We hold that the Nueces County district court was required to grant the plea in abatement because a previously filed suit between the parties was pending."[18]
>
> "It is well settled that when suit would be proper in more than one county, the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other courts.[19]

---

[12] *Cleveland,* at p. 1071.
[13] *Cleveland*, at p. 1071.
[14] *Cleveland,* at p. 1071.
[15] See *Wyatt.*
[16] See *Wyatt,* at p. 246.
[17] See Wyatt, at p. 247.
[18] *Wyatt,* at p. 246.
[19] *Wyatt*, at p. 248, citing *Curtis v. Gibbs,* 511 S.W.2d 263, 267 (Tex.1974); *V.D. Anderson Co. v. Young,* 128 Tex. 631, 636, 101 S.W.2d 798, 800 (1937); *Cleveland v. Ward,* 116 Tex. 1, 19, 285 S.W. 1063, 1070 (1926).

6

> "Abatement of a lawsuit due to the pendency of a prior suit is based on the principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues."[20]

13. From 1926 to present, Texas law has been quite clear. The first filed case has dominant jurisdiction. The second filed case is properly abated. As per *Wyatt*, "a plea in abatement in the second action must be granted."

### III.
### Factual Background

14. Defendant M.Berry files this Plea in Abatement / Motion to Abate in support of an orderly administration of justice. M.Berry invites this Court's consideration of the present circumstances as more fully described below.

15. On November 27, 2023, Lawrence Berry ("L.Berry") filed a lawsuit against M.Berry (his brother) in Harris County, Texas (Cause No. 2023-81703, 333rd Judicial District Court; the "First Harris County Lawsuit"). This First Harris County Lawsuit alleged M.Berry was liable for self-dealing (loaning millions of dollars to support the Berry Brothers' businesses, along with other allegations relating to interests is real property).[21] D.Berry also loaned millions of dollars to support the Berry Brothers' businesses, but was not a named defendant in the original lawsuit out of respect for his cancer diagnosis (now D.Berry's interests represented by B.Berry, Dennis' surviving wife).

---

[20] *Wyatt,* at p. 248, citing *McCurdy v. Gage,* 123 Tex. 558, 565–66, 69 S.W.2d 56, 59, *reh'g overruled per curiam and opinion adopted,* 75 S.W.2d 1107 (Tex.Comm'n App.1934).
[21] See Exhibit 1 (L.Berry's (Plaintiffs') Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction).

7

16. On November 28, 2023, L.Berry obtained an ex parte Temporary Restraining Order ("TRO"). In part, the TRO restrained M.Berry from "selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property . . . ."[22]

17. On December 6, 2023, M.Berry filed his Emergency Motion to Transfer Venue, Emergency Motion for Leave for Expedited Hearing on Motion to Transfer Venue, and Original Answer. M.Berry's Motion to Transfer venue relied, in part, upon the fact that L.Berry's lawsuit was an action that involved an "interest in real property."[23]

18. On December 7, 2023, an Amended Temporary Restraining Order ("ATRO") "restrained [M.Berry] from selling any of the Berry Entities' real property" and restrained M.Berry "from modifying the composition of the Board of Directors of any of the Berry Entities"[24] – and confirmed the "parties have agreed to entry of a court order granting . . . [M.Berry's] Motion to Transfer Venue" to Nueces County, Texas.[25]

19. On December 22, 2023, the First Harris County Lawsuit was transferred to Nueces County, Texas (now the "Nueces County Lawsuit" (*first filed*);[26] and this Berry Brothers' dispute about "Berry Entities' real property" and control of the "Board of Directors of any of the Berry Entities" (L.Berry's words) is still pending in Nueces County, Texas.

20. On January 23, 2024, M.Berry and the Berry Entities filed Counter-Plaintiff's Original Petition Asserting Counter-Claims ("Nueces County Counter-Petition") against L.Berry complaining of L.Berry's self-dealing (and other causes of action). M.Berry's and Berry Entities' Nueces County Counter-Petition complains of how Berry Entities seeded capital which – in turn – "became seed-money/assets . . . for several of the Berry-Related Entities (the

---

[22] Exhibit 2 (Temporary Restraining Order).
[23] See Texas Civil Practice & Remedies Code, Chapter 15, section 15.011.
[24] Exhibit 3 (Amended Temporary Restraining Order).
[25] Exhibit 3 (Amended Temporary Restraining Order).
[26] Exhibit 4 (Order transferring case from Harris County to Nueces County).

"Investment");" but that "L.Berry[] has engaged a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/ shareholders/directors of Counter-Plaintiffs." M.Berry and Berry Entities sue in such Counter-Petition for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, fraud, and asserts other claims.[27]

21. On February 16, March 22 and March 25, 2024, the hearing on L.Berry's Application for Temporary Injunction was heard and considered by the Honorable Judge Robert Galvan, 94TH Judicial District Court, Nueces County, Texas. With regard to L.Berry's attempt to preclude sale of real estate interests, the Honorable Judge Robert Galvan ruled "there must be 48 hours notice to all of the Board members; whoever they may be at the time." With regard to L.Berry's attempt to preclude any change of directors (serving on Board of Directors), the Honorable Judge Robert Galvan ruled " . . . the Court has heard evidence over a three-day period. Temporary injunction requested. Bylaws provide for the removal and appointment of a Board of Directors, so I'm not gonna interfere with that" – essentially denying the type-relief now sought in this new, Second Harris County Lawsuit.[28]

22. On April 15, 2024, M.Berry filed his Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claims ("Nueces County Amended Counter-Petition") against L.Berry complaining of L.Berry's self-dealing (and other causes of action). M.Berry's Nueces County Amended Counter-Petition complains of how Berry Entities invested seed money in "Berry-Related Entities (the "Investment")," . . . but that L.Berry "has engaged a series of self-dealing transactions without notice to, consultation with, or vote (in-meeting or otherwise) of a majority of the owners/shareholders/ directors of Counter-Plaintiffs." [M.Berry] In such counter-petition,

---

[27] Exhibit 5.
[28] Exhibit 6 (transcript of proceedings in Nueces County, Texas).

M.Berry and the Berry Entities sue L.Berry for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, fraud, and asserts other claims.[29]

23. On May 8, 2024, the Berry Entities propounded discovery in the Nueces County Lawsuit *(first filed)* to L.Berry. In part, these Requests for Production defined "Berry-Related Companies" to mean the "Allen Lawrence Berry 2007 Trust, . . . Gansevoort Investments LLC, . . . Axis Midstream Holdings LLC ("Axis"), Lone Star Ports LLC ("Lone Star"), . . . and Midway Junction Properties LLC ("Midway"). Moreover, the Berry Entities' formal, legal discovery in the *first-filed* Nueces County Lawsuit requested production of Axis Midstream Holdings LLC's documents (Articles of Incorporation, Certificate of Organization, Operating Agreement, Organizational Meeting documents, Articles of Organization, Membership Interest Certificate, Membership Interest transfer ledger, and Meeting Minutes for each and every meeting of Axis); and requested production of Axis Midstream Holdings LLC's "Current Balance Sheet," "consolidated financial statement," "most recent annual Profit and Loss statement," and signed "financial statement." Similarly, the Berry Entities' formal, legal discovery in the *first-filed* Nueces County Lawsuit requested production of Lone Star Port LLC's documents (Articles of Incorporation, Certificate of Organization, Operating Agreement, Organizational Meeting documents, Articles of Organization, Membership Interest Certificate, Membership Interest transfer ledger, and Meeting Minutes for each and every meeting of Lone Star Ports LLC); and requested production of Lone Star Ports LLC's "Current Balance Sheet," "consolidated financial statement," "most recent annual Profit and Loss statement," and signed "financial statement." Moreover, the Berry Entities' formal, legal discovery in the *first-filed* Nueces County Lawsuit requested production of Midway Junction Properties LLC's documents (Articles of

---

[29] Exhibit 7.

10

Incorporation, Certificate of Organization, Operating Agreement, Organizational Meeting documents, Articles of Organization, Membership Interest Certificate, Membership Interest transfer ledger, and Meeting Minutes for each and every meeting of Midway Junction Properties LLC); and requested production of Midway Junction Properties LLC's "Current Balance Sheet," "consolidated financial statement," "most recent annual Profit and Loss statement," and signed "financial statement."[30]

24. Axis Midstream Holdings LLC, Lone Star Ports LLC, and Midway Junction Properties LLC are three (3) of the critical legal entities made the subject of the Nueces County Lawsuit (*first-filed*). Reems of paper relating to these entities have already been the subject of discovery in the Nueces County Lawsuit. M.Berry and the Berry Entities have already sued L.Berry with regard to L.Berry's wrongful conduct relating to Axis Midstream Holdings LLC, Lone Star Ports LLC, and Midway Junction Properties LLC (and many, many other companies for which L.Berry engaged the same wrongful conduct).

25. M.Berry would further show that emails as between the parties confirm the specific conflict as between M.Berry, Berry Entities, and L.Berry – relating to Axis Midstream Holdings LLC, Lone Star Ports LLC, and Midway Junction Properties LLC.

**26. The matters made the subject of the *first-filed* Nueces County Lawsuit are interrelated with the matters made the subject of the Plaintiffs' Second Filed Harris County Lawsuit.**

---

[30] Exhibit 8.

27. Plaintiffs' Second Harris County Lawsuit – filed about a year after the Nueces County Lawsuit – alleges that "Marty and Bonnie contend that the Project is owned by the Berry Defendants [aka Berry Entities] . . . ." Plaintiffs Second Harris County Lawsuit endeavors to enjoin M.Berry and the Berry Entities from having meetings that "affect the management or ownership interest of Axis or any other entity, property, or tangible or intangible rights associated with the Project," or "[c]hanging . . . management of Axis or any other entity associated with the Project." These exact fights have already occurred in Nueces County, Texas, and more to come – apparently – in Nueces County Texas. Both lawsuits involve disputes relating to control of Berry-Related Entities (as between L.Berry, M.Berry, B.Berry, and the Berry Entities), and both lawsuits involve disputes relating to interests in real property (the same real properties).

28. As noted above, since 1926 to present, Texas law has been quite clear. The first filed case has dominant jurisdiction. The second filed case is properly abated. As per *Wyatt*, "a plea in abatement in the second action must be granted."

> "Since jurisdiction attached upon filing the suit in [Nueces] ~~Johnson~~ County, the rule is elementary that it could not be taken away or arrested by the subsequent proceedings in another court."[31]

> "The [Nueces] ~~Johnson~~ County court, having first acquired jurisdiction, may exercise it to dispose of the whole subject-matter of the litigation and adjust all the equities between the parties and is entitled to do so."[32]

---

[31] *Cleveland,* at p. 1070, citing *Palestine Water & P. Co. v. City of Palestine*, 91 Tex. 540, 44 S. W. 814,; *Waters-Pierce Oil Co. v. State*, 47 Tex. Civ. App. 162, 103 S. W. 836; *Arthur v. Batte,* 42 Tex. 159; *Burdett v. State*, 9 Tex. 43, 44; *Goggan & Bros. v. Morrison,* 163 S.W. 119, 120 (Tex. Civ. App); *Neill v. Johnson,* 234 S.W. 147, 150 (Tex. Civ. App.); *Phelps v. Mutual Reserve Fund Life Ass'n,* 112 F.453; *Beardslee v. Ingraham,* 183 N.Y. 411, 76 N.E. 476.

[32] *Cleveland,* at p. 1070, citing Black on Rescission and Cancellation, vol. 2, section 689; *Chambers v. Cannon*, 62 Tex. 293, 294; *Pioneer Savings & Loan Co. v. Peck,* 20 Tex. Civ. App. 111, 49 S.W. 160, 169 (writ refused).

12

"Because there was a difference in both issues and parties, [Allied will] ~~Shaw argues~~ that the Harris ~~Nueces~~ County district court is ~~was~~ not obliged to grant the plea in abatement. We [Texas Supreme Court] disagree[s] . . . . When an inherent interrelation of the subject matter exists in two pending lawsuits, a plea in abatement in the second action **must be granted.** It is not required that the exact issues and all the parties be included in the first action before the second is filed, provided that the claim in the first suit may be amended to bring in all necessary and proper parties and issues . . . "[33] (emphasis added).

" . . . We hold that the Harris ~~Nueces~~ County district court was required to grant the plea in abatement because a previously filed suit between the parties was pending."[34]

**"It is well settled that when suit would be proper in more than one county, the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other courts.**[35]  (emphasis added)

**"Courts are erected to settle controversies, not to multiply them."**[36]

29. Texas law is quite clear.  In a matter such as this, the second filed action must be abated until such time as the first filed matter (the Nueces County Lawsuit) is completed – inclusive of all matters that may be interrelated and adjudicated therein.  Applying Texas law to the circumstances of the present litigation can yield but one conclusion:  the Nueces County Lawsuit (***first-filed***) acquired dominant jurisdiction, and the Second Harris County Lawsuit is properly abated.

---

[33] See Wyatt, at p. 247.
[34] *Wyatt,* at p. 246.
[35] *Wyatt*, at p. 248, citing *Curtis v. Gibbs,* 511 S.W.2d 263, 267 (Tex.1974); *V.D. Anderson Co. v. Young,* 128 Tex. 631, 636, 101 S.W.2d 798, 800 (1937); *Cleveland v. Ward,* 116 Tex. 1, 19, 285 S.W. 1063, 1070 (1926).
[36] *Cleveland,* at p. 1071.

13

WHEREFORE, PREMISES CONSIDERED, M.Berry prays that this Plea in Abatement / Motion to Abate be in all things granted and sustained; that this Second Harris County Lawsuit be abated until such time as all matters in controversy in the Nueces County Lawsuit are completely resolved and/or dismissed with prejudice; that this Second Harris County Lawsuit be dismissed, and for such other and further relief to which M.Berry may show himself justly entitled.

Respectfully Submitted,

**LAW OFFICES OF DOUGLAS ALLISON**
403 N. Tancahua Street
Corpus Christi, Texas 78401
T:      361-888-6002
F:      361-888-6651
E:      doug@dallisonlaw.com

BY:      _/s/ Douglas A. Allison_____
**DOUGLAS A. ALLISON**
State Bar No. 01083500

Attorney for Marvin Glenn Berry

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing document has been or will be served upon all counsel of record for the parties in accordance with the Texas Rules of Civil Procedure on this the 8th day of November 2024.

_/s/ Douglas A. Allison_____
**DOUGLAS A. ALLISON**

14

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 94117586
Filing Code Description: Motion (No Fee)
Filing Description: Plea in Abatement Motion to Abate
Status as of 11/11/2024 1:27 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas AAllison | | doug@dallisonlaw.com | 11/8/2024 5:05:59 PM | SENT |
| Alistair B. Dawson | | adawson@beckredden.com | 11/8/2024 5:05:59 PM | SENT |
| Michael JakeMcClellan | | jmcclellan@beckredden.com | 11/8/2024 5:05:59 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 11/8/2024 5:05:59 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 11/8/2024 5:05:59 PM | SENT |

# EXHIBIT 16

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
THE BUSINESS COURT OF TEXAS,
11TH DIVISION

ALBERT THEODORE POWERS;   )
ALLIED PORTS, LLC         )
    Plaintiffs,           )
                       )
V.                        )
                       ) CAUSE NO. 24-BC11A-0025
AXIS MIDSTREAM HOLDINGS,  )
LLC; ALLEN LAWRENCE       )
BERRY; MARVIN GLENN       )
BERRY; AND BONNIE BERRY,  )
As successor in interest  )
To DENNIS WAYNE BERRY     )
    Defendants.           )

*******************************************

HEARING ON MARTY GLENN BERRY'S PLEA
AND ABATEMENT AND MOTION TO ABATE;
THE MOVANT'S MOTION TO REMAND, DISMISS,
AND TRANSFER VENUE PURSUANT TO CHAPTER 25;
DEFENDANT, AXIS MIDSTREAM HOLDINGS',
MOTION TO TRANSFER VENUE

*******************************************

On the 6th day of December, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Sofia Adrogue, Judge presiding for the 11th Division Business Court, held in Houston, Harris County, Texas:

Proceedings reported by machine shorthand.

A P P E A R A N C E S


Mr. Alistair B. Dawson
BECK REDDEN, LLP
SBOT: 05596100
Mr. M. Jake McClellan
SBOT: 24109525
1221 McKinney Street
Suite 4500
Houston, Texas 77056
713-951-3700
ATTORNEYS FOR ALBERT T. POWERS

          -AND-

Mr. Roland Garcia
GREENBERG TRAURIG, LLP
SBOT: 07645250
1000 Louisiana Street
Suite 7600
Houston, Texas 77002
713-374-3500
ATTORNEY FOR ALLIED PORTS, LLC

          -AND-

Mr. Barrett Reasoner
GIBBS & BRUNS LLP
SBOT: 16641980
Mr. Michael Absmeier
SBOT: 24050195
Mr. Bruce Baldree
SBOT: 24116064
1100 Louisiana
Suite 5300
Houston, Texas 77002
713-650-8805
ATTORNEYS FOR A. LAWRENCE BERRY

-AND-

Mr. Douglas Allison
LAW OFFICES OF DOUGLAS ALLISON
SBOT: 01083500
403 N. Tancahua Street
Corpus Christi, Texas 78401
361-888-6002
Ms. Vanessa Diane Gilmore
SBOT: 07960010
609 Main Street
Suite 3930
Houston, Texas 77002
713-651-1400
ATTORNEYS FOR DEFENDANTS MARTY BERRY, BONNIE BERRY & AXIS
MIDSTREAM HOLDINGS, LLC

**I N D E X**
**VOLUME 1**
**HEARING ON MARTY GLENN BERRY'S PLEA**
**AND ABATEMENT AND MOTION TO ABATE;**
**THE MOVANT'S MOTION TO REMAND, DISMISS,**
**AND TRANSFER VENUE PURSUANT TO CHAPTER 25;**
**DEFENDANT, AXIS MIDSTREAM HOLDINGS',**
**MOTION TO TRANSFER VENUE**

|  | Page | Vol. |
|---|---|---|
| **DECEMBER 6, 2024** | | |
| Appearances.................... | 9 | 1 |
| Defendant Marty Berry's Plea and Abatement and Motion To Abate..................... | 9 | 1 |
| Plaintiff Albert Powers' Argument on the Plea and Abatement and Motion to Abate... | 31 | 1 |
| Movant's Argument on The Motion To Remand, Dismiss, and Transfer Venue........................... | 60,99 | 1 |
| Plaintiff Albert Powers' Argument on the Motion to Remand, Dismiss,and Transfer Venue........................... | 95 | 1 |
| Defendant Axis Midstream Holdings' Argument on the Motion To Transfer Venue.............. | 99 | 1 |
| Plaintiff Albert Powers' Argument on the Motion to Transfer Venue................ | 100 | 1 |
| Court Reporter's Certificate... | 103 | 1 |
| Exhibit Certificate........... | 104 | 1 |

**EXHIBITS**
**MARTY BERRY'S EXHIBIT**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Companies' Organizational Chart | | 74 | 1 |
| 2 | Axis Midstream Holdings,LLC Application for Permit | | 75 | 1 |
| 3 | Map of Real Property Owned | | 76 | 1 |

MARTY BERRY'S EXHIBIT CONT.D.

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 4 | Overlay Image | | 76 | 1 |
| 5 | Van Huseman E-mail to Barrett Reasoner | | 76 | 1 |
| 6 | Plaintiffs' Verified Original Petition And App for TRO | | 76 | 1 |
| 7 | Agreement | | 77 | 1 |
| 8 | Investment Agreement | | 77 | 1 |
| 11 | Signed TRO | | 78 | 1 |
| 12 | Plaintiffs' Verified First Amended Petition And Application for Temporary Restraining Order and Temporary Injunction | | 78 | 1 |
| 13 | Plaintiffs' Verified Second Amended Petition And Application for Temporary Restraining Order and Temporary Injunction | | 78 | 1 |
| 14 | Plaintiffs' Verified Third Amended Petition And Application for Temporary Restraining Order and Temporary Injunction | | 78 | 1 |
| 15 | Plaintiffs' Original Verified Petition And Application for Temporary Restraining Order and Temporary Injunction | | 79 | 1 |
| 16 | Signed TRO Against Defendants and Order Setting Hearing for TI | | 79 | 1 |
| 17 | Signed Amended TRO | | 79 | 1 |
| 18 | Signed Order Transferring Venue | | 80 | 1 |
| 19 | Plaintiffs' Second Amended Petition | | 80 | 1 |
| 20 | Counter-Plaintiffs' First Amended Original Petition Asserting Counter-Claim | | 80 | 1 |
| 21 | Motion for Temporary Injunction Transcript | | 81 | 1 |
| 22 | Judge's Ruling | | 81 | 1 |
| 23 | First Set of Requests For Production to Allen Lawrence Berry | | 81 | 1 |

**MARTY BERRY'S EXHIBIT CONT.D**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 25 | Counter-Plaintiffs' Second Amended Original Petition Asserting Counter-Claims | 82 | 1 | |
| 26 | Amended and Restated Operating Agreement - In Camera Review | 83 | 1 | |
| 27 | Transfer of Interest - In Camera Review | 83 | 1 | |
| 28 | Transfer of Interests and Change of Manager Agreement - In Camera Review | 83 | 1 | |
| 29 | Bylaws - In Camera Review | 83 | 1 | |
| 30 | Transfer of Interests - In Camera Review | 83 | 1 | |
| 31 | Bylaws of Red Fish Bay Terminal, Inc.- In Camera Review | 83 | 1 | |
| 32 | Loan Star Ports - Term Sheet | 83 | 1 | |
| 33 | LSP Compensation and Investment Agreement | 83 | 1 | |
| 34 | Letter Dated Sept. 25, 2019 From Berry GP | 83 | 1 | |
| 35 | Transfer of LSPE Interests - In Camera Review | 83 | 1 | |
| 36 | Termination of Lease - POCCA | 83 | 1 | |
| 37 | E-mail From G. Reed Requesting Reimbursement | 83 | 1 | |
| 38 | E-mail From Ramirez to Powers | 83 | 1 | |
| 39 | E-mail Dated July 26, 2024 From Doug Allison To Mike Hummell | 83 | 1 | |
| 40 | Beacon, Inc. - Aug. 6, 2024 | 83 | 1 | |
| 42 | Plaintiffs' Original Petition | 83 | 1 | |
| 43 | Plaintiffs' First Amended Petition | 83 | 1 | |
| 44 | Orca Assets GP, LLC Organizational Meeting | 84 | 1 | |
| 45 | Purchase and Sale Agreement | 84 | 1 | |
| 46 | E-mail - Organizational Structure | 84 | 1 | |

```
MARTY BERRY'S EXHIBIT CONT.D.
NO.          DESCRIPTION          OFFERED   ADMITTED      VOL.

50 Affidavit of Mike Hummell                  84          1

ALBERT POWERS' EXHIBIT
NO.          DESCRIPTION          OFFERED   ADMITTED      VOL.

1  Temporary Injunction                       84          1

2  Investment Agreement                        84          1

3  Consulting Agreement                        84          1

4  Plaintiffs' Second Amended Petition         84          1

5  Counter-Plaintiffs' First Amended
   Original Petition Asserting
   Counter-Claims                              84          1

6  Motion to Temporary Injunction
   Transcript                                  84          1

7  Temporary Injunction Hearing
   (March 22, 2024) Small Version              84          1

8  Temporary Injunction Hearing
   (March 22, 2024) Large Version              84          1

11 Transfer - Allen Lawrence Berry Trust       84          1

12 Transfer - Axis Midstream Holdings , LLC    84          1

13 Transfer - Gansevoort Investments, LLC      84          1

14 April 23, 2020 E-mail                       84          1

15 Counter-Plaintiffs' Second Amended
   Original Petition Asserting Counter-Claims  86          1

16 Demonstrative Handout                       86          1
```

**P R O C E E D I N G S**

THE COURT: Good morning. We will now be on the record and thank you very much. This is the Cause No. 24-BC11A-0025. And before us, from our perspective, we have notices of hearing of Marty Glenn Berry's plea and abatement and motion to abate; the Movant's motion to remand, dismiss, and transfer venue pursuant to Chapter 25; we also have the Defendant, Axis Midstream Holdings', motion to transfer venue. And I am appreciative --

Let's see, where are all my boxes, the two boxes?

Okay. I'm going -- I have -- thank you for all the great work. We appreciate it and actually they were used and scrutinized. I can't say I've memorized them, but I definitely, definitely looked at them, so we appreciate it very, very much. Okay. If we will make appearances by counsel.

MR. ALLISON: Plaintiff first or...

THE COURT: Go ahead. Yes, please.

MR. DAWSON: Your Honor, Alistair Dawson for Albert Ted Powers, Plaintiff.

MR. GARCIA: Roland Garcia for Allied Ports.

MR. MCCLELLAN: Jake McClellan for Plaintiff, Ted Powers.

MR. REASONER: Barrett Reasoner for Defendant,

Lawrence Berry.

MR. BALDREE: Bruce Baldree also for Defendant, Lawrence Berry.

MR. ABSMEIER: Mike Absmeier also for the Defendant, Lawrence Berry.

MS. GILMORE: Vanessa Gilmore here for one of the named Defendants, Marvin Berry, goes by Marty Berry.

MR. ALLISON: And Doug Allison also here for Marty Berry, and Bonnie Berry, and Axis Midstream Holdings, LLC.

THE COURT: Thank you very much. Okay. Are you ready to proceed?

MR. ALLISON: My motion?

THE COURT: Yes.

MR. ALLISON: Okay. And my intention, your Honor, right now is to probably give you some background.

THE COURT: Perfect.

MR. ALLISON: And then to offer some exhibits; and then if need be, I don't think we're going to get there, but if need be, to offer some predicate for exhibits if the Court chooses.

THE COURT: Okay.

MR. ALLISON: Okay.

THE COURT: And if to the degree that you are adhering to the exhibits you gave me in the notebook, just --

just tell me.

MR. ALLISON: And I'm sorry, say that...

THE COURT: If -- if you are referencing the exhibits from the notebook that you gave me, as I surmise you are --

MR. ALLISON: Yes.

THE COURT: -- if you give me the number, then I can prepare.

MR. ALLISON: Okay.

THE COURT: Thank you. Okay.

MR. ALLISON: And at first -- okay. And I think we are addressing first the plea and the abatement is my understanding?

THE COURT: Yes.

MR. ALLISON: And I think I need to give the Court probably some more general background just so you have some -- it's not a small timeframe we're looking at here. We're looking at really going back to 2018.

THE COURT: Absolutely.

MR. ALLISON: Okay.

THE COURT: Yes.

MR. ALLISON: And really we go before that in the sense that Marty Berry and Bonnie Berry, she is the surviving wife of Dennis Berry, who recently passed. So, you'll hear me say Bonnie or Dennis sometimes interchangeably;

and then Lawrence Berry, who's -- what I've characterized in my pleadings as the friendly Defendant, okay, those three brothers really through their father and their mother were in business really for the last 20, 30 years, okay. And it has been for years two out of three votes is what's required according to the bylaws and the rules, and those bylaws are in the -- in the Court's record. The bylaws for Red Fish Bay Terminal and Berry GP, Inc., which we call Berry GP, all of those entities require two out of three votes. And that has always for a long time, for years and years been two out of three brothers and now Bonnie in the place of Lawrence.

They developed or wanted to develop a project in Harbor Island. That is our backyard down there in Nueces County, Texas. And the idea was to put a large-scale terminal into place there, an oil -- crude oil transport facility. And so that idea became something that got some momentum back in 2018 by their doing some development on it on their own, maybe even 2017, and they had agreements with the Port of Corpus Christi. By the way, that lease with the Port of Corpus Christi has since terminated, and that's, I think, in some of the records. And then they did -- Lawrence, actually, not they. That's actually a very important distinction. Lawrence Berry contacted Ted Powers and brought him in. I know your Honor knows that there is a dispute with regard to -- with regard to whether that document was signed by all the

brothers, okay. But they brought in -- or Lawrence, like I say, really brought in Ted Powers and they paid him. There's no doubt they compensated them. I think our view is we did pay him about 2 million dollars, and that 2 million dollars is for services rendered. And those were really services rendered with regard to a lease. This group had a lease with the Port of Corpus Christi, which the Port of Corpus Christi terminated and the project died, done, okay.

Separately, and it's very separately, there are companies (and this becomes very important, your Honor) the companies really to understand the structure, it's Marty, Lawrence, and Dennis were the three brothers.

MR. GARCIA: May we approach?

THE COURT: Of course. No problem.

MR. ALLISON: I'll get back as far as I can, too, where I have a little bit of a stand.

THE COURT: That's fine. Perfect. Thank you so much. We can all join.

MR. ALLISON: Sure.

THE COURT: That's a good use.

MR. ALLISON: Talk about underutilization.

THE COURT: I can't even -- I'm ignoring y'all.

MR. ALLISON: It's not what I meant. It's not what I meant.

MS. GILMORE: Donna, Vanessa.

MR. ALLISON: Okay. The corporate structure that the Berrys have operated with for years is -- it's a series of limited partnerships, and corporations, and LLC obviously, designed for what we all know it's designed for in terms of allocating business and also protection, okay. And Marty, and Lawrence, and Dennis for years were the three percent, okay, and the 97 percent of LDMA. By the way, that's Laura, that's mom; D is Dennis; M is Marty; A is Allen Lawrence Berry. Don't get it confused, it's Allen Lawrence, but he goes by Lawrence. Okay. So the control always has been the three brothers with 97 percent of the company being -- well, most of that 97 percent being held in trust and also individually and as limited partners, the other 97 percent.

So LDMA then is the partnership that chooses the directors for Berry GP, which I always call the mother ship. It's the everything happens through Berry GP. Berry GP, for example, owns a hundred percent of Red Fish Bay Terminal. And I'm not going to get all the percentages right, but Berry GP through those three directors operates through Bay, Inc., Big Con Holdings, Inc., Berry Holdings, LP, Berry Operating Company, and Bay, LTD. You'll see in the financial exhibits, for example, that the money for this Midstream project, this Axis Midstream project and that work, all the workers, the people that run the office, all of them are here so really everything flows here, to Red Fish Bay or here out

of the trusts to Canada Programs Holdings, and from here to what we call Lone Star Ports Holdings, which owns some land, okay.

That has been the structure for a long, long time. Lawrence separately created, he did, he created Axis Midstream. And this part, by the way, on this chart, I think this is the only section that's not disagreed on.

THE COURT: Okay.

MR. ALLISON: Lawrence created Axis Midstream and through his trust transferred it to Gooseabort [sic] Investments, which was solely his, also. Sorry, Gansevoort Investments, okay.

THE COURT: That's okay.

MR. ALLISON: And then into Berry GP, okay. And to be honest with you, your Honor, that's the -- that's where the agreement between the parties ends, okay. And what I mean by that is their claim is that then Axis went to Red Fish Bay Terminals, which by the way has been a Berry company since 1978, okay, and then it's their claim that Berry GP, even though there was no two-out-of-three vote, even though the other brothers, Dennis and Marty, didn't know about it, their claim is that Dennis unilaterally transferred Axis to Red Fish Bay Terminals. Red Fish Bay Terminals, and I think up here there's three people who control Berry GP, Red Fish Bay Terminals a hundred percent owned by GP, but there's four

directors instead of three. But you still need a majority vote, but Lawrence Berry unilaterally, only his signature on the document, transferred to Lone Star Holdings, to Lone Star Ventures, to Lone Star Enterprises, to Axis.

So these are things that were done -- the only signature -- and just to be candid, it's certainly worth looking at their exhibits. We don't disagree, again, that Lawrence had ability to transfer through these entities over here. He did, he was sole owner and sole manager; but we are certain that it would require two out of three votes. And I need to make a correction. I had double-dipped accidently when I was merging some spreadsheets on costs and there's some numbers in the briefing that say 25 million invested, it's 15 million.

THE COURT: Thank you.

MR. ALLISON: And it's 10 million from Berry GP directly, which really came from Bay, LTD, and then it's 6.2 million from -- and this is really nine something and then this one 6.2, 6.2 million through Canada Programs Holdings, which is owned by Marty's, Lawrence's, and Dennis' trusts. Those were all set up, I think, in 2007. It goes back a long ways.

So -- sorry, let me go for a while.

MS. GILMORE: Okay. You got it.

MR. ALLISON: The corporate structure is so --

it just really highlights, your Honor, how this -- how this is intertwined, which I know your Honor knows this is a $64,000 question. Right now they think that Axis Midstream is owned and controlled by Allied. We don't think any of these transfers are valid from Berry to Red Fish or from Red Fish to Lone Star Holdings. So, we think that Axis is still up here in Berry GP. I bet it's interesting in the case, your Honor, that they've sued Marty Berry, who doesn't claim ownership in Axis. They've sued Bonnie Berry who does not claim ownership in Axis. They haven't even sued the entity. And of course the reason they haven't is this entity is in the Corpus litigation, too. They haven't even sued the entity that owns Axis Holdings Midstream, according to the paperwork as implemented through the bylaws. And what I'm saying there is they haven't sued the company that requires a two-out-of-three vote in order to transfer it.

So what we really have we think, your Honor, is we have a fight -- and I get that they want to say this is all about our contract, okay, which by the way, we didn't even know he was claiming. We thought when -- we thought when Lone Star Ports and there's -- it's all in the record, too, your Honor. When Lone Star Ports, the project died over there as with Carlyle and Mr. Powers, when that died and first of all, his contract was terminated for -- the compensation agreement was clearly terminated in early 2020. We have

records that show -- and they're in the record. There was a lawsuit here in Harris County as between the Berry brothers and between them and Carlyle where Butch Boyd, who you'll recall was on the phone call the other day --

THE COURT: Yes, thank you.

MR. ALLISON: Okay -- he's Lawrence's lawyer and he filed a lawsuit getting it to have it declared that the Berrys, the three brothers, were a hundred percent owners of this project, which then the lease got terminated on. So we hadn't heard -- Marty Berry and Mr. Dennis Berry haven't heard from Mr. Powers for three, four years until we get the permit from Axis, okay, and then here we are. We set up a meeting. I would invite you to read the transcript of the meeting from August 6th, 2024. We started that meeting to try to figure out what's going on because we had no idea that he was going to be claiming an interest in it four years after the fact when we thought that the project with the Port had died.

Now, how does that relate specifically then to the litigation in Corpus Christi? That litigation in Corpus Christi was originally instituted by Lawrence Berry here in Harris County.

THE COURT: 2023.

MR. ALLISON: The Court -- Judge, I think it's Reeder. I apologize. At one point I couldn't read the signature and I wrote Redden.

THE COURT: It's fine.

MR. ALLISON: Okay. I figured that out finally.

THE COURT: We figured it out.

MR. ALLISON: Judge Reeder entered the TRO. It enjoined Berry GP and Marty, just like he's been enjoined in this lawsuit, from selling real property or encumbering it. It's the same real property, okay. So that lawsuit got filed and then got transferred to Corpus Christi, Nueces County by agreement, because that's where we still believe all the venue should lie. We then proceeded to do discovery, and I guess this is probably the best way to put it. I reference all the transactions that occurred or they say Axis is now over here that we're just now really coming to appreciate what they've done. Lawrence Berry -- think about this for a minute -- Lawrence Berry knows there's a two-out-of-three vote required. It's in the transcripts that are in the record, exhibits in this case. He testified all the time two out of three votes for this, two out of three votes for that, sometimes we win, sometimes it's me against the two, sometimes I'm on the winning side, sometimes it's usually unanimous, okay.

So for years when they were working effectively, everybody understands it takes a two-out-of-three vote to get anything out of Berry GP; but nonetheless, if you look at the documents, the one person who signed for Berry GP

was Lawrence Berry. I will say Dennis Berry's name is on it for Red Fish Bay, and that really didn't alarm us because Red Fish Bay Terminal is a hundred percent owned by Berry GP. So they wanted to do that, we really -- it doesn't comply with the two-out-of-three rule out of Berry GP, but that's what the document says. But to get from Berry GP to Red Fish Bay Terminal, Inc. -- oh, excuse me, to get from Red Fish Bay Terminal, Inc. to Lone Star Ports Holdings would require majority of the four directors. All this paperwork is in the record. Those four directors, so you'd need three out of four to sign it or approve it at a board meeting. Never happened, nobody even disputes or says it happens. If you look at their briefing, their argument is, "Well, we sent it to them, so they should have known." That's not the same "them" as respectfully -- it's not the same thing as a corporate approval or resolution. In fact, it's way, way short of that.

But Dennis -- excuse me, Lawrence is the only one who signed that document supposedly transferring from Red Fish Bay Terminals to Lone Star Ports Holdings. And he signed it for Red Fish Bay Terminal, even though he's not majority, and he signed it for Lone Star -- excuse me, Lone Star Ports Holdings. And then he signed another document, Lawrence Berry did. He signed the one that went from Lone Star Ports Holdings saying I'm transferring it to Lone Star -- Lone Star Ports Ventures and then he, Lawrence, also signed for Lone

Star Ports Ventures saying I accept it. And then he signed another one that says he was for Lone Star Ports Ventures and he says he signed it for them again transferring it to Lone Star Ports Enterprises saying I'm accepting it for Lone Star Ports Enterprises.

So we haven't even seen -- by the way, there's these other entities up here. They say I think it's Lawrence's position and I guess Mr. Powers' position that these entities up here, Capella, Arcturus, and Sirius, which we've never heard of, okay, they say they created those companies for Marty and Dennis, but I'm guessing that Lawrence signed those papers, too. That's a guess at this point. I've asked for that paperwork, haven't gotten it. So, I mean, Lawrence is sort of truly the Don Juan of any blank that needs to be signed for any of these corporations. I mean, he -- he apparently thinks he can work unilaterally.

Why is that important? Because the lawsuit in this -- I got digressed there a little bit, but the lawsuit in Nueces County was all about that. The lawsuit was all about how he thought he was the sole disinterested director and, therefore, should be unilaterally allowed to sign documents for transfer of real property. Okay. And I think for all purposes. We had that huge fight. That ended up with the judge ruling because they had put it also in their temporary restraining order. They had put it in the TRO in then what's

now in the Nueces County lawsuit. They had put it in there that we could not remove him as a director because when we started finding out that he's out there signing things like, you know, and we have no idea what he signed, okay, and people might misinterpret that, we said we've got to be real clear he's not a director, so we removed him from the board. We only removed him from the board after the judge ruled on the temporary injunction and denied their relief requested with regard to that.

The judge also -- originally, the TRO in Nueces County, like I said, tied up the Berry entities, all of them, just like the one does in this case. It ties up all the Berry entities. Well, I say that. It says, all the Berry entities related to the project, and the Berry entities related to the project would be Marty, Lawrence, Dennis, the three trusts. Canada Programs Holdings, by the way, I didn't point this out earlier, is the one that owns all the land -- excuse me, leases all the land in Harbor Island. There's going to be a huge fight between Canada Programs Holdings, and I think they think the land ought to be in Harbor Island properties. There's going to be a huge fight because they -- they can't develop the project without the land.

We've been paying Berry GP and Canada Programs Holdings have paid 6.2 million dollars over the last three or four years in order to have this land on hold. That is the

very land that Axis' permit is approved for. They cannot do the project without this fight, okay. I mean, we have the land under lease and have for years. It's cost us 6.2 million dollars over the last three or four years to hold on to that land. They also need this land that's right here that Marty Berry and his trust paid a million dollars for. That's going to be a fight. And that has to do with Marty's trust. They also then when you get into this Red Fish Bay Terminals land, there's an employee of Berry GP and really Bay, LTD through Berry GP because all the control is here, there's an employee named Robert Rickett. And Robert Rickett was sued, even though he's a land guy basically, he got sued in the lawsuit that is now in Nueces County. He got sued because what they do, and they've done it for years, is they would have people like Robert go out and buy land and hold it in their name because they didn't want to run up the price. They didn't want the word out that Berry's buying land, okay. And so he holds it nominally in his name for Berry GP, and so they sued him and it's all in the Court's documents, they sued him saying we want that land. You've got to transfer that for the project, for this project. That hasn't happened yet either.

So there's going to be a huge fight. That one's really going to be Berry GP who controls where Robert Rickett will put that name into whichever entity and the directors here. And really, I guess, it's going to be

controlled here, but all that control comes from the top, okay. And so that land is the very land that they need in order to do storage tanks. In order to develop the project, there's going to have to be storage tanks somewhere other than Harbor Island.

And let me give you that picture so you'll understand it. I just talked about Marty owning some land, Marty Berry owning some land that was -- that he spent the million dollars on through his trust. That land is in Taft, Texas. Think of it as further north in San Patricio County. And then we have the land held by Robert Rickett, some of it is, and some of it is held by Red Fish Bay Terminals. All of it controlled by Berry GP, which is controlled by two-thirds vote, which is Bonnie and Marty, Defendants, my clients. So I wouldn't hold my breath looking for a vote to give it away to them now, okay. And so we're going to have a huge fight about them needing that land. That is the very land within the Axis permit. Let me say that again. The Axis permit identifies the land way north in Taft that it wants to use that Marty Berry paid for. That's part of the permit. And it has a pipeline that goes down to Aransas Pass which is there on the water which is where Red Bay Fish Terminals owns land. And that land is owned and controlled by Berry GP, some of it nominally through Robert Rickett; and then in order to do anything with the permit, they also have to have land over on

Harbor Island. Harbor Island is the place where the ship docks can be built, okay. So they are on the ship channel and that land is leased by Canada Programs Holdings from what we call the Ed Rachal Foundation.

Okay. They're the owner of the property, but we have that leasing agreement to use it for this project, which again, we've been owning that for years and paid millions for it. So although on the one hand, you know -- well, and I should tell the Court this. And we have -- I looked hard at the case law and I didn't -- sometimes when you do something that people go, "Oh, yeah, we had to do that otherwise there's no overlap and the cases aren't intertwined." The case law is very, very clear if you looked at the White opinion or the Cleveland opinion. And I always cite to those because those were just sort of bedrock, okay, to me and I've been in these jurisdictional fights before. But I will say that in terms of really understanding dominant jurisdiction, some of the cases they cite and I cite is that JB Hunt case, and the Encore case, and the Phillips case. And all of those cases make it very clear that when there's a plea of privilege filed, like we have here, that there is a -- it's the first pleading to be heard. And the reason for that speaks volumes; and that is, we show respect in Texas to other Texas courts. It is about comity, it is about convenience, it is about honoring another court's jurisdiction. All those

cases very clearly say that once a court accepts jurisdiction, which down in Nueces County that's been happening for the past year, accepts and exercises -- really they don't have to exercise. Once they acquire, is the word the cases use, once they acquire jurisdiction, that it is their case, the Nueces County Court in this instance, it is their case to adjudicate all of it and whatever are the interrelated matters until conclusion, okay, period.

And we do that because, and I'm going to, respect for the law and the respect that is shown from one court to another. And I'm sure you're keenly aware of this, so I probably don't have to say this and it's in the briefing. But the statute says you have concurrent jurisdiction. It doesn't say that it's a superior jurisdiction. You certainly -- this Court has a unique carveout of the types of cases it has and has a right and jurisdiction. I know I've pushed back a little bit on subject matter jurisdiction. We probably have subject matter jurisdiction, okay, but the cases are very clear when two courts have subject matter jurisdiction and when two courts can have proper venue, you go with the first filed and that's what dominant jurisdiction is. And the last three cases I named, the J.B. Hunt, the Phillips, and the Encore case really do a nice job of saying, and we know it's kind of a quasi-venue issue because really what you're doing is letting another venue take care of the

litigation.

And I would really commend those cases for a close read, but again I always start with Wyatt and I always start with Cleveland because it shows how long this time-honored process is for courts with concurrent jurisdiction to have respect for each other. And I get into the else what. What happens if we don't do that? I mean, I already have pleadings down there in Nueces County and we went ahead and filed them; although, I can file them at any time because the court down there requires jurisdiction not only of the pleadings that have already been filed, but any -- and Cleveland and Wyatt are very clear on this -- that court down in Nueces has jurisdiction of any intertwined-related litigation that it takes on that's related to the dispute before it, okay. I can't come out of the blue with something, but anything that would be interrelated, that court in Nueces requires first jurisdiction. I say that with respect. I've learned a long time ago never tell a court you don't have power. You have subject matter jurisdiction, like I said.

But it is a matter of respect, and comity, and honoring what's been Texas jurisprudence for, you know, ten decades. Else we do what? We have a pleading down there that says what, that we're asking the Court to declare this transfer void and to declare this transfer void. They don't have a project without it. How much more intertwined can we

be? We have -- right now these three trust -- again, Dennis is now exercised by Berry -- that's by Bonnie, excuse me. And then so with Bonnie and Marty, two out of three votes control Canada Programs Holdings. They don't have any land for their permit without this land. They can't do it. You've got to have water on the ship channel to build a port. This land up here, I suppose they could try to go to another location, but the Axis permit specifies this location already. They'd have to go change the permit, which you don't want to do. I've been down that road. That's a -- when you start amending permits, anything that's a major amendment with Army Corps of Engineers is not a small task. So all of this -- in our mind, to say that this does not -- this is just one piece.

By the way, we have another company and I've put a little bit in the pleadings and a little bit in the exhibits to show it. There's another company where right now Lawrence sort of did the same thing or did the same thing with Orca, started signing things and transferring property; and we still haven't traced it all down yet either, okay. But remember, it's been going on for about a year, but it's taking a while and we're figuring out where all the properties are. And, again, if you look at that August 6, 2024 recent transcript, you'll see Marty Berry on there and Bonnie Berry on there saying, "We're just trying to figure out what you did and what's happening; we didn't know." And I know they have

some e-mails that said we sent it to you, but if you know Marty Berry much, that's not saying much. And it's certainly not a two-thirds vote.

I know that's been a lot of explanation. I guess I'm going to yield to other counsel. I think it probably makes sense to me that I not offer the exhibits. They're already in the record, but I'll offer them formally in a moment, but I think I'm better probably yielding now.

MS. GILMORE: Your Honor, may I just add one or two things to my co-counsel's argument this morning?

THE COURT: Of course.

MS. GILMORE: And I want to state for the record, your Honor, that that was not my phone that went off a few moments ago.

THE COURT: I didn't even hear it. I didn't -- I'm so --

MS. GILMORE: I'm going to -- I'm going to -- I'm going to be up here to support him and throw him under the bus at the same time.

MR. ALLISON: I didn't know.

THE COURT: The good news is I'm worried about my phone going off. I think we are all good.

MS. GILMORE: But to put it a little bit differently, you know, Mr. Allison obviously is concerned about making sure that we're not seeing anything that could be

potentially offensive to the Court in terms of you don't have jurisdiction, but, you know, for almost 30 years I had a book on my shelf by James Wagstaffe called Three Cases Off Your Docket By Monday. And the very first point in that book was that you should test jurisdiction first. And as Ms. Johnson already pointed out, not subject matter jurisdiction. Obviously, both courts have subject matter jurisdiction, but both of these cases are about control of the Axis property. Both Marty Berry and Lawrence Berry are both involved in both lawsuits. Now, the Defendant's position is going to be that everybody wasn't involved in the other lawsuit, and that is true; but all of the things that in which people are interested in, the control of that property, are the subject of both lawsuits. Frankly, it would probably be wise of them to come down and try to intervene in that other lawsuit in Nueces County to make sure that their interests are protected in that case. But we've already got a scenario where we had a three-day hearing in Nueces County in which the court did not grant all of the relief that was originally requested in the first lawsuit by Lawrence Berry and has allowed the company to go forward with some of the things that it needs to do to handle and run his businesses.

So we have already a potential conflict setup here because we've got a TRO in place that is really contrary to the ruling that's already in place in Nueces County that

did not give Lawrence Berry the relief that he wanted in terms of controlling what happens. So we've got already a conflict situation set up. So it's not an issue of whether or not both courts have subject matter jurisdiction, they do. Dominant jurisdiction is really the issue here, in which case should go forward first and should it be the case that was first filed. Even though all the parties that are in this litigation are involved in that other litigation, all of the interests and issues that both sides are interested in already involved in that Nueces County. So that's sort of the 10,000-foot view. And Mr. Allison was in the weeds explaining all of the things that make us clear -- that make it clear that the issues are inextricably intertwined, that the parties are intertwined, that the interests are intertwined. And so given the fact that he's sort of laid the groundwork for all that already showing how intertwined they are, then we really do have to just look at the dominant jurisdiction issue, which is really more of a venue issue. You can either, you know, abate this case and wait until the Nueces County case is finished or dismiss this case and say everybody should go down to Nueces County or transfer the venue of this case to the Nueces County case and ask for those cases and the issues to be consolidated. Any of which would be appropriate and the thing that should happen as the first order of business.

I don't think that we're going to get to

needing to do another temporary injunction hearing in this case because the issues are so interrelated that it really is frankly a waste of the Court's judicial resources to start all over again. And then if you have a ruling that is contrary to the ruling of the court in Nueces County, then what do we do? That judge says we can do one thing, this Court says we do something else. We've got a complete impasse in terms of which court has the proper authority or which court we should follow in terms of what actions we take as a company. And so I think that that really puts us in a situation where we really should be here talking only about whether or not this case should be abated, whether or not there is actual jurisdiction, and whether or not we could get this case off your docket by Monday.

THE COURT: Thank you.

MR. DAWSON: May I proceed, your Honor?

THE COURT: Of course.

MR. DAWSON: Your Honor, today is not the day to get into the merits of this case. I will respond, just to clarify the record a little bit, to some of what I've heard from opposing counsel, but that is not the issue before the Court. Respectfully, the only issue that you have to decide today is the venue issue, and I'll get to that in a moment. But just so, you know, I heard Mr. Allison say, "Well, my clients, Marty and Bonnie, they don't claim to own Axis

Midstream." Well, that's not what they said before they came into this courtroom. The documents that are attached as Exhibit 3, 4, and 5 to our third amended petition, they are communications involving Bonnie, and Marty, and Mr. Hummell, who is here today, in which they claim they owned a hundred percent of Axis. And they called a meeting for the purpose of removing the manager and setting forth new directors. And that's what prompted this case, that's what prompted the initial temporary restraining order. They were claiming to be owners and they were claiming that they were going to call a meeting for purposes of doing whatever they had in mind, which we don't know yet.

They now acknowledge that they are not owners, and they now acknowledge that they are not even the manager. They had no legal authority to call that meeting. They say, "Well, Lawrence Berry signed all these documents, and we didn't know about it, and he didn't have authority." I invite you to look at Exhibit 7 to the papers we've submitted in connection with today's motion. It is an e-mail from Mr. Powers to a Scott Baker and a Bill Schoppe. They were potential investors in this project. And Marty Berry and Bonnie -- excuse me, Marty Berry and Dennis Berry were copied on the e-mail. And he attaches all of the operating agreements for all of the companies that they claim they knew nothing about, all of them. And they're all signed by

Mr. Berry on behalf of the various entities. He also describes/includes the legal descriptions for Midway Junction Land and Red Fish Bay Land. That was in April of 2020.

Not once, until about a week ago, not once did any of the people, Marty Berry, Bonnie Berry, Dennis Berry say, "Wait a minute, you didn't have authority to sign that." Here, they're sending documents to a potential investor which has all kinds of securities potential, you know, liability. They didn't say to that potential investor, "Wait a minute, you shouldn't rely on those documents because Lawrence Berry wasn't authorized to sign them." They were fine with him signing them. This was largely a project that he ran with. He and Mr. Powers were the ones doing all the work on this project up here in Houston. So I just wanted to clarify that.

Now, the first thing, your Honor, I want to tell you is that -- and Judge Gilmore said this -- is that while it's called dominant jurisdiction, it's really a venue issue; it is not a jurisdictional issue. And I will refer the Court to the Phillips versus Phillips case. And I have an extra copy if you would like it.

THE COURT: Absolutely.

MR. DAWSON: The Phillips versus Phillips case -- if I may approach, your Honor?

THE COURT: Of course.

MR. DAWSON: And I know you'll probably want

one, too.

THE COURT: I want him to have one.

MR. DAWSON: This was a case, your Honor, in which there was a divorce that was filed in one court in Harris County; and then in another court, one of the parties filed for a projective order. I believe the wife filed for a protective order, but not in a divorce court, in a different court. And the question was whether there was a dominate jurisdiction question in that case. For the second filed case, did dominant jurisdiction exist in the first filed case. And if you look at Footnote Four on this case, it says, "Despite it's name, the doctrine of dominant jurisdiction is not jurisdictional." That's what the court says. And if you continue on in the footnote, it discusses why it's not jurisdictional and then the last sentence says, "Therefore, the doctrine of dominant jurisdiction pertains to venue and is not jurisdictional." And similarly, your Honor, in the Gordon versus Jones case, if I may, I have a copy of it as well.

THE COURT: Yes.

MR. DAWSON: May I approach?

THE COURT: Of course.

MR. DAWSON: Thank you. In the Gordon versus Jones case, your Honor, there's a case filed in county court to determine heirship and then a second suit was filed in Fort Bend County for trespass to try title. And the question --

and then what happened was it got dismissed -- no, no, I'm sorry, there was a dominant jurisdiction question. And if you'll look at Heading C, it says, "Dominant jurisdiction," colon, "A venue doctrine." And it says, "Dominate jurisdiction applies when venue is proper in two or more Texas counties." And then it went on to say at the second heading it says, "Venue is not jurisdictional." And here, if I remember correctly, they determined that because they had filed this motion after they had filed their -- their answer, their -- they filed the general denial and they determined because this is a venue issue, you waived it because as the Court knows if you don't assert venue first, then you waive it.

And so but my point is is that the question for the Court is: Is there jurisdiction of this case? I mean, is there venue of this case in Nueces County? And the answer to that question is absolutely not because if you look at Exhibit 1 to our pleadings that we filed in connection with this -- these motions, it is the fully-signed investment agreement signed by all parties. And we have an affidavit, a declaration from Mr. Powers in which he says that he has the original, that it is signed in ink, and that what we have attached is a true and correct copy of the original document.

Now, your Honor, I know I said at the previous that I was going to have a copy of it. I did not feel

comfortable asking Mr. Powers to put it in the mail to me. He lives in New York. And I was like "If something happens and that thing gets lost, then I'm going to feel terrible," so I 9had him put that in his declaration that he has the original and that what's been attached and filed with the Court is a true and correct copy of that original. And I will tell the Court that if we do have the injunction hearing, you will get to look at the original for yourself. He can bring it down on the plane. I don't have to worry about it getting lost in the mail.

Your Honor, the documents that we have attached in his declaration establish prima facia evidence that there is a fully-signed investment agreement that has a forum selection clause that I'm going to get to in a minute. And in the Sustainable Texas Oyster Resources versus Hannah Reef case, which again, I have a copy for your Honor.

THE COURT: Okay. Thank you.

MR. DAWSON: In that case, your Honor, if you look at Head Notes Four, Five, and Six on Page 9, it says, "A Plaintiff independently establishes venue with prima facia proof that venue is proper." It goes on to say, "Prima facia proof is made when the venue facts are properly pleaded in an affidavit and any duly-proved attachments to the affidavit are filed fully and specifically setting forth the facts supporting each venue." And then if you go on to the last

sentence -- oh, no, no, the next sentence, excuse me, it says very important, your Honor, "A Plaintiff's prima facia proof is not subject to rebuttal, cross-examination, impeachment or disproof." So we have proved that there's a fully-executed document. We've given the Court prima facia evidence of a fully-executed document that has a forum selection clause in it and they can't challenge that. They can't say it's not fully signed, they can't -- they can do nothing to disprove the fully-executed document because the law doesn't permit them because at a venue hearing, you're not getting into -- it's not a summary judgment hearing; it's not other issues of material fact. Once we establish prima facia evidence, it is established and the Court must accept it.

And there you have -- and so not only that, your Honor, I also point out that in the Knox Waste Services versus Sherman case that we've cited in our papers, a mere denial by the party that he did not sign the agreement without more, fails to create a genuine issue of material fact. And so even if -- so the sort of venue hearing, you still -- mere denial is not enough, but the Court must accept respectfully that we have this fully-signed agreement. The other thing I will point out to your Honor is the conduct of the parties is consistent with there being two fully-signed agreements, both the one that deals with compensation, and the investment agreement, which is what we're about here today. If you look,

Mr. Powers says in his declaration and I think Mr. Allison has acknowledged, he was paid 2 million dollars pursuant to this agreement, the compensation agreement, which is Exhibit 2 to our pleadings.

And if you look at Exhibits 3 and 4, Exhibit 3 is where they terminate the compensation portion of the agreement. It's a letter from Mr. Boyd, and it references the compensation agreement. And it says, "We're terminating the compensation," the monthly stipend. He was paid a hundred thousand dollars a month for 18 months and he was also reimbursed expenses. And it says in there that we'll continue -- "If you want to keep working on this, we will continue to reimburse your expenses," which they did. They reimbursed his expenses through June of 2023. And so if there wasn't a fully-signed agreement, why would it be necessary to terminate the compensation portion of it. And if you look at Exhibit 4, it's Mr. Powers' response to the letter saying, "Okay, fine, I will continue to work on it and you'll pay me my monthly expenses I incur. And oh, by the way, by not getting my monthly compensation, it does nothing to change my ownership interest in this project, my 20 percent ownership interest, which is set forth in the investment agreement." Nobody writes back and says, "What, what are you talking about; what ownership interest; you don't have an ownership interest."

And then if you look also at Exhibits 5 through

8, there are various documents where Mr. Powers' 20 percent ownership interest is circulated among the parties and nobody challenges it. Nobody says, "You didn't have this ownership interest." So the conduct of the parties is consistent with there being this signed agreement that's before the Court. And then Section 5A of the investment agreement is the forum selection clause. And, your Honor, I have created a chart that I would like to hand to you. It's a demonstrative aid.

THE COURT: Okay. Thank you.

MR. DAWSON: And what this is, your Honor, is the first section is Section 5A from the investment agreement. And it says, "That any disputes arising under this agreement," quote, "Shall be brought in the state or federal courts in Harris County, Texas." And it goes on to say "Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts, such courts being state or federal in Harris County, and irrevocably waives any objection to the filing in Harris County." And what I have below that, your Honor, these are quotes from the various cases that we've cited in our papers. And these are the forum selection causes from these various cases. And in every one of these cases, in every one that I have in this handout, those forum selection clauses were held to be enforceable and were upheld and enforced.

And if you look at the language that I've

highlighted, the language from each of these cases is consistent with the language in Section 5A of the investment agreement. So in the Automated Collection case, they consent to the exclusive jurisdiction of courts of Montgomery County, Pennsylvania. And that -- in that case, the court held that's mandatory. The forum selection clause is mandatory. The court has to follow it. And then in the next case, the Lion Financial Services case, which is also out of the Texas Supreme Court, in that case the forum selection clause said that they agreed to the exclusive jurisdiction of the courts of the Commonwealth of Pennsylvania, courts of the United States of America for the Commonwealth, and they waive any objection they have to venue.

In that case, they said it's an abuse of discretion for the court not to follow the forum selection clause unless the party challenging it meets a very heavy burden, which I'm going to get to. Similarly, in the International Profit Association case, the language there was exclusive jurisdiction of venue in the 19th Judicial District Court of Lake County, Illinois. But you can see, your Honor, all these cases, many of which are from the Texas Supreme Court, some of which are from the Houston Court, all have language that is virtually identical to the language that we have in Section 5A of the investment agreement which is the -- which is the basis for this lawsuit. We're saying that

Mr. Powers and his company that he created are entitled to a 20 percent ownership in the project and a 20 percent ownership in -- this is the corporate structure, your Honor, for this Lone Star Ports Project. And you'll see Allied Ports is represented by Mr. Garcia is the entity that owns the 20 percent interest. It owns it in Lone Star Ports Holdings. These sump companies Sirius, Arcturus, Capella, and Red Fish Bay Terminals, my understanding is they're all owned by the other individuals -- excuse me, Capella, Arcturus, and Sirius are owned by the Berrys and I forget which one. Mr. Lawrence Berry owns one, Marty Berry owns the other, and then Dennis now -- Dennis Berry at the time and now Bonnie Berry owns one. So they all own this collectively, this Lone Star Ports Holdings, and which in turn -- I got it -- which in turn owns these entities.

MR. GARCIA: Would you like to hold it for me?

THE COURT: No comment, Mr. Garcia.

MR. DAWSON: And then it's Lone Star Ports Enterprises that owns -- that owns these various interests here. And these properties at the bottom, they -- some of them have land, Axis Midstream is the owner of the permit and what have you. So that's the corporate structure. And by the way, your Honor, it is Mr. Powers that set up this corporate structure. That's part of the reason that he was hired is he's a corporate transactional lawyer by background. He had

done work for the Berrys for many, many years, particularly when he was in Hong Kong. He helped them with some projects in China. They worked with him for years and so they called him and asked him not only to set up the corporate structure. And the reason it's important is because these are very wealthy people and they want to set up their corporate structure that minimizes their tax obligations. And I'm not critical of that, but that was why it was important that they have this complicated corporate structure is to avoid taxes or unnecessary taxes.

And the other thing they wanted him to do is they wanted him to negotiate the deal that they were -- they were in discussions with the Carlyle Group, which as the Court knows is a very, very big, you know, joint private equity firm. They were in negotiations and you'll hear testimony if we get to the injunction hearing that they were a little in over their head and they needed somebody to help come and negotiate the deal. And you'll hear that Mr. Powers negotiated with Carlyle and that he took the value for the Berry interest, he took it for something like 40 million -- and I may have these numbers a little bit -- but he negotiated where they were going to get 400 million dollars on this transaction. And there's a term sheet and it's attached I believe as Exhibit 8 or 9 to our pleadings. There's a term sheet with Carlyle where they acknowledge that the Berry

interests are worth 400 million dollars on this project alone. And so that was part of the work that he did.

But now our clients are because they were trying to deny Mr. Powers his interest, his 20 percent interest, you'll see in our attachments to our third amended petition where they are saying no, no, this project is only owned by the Berrys. And Mr. Powers implicitly doesn't have an ownership interest. That's what prompted this lawsuit. So he's filed this lawsuit under the investment agreement. He is entitled to a 20 percent ownership interest. And that -- that -- the forum selection clause is mandatory. And it is presumptively valid under Texas law. If you look at Reeder versus Woods and In Re: Lion Financial Services, they say in there and here's a quote from Reeder which is -- he's co-counsel, your Honor. I don't know.

THE COURT: They don't know what to do. We don't know what to do with Mr. Garcia.

MR. DAWSON: In the Reeder case, your Honor, which is from the Texas Supreme Court, it says, "Such clauses," referring to forum selection clauses, "Are presumptively valid and constitute consent to jurisdiction in the agreed forum." That's from the Texas Supreme Court. Now, I said earlier that there is a circumstance under which they can be ignored; and that is, that you -- the party challenging venue in the selective forum must show -- clearly

show that the enforcement would be unreasonable or unjust, that the clause is invalid for reasons of fraud, that enforcement would contravene a strong public policy of the forum where the suit was brought or that the selective forum would be seriously inconvenient for the parties. And it is described as a, quote, "particularly heavy burden," end quote.

And in the Pinto Tech. Ventures case with Sheldon, a Texas Supreme Court, and I've got that if you want it.

THE COURT: I do.

MR. DAWSON: Here is a copy, your Honor.

THE COURT: Thank you.

MR. DAWSON: There on Page 7 in heading four, five, and six it says, "Forum selection clauses provide parties with an opportunity to contractually pre-select the jurisdiction for dispute resolution. In Texas, forum selection clauses are generally enforceable and should be given full effect. Failing to give effect to contractual forum selection clauses, enforcing a party to litigate in a forum other than the contractually chosen one amounts to clear harassment, injecting inefficiency by enabling a forum shopping wasting judicial resources, delaying adjudication on the merits, and skewing settlement dynamics."

And so, your Honor, I respectfully -- where's my notes -- submit that what you have before you in Section 5A

is a forum selection clause that is enforceable, that they have not put forth any evidence that meets the very heavy burden to avoid application of the forum selection clause. There's no evidence in the record before you that it would be unreasonable or unjust or that there's fraud or it would contravene public policy or that it would be seriously inconvenient. There's no evidence. They do make an argument about it's more convenient in Corpus. We respectfully disagree. Mr. Lawrence Berry lives here in Houston, much of the work that was done on the project was done here in Houston; but regardless, they haven't met the burden, the heavy burden that's required in order to avoid the forum selection clause.

And if you determine -- and I will remind the Court that the clause in 5A is exclusive, exclusive jurisdiction to Harris County. And what that means, if that is a valid and enforceable forum selection clause, which we say it is, means this case can only be in Harris County; it cannot be in Nueces County. And not only can you not transfer it to Nueces County, but it totally obliterates the plea -- the plea and abatement because the plea and abatement presumes that venue would be appropriate in the first filed court. And here, it would not. Jurisdiction is exclusive in Harris County; therefore, the Court if it reaches that conclusion on the forum selection clause, you can deny both motions. You

don't have to go any further. You don't have to analyze whether the claims in this case are interwoven or intertwined with the case -- the case in Nueces County. It's -- that's the end of the analysis for the Court if you determine that the forum selection clause is enforceable, which I submit to you, your Honor, you should because it's presumptively valid. We have given you prima facia evidence and they have not met their heavy burden.

If for some reason you disagree with me on the forum selection clause, in the alternative, it's a venue clause which is enforceable under Section 15.020 of the Texas Civil Practice and Remedies Code. And in that case in the Texas Practice and Remedies Code it says, "That if parties to a venue selection clause and it's a major transaction, that is mandatory." And not only is it mandatory, it trumps all other venue provisions. So if you have -- if you have mandatory venue as a major transaction under 15.020, then even if there's another mandatory venue provision, it doesn't matter, 020 trumps. And that's not only set forth in the statute itself, but one of the cases is Fisher, in re: Fisher. I was -- I was -- I heard from the gallery.

THE COURT: An important part of the gallery, if I may say.

MR. DAWSON: Yes, indeed. You know, your Honor, I'll digress a moment. I once went to London and

watched the -- went to the arguments in one of the ports of justice. And there were three justices up with their wigs and they asked a question. And the barrister said, "My Lord, I should require instruction on that issue." And the little fellah came running up from behind him. He leaned over and he whispered something in his ear, and he comes back and he says, "My, Lord, I have been instructed that..." I thought what a civilized system. I wish we could do that instead of us having to whisper from the gallery.

But In Re: Fisher, it says that the venue provision in 15.020 trumps all over provisions. And the other thing I'll point out, your Honor, is that you may -- you can look at the investment agreement itself, but you can also consider other evidence. In the SM Energy versus Union Pacific case, which I have, in that case what happened was there was an agreement and the question was whether it was a major transaction. And you'll see in that court that the court looked beyond the face of the agreement itself and it saw that one of the parties had offered to pay I think it was 2.4 million. And so they said, "The fact that they had offered to pay 2.4 million makes this a major transaction." And so we say, your Honor, that the investment agreement is a major transaction. You've already heard from Mr. Allison and from me, and it's in the declaration of Mr. Powers that he received over 2 million dollars. And the threshold for a

major transaction is 1 million, so he's already received more than is required for the major transaction doctrine.

You'll also see in the agreement, it says, "That the Berrys are entitled to receive the first 250 million dollars of this project." His -- Mr. Powers' ownership interest only kicks in after the Berrys have received 250 million. And that -- under the statute, the language of the statute is whether anyone is entitled to receive consideration with the value over 1 million. The agreement on its face says that they are entitled to receive consideration of 250 million and, therefore, makes it a major transaction. And the -- the Carlyle offer is Exhibit 9. That's where they offer or their terms were 400 million. That document was executed about the same time or close in time to the investment agreement. The Court can consider that. That is Exhibit 9 to our response and is on Page 318. And Mr. Alistair represented to Judge Reeder at the temporary restraining order or at the -- where did you represent the... but Exhibit 10 to our pleading -- oh, in this Court, I think, maybe. I can't remember. It's Exhibit 10, wherever Exhibit 10 took place. Oh, it was to judge -- I'm sorry, now I remember. It was to Judge Palmer.

THE COURT: Yes.

MR. DAWSON: Told Judge Palmer when we had our hearing over there in the 215 that this is a billion dollar project. And that's Exhibit 10 at Page 4 of our pleading.

And the other thing, your Honor, under the Shamoun -- and I don't have an extra copy of this. I have one copy, but it's all highlighted. Under the Shamoun & Norman, LLP versus Yarto International Group case 398 S.W.3d, 272, in that case, it doesn't matter whether they actually got the 250 million or the 400 million. It doesn't matter that it hasn't come in yet and may or may not happen in the future because in that case, they said the fact that the document entitles you to receive it, and I'm paraphrasing, I mean, it doesn't matter. That's enough for the major transaction doctrine even if you haven't gotten it yet. And I think what happened in that case is that they -- they were obligated to pay up to a certain amount and the court -- the party challenging the transaction said, "But we haven't received that." And he says, "It doesn't matter. Under the document, you were entitled to receive it. That makes it a major transaction."

And so if -- if the Court determines that this is a valid and enforceable venue provision under 15.020, that again ends the analysis because it's mandatory in Harris County and it cannot be transferred to Nueces County. That addresses the plea and abatement and it addresses the motion to transfer venue. And so briefly I'll just on their venue issues, I'll just say that this is not a land dispute. One of their arguments is that there's a mandatory venue under Section 15.00 -- excuse me, 15.011 because they say that Axis

Midstream owns some property. This is not a land dispute. If you look at 15.011, land disputes are defined in the statute as suits where somebody is either trying to recover property, recover an interest in property, partition property, remove incumbrances to title on property, recover damages to property or quiet title to property. And you can look in the relief that we're seeking in this lawsuit, there is no request for anything having to do with real property. And then I'll also say that Nueces County we do not believe is more convenient for some of the reasons I have articulated previously.

Now, let me also -- I do this all the time, I make a mess. Let me address the allegations and why these lawsuits are different. If you get to the question of whether this case and the Nueces case are intertwined, inherently interrelated, if you get to that question, the Court -- what the Court should ask is are the claims asserted in this case compulsory counterclaims to the claims that were asserted or are asserted in Nueces County. That's the standard. If you look at the cases that we've cited, you hear the courts say the definition of inherently interrelated is whether the second-filed case in this -- this one, the case that we're here on today, is that -- are the claims asserted in this case compulsory counterclaims to the claims in Nueces County?

If you look at Mr. Allison's, he likes the Wyatt case and he likes the Cleveland case. If you look at

those two cases, what they show is that where -- there are two lawsuits that all arise out of the same transaction; then, dominant jurisdiction may be appropriate. In the Cleveland case, Mr. Cleveland signed seven promissory notes having to do with his house. And he filed suit in Johnson County seeking to cancel those notes. Well, then the bank filed suit in Dallas County over the same notes and said we want to enforce the notes. And so the court said, "No, you can't file that. There was dominant jurisdiction in Johnson County because they had -- both lawsuits have to do with these promissory notes."

In Wyatt versus Shaw Plumbing, there Shaw Plumbing provided services for the Wyatt's house in Duval County. And Wyatt sued saying, "You did a bad job and we're suing you for DTPA." Well, then the plumbing company sued, and ironically in Nueces County, for breach of contract saying we did this work for you and you haven't paid us. Both lawsuits had to do with the work done by the plumbing company and they say that that was -- there was dominant jurisdiction.

Here, it's completely different. So the standard for compulsory counterclaims -- oh, and the J.B. Hunt case that he talks about, they both involved the same car crash. Here, the first question in a compulsory counterclaim analysis is whether the court in Nueces County has jurisdiction. And we've already established that we do not

believe it does based on the forum selection clause and the venue selection clause. Secondly, the claims asserted in this case must be claims that the Plaintiffs here have against the opposing party in Nueces County. And that's in rule -- Texas Rule of Civil Procedure 97a and it's also in the J.B. Hunt case where in order for dominant jurisdiction to exist, the pleader, the Plaintiffs in this case, must be asserting claims that they have against the opposing party. Well, your Honor, we're not a party to Nueces County. We don't have claims against anybody in Nueces County because we're not a party. And so it cannot be a compulsory counterclaim to us because we're not parties to that case. So that's the second part of the compulsory counterclaim analysis that fails.

And then if you look at, your Honor, Exhibits 1 and 5 to the plea and abatement from Mr. Allison, Exhibit 1 is the lawsuit that Lawrence Berry filed originally. If you look at that claim, your Honor, in Paragraph One they say, "This actually concerns the management and finances of several Texas companies and they're listed." That's what that lawsuit is about is the management and finances of several Texas companies. And in Paragraph 3, Lawrence Berry asserts that "Marty Berry has been mismanaging the Berry entities' finances and he's engaged in self-dealing loan agreement for Marty and Dennis to the Berry entities." If you go on and look at the Heading B on Page 7, it says, "That Defendants have excluded

Lawrence from key decisions relating to the Berry entities, including improper self-interested transactions." If you go on to Paragraph C on Page 10, Marty, Dennis, and a different person named Powers, not my Powers, have threatened the financial operations of the Berry entities.

If you look through Exhibit 1, your Honor, it is clear that Mr. Lawrence Berry is complaining about the mismanagement of these various Berry entities. That is not a claim that we assert. Exhibit 5 to Mr. Allison's plea and abatement is the counterclaim that was filed by various Berry entities. And again, the allegations, they claim that Lawrence Berry engaged in conversion, breach of -- this is Paragraph 11 on Page 3. Counter-Plaintiffs filed this counterpetition asserting claims against L. Berry for conversion, breach of fiduciary duty, breach of contract, unjust enrichment, breach of constructive trust, fraud and others. And they accuse Mr. Lawrence Berry of self-dealing and breach of fiduciary duty. And those are claims not asserted here.

In Paragraph 14, Mr. Allison in filing this pleading, he defines what he calls Berry-related entities. And you can read them all. There's no mention of Ted Powers, there's no mention of Allied Ports, there's no mention of Axis Midstream. Now, in fairness to Mr. Allison, I think a few days he did amend his counterclaim to throw in some stuff

about Axis Midstream. And I don't think you can create dominant jurisdiction that by filing pleadings after this case has already been filed; but in any event, and so there isn't -- and in a different pleading, there isn't a mention of Axis pleading. But if you go through, they allege that there was self-dealing by Lawrence Berry, that he hasn't paid up some money that was owed on an Orca transaction. None of that has anything to do with this lawsuit.

And if you look at those two lawsuits, there's no question that my client, Mr. Powers or Mr. Garcia's client, Allied, they are not parties to that case. They're not mentioned in either of the pleadings that are before the Court. There's no mention of Ted Powers, there's no mention of Allied Ports, there's no mention about their ownership interest in this project. I don't think, I'm almost certain, that there's no mention of the Lone Star Ports project, which is what this case is all about. And if you look at what's in this lawsuit, this lawsuit is about Mr. Powers or his company's ownership interest in really it's in Lone Star Ports Holdings. That's the top -- that's who he has the ownership interest in Lone Star Ports Holdings, which in turn has an ownership interest in the various other companies that are part of the project. That's what this lawsuit is about. There's no -- and it's about breach of the investment agreement. There's no mention of the investment agreement in

Nueces County. Not mentioned anywhere in that case. So -- and if you look at the claims that we are asserting, then you'll see that they are not being asserted in Nueces County.

Now, there's been mention about the injunction that was granted by the judge in Nueces County and how there might be inconsistencies. I promise your Honor that I will -- I didn't know about that injunction when I filed this lawsuit, and I promise you that I will draft our proposed injunction in a way that it will not interfere at all with whatever the injunction that exists down in Nueces County. It is not our intention to get into those issues, and we can certainly craft an injunction that does not in any way impinge or infringe upon what the Judge Galvan, I think is his name, down in Corpus Christie, what he's doing. I just wanted to let the Court know that.

And the Dolan's case says that you should not -- there is no dominant jurisdiction when the judgment in the first case will not foreclose all issues in the second case. That's what they put in the Dolan's case. And you can look at the relief that is sought in the petition and in the counterclaim and the court down there can give all that relief and it won't have one -- it won't have any bearing at all on this case. And so I think that -- I think that there is no dominant jurisdiction. I also will refer the Court to kind of three cases: One is the Ruebbling versus Foremost County

Mutual Insurance. Hold on a second. I have some cases, copies for your Honor.

THE COURT: Thank you.

MR. DAWSON: In that case, your Honor, the Ruebbling case, there was a car crash and the family sued in Travis County. And the insurance company said, "We're tendering policy limits." And the family members could not agree on how to divide up the insurance money, and the insurance company tried to work with them to get them to work it out and they couldn't get it worked out, so the insurance company interpled the insurance proceeds into the county -- into the court in Caldwell County. The first case was in Travis County and they interpled the funds in Caldwell County. And there was a question of whether there was dominant jurisdiction and the court said, "No, one, the insurance company is not a party to the Travis County case; and two, interpleading the funds is different." They both -- both cases had to do with the underlying car crash, but they were not -- they were not inextricably interwoven or whatever the language is. The court said, "No, the case is not subject to dominant jurisdiction."

In the Forney case, if I could give the Court --

THE COURT: Thank you.

MR. DAWSON: -- in the Forney case, the suit

was filed in Harris County for breaches of certain agreements. And then the Defendant sued the Plaintiffs in Bexar County for breach of fiduciary duty for having set up a competing business. Both lawsuits related to the underlying employment agreement. The Plaintiff sued in Harris County, said, "I'm entitled to be -- to get certain compensation under these employment agreements," and then the Bexar County case said, "Well, you have set up a competing company. That's in violation of the same employment agreements." And the court said, "No, even though there are overlapping parties and that both lawsuits arise out of the employment relationship," here's a quote on the last page, Page 6, in the middle of the paragraph: "Although the two suits involve overlapping parties and claims and both suits arise out of the prior employment relationship between realtors and Makomes (phonetic) Energy, the subject matter of the two suits is not inherently interrelated." And so they found no dominant jurisdiction.

And in the In Re: Martin case, the case which Mr. Reasoner is familiar, Scott Martin filed suit in Harris County. And he said, "It's kind of funny, it's somewhat similar analogous to this case." The father, Mr. Martin, had set up the company and then there it was left to the -- his three children: Scott Martin, Ruben Martin, and a daughter. The daughter passed away and so there was a fight among the

brothers, Scott Martin and Ruben Martin, for control of the company. And the company issued shares to its employees and Scott Martin sued in Harris County, said, "That was an unauthorized issuance of shares and it was done to dilute me so that I wouldn't have control of the company." And thereafter there was a suit filed I believe in Gregg County if I remember correctly where they said there the claim was you're interfering with the company's business. And part of their claim was you filed suit in Harris County. That was part of their claim in Gregg County was that they had filed suit in Harris County. And so the dominant jurisdiction question was raised and the court said, "No, they are not interrelated," even though the second suit relied upon in some sense the suit that was filed Harris County.

And I guess last point before I sum up, your Honor, is the plea and abatement must be supported by a preponderance of the evidence. There's an evidentiary requirement and this is in the In Re: HPGM case.

THE COURT: Thanks.

MR. DAWSON: And if you look on Page 6, it says at the top of the page under Heading 14, "The verification of a plea does not do away with the requirement that one urging the plea," the plea and abatement, "Prove the grounds by a preponderance of the evidence at the time the plea is presented to the court. And if you look at the heading under

17, your Honor, it says, "Indeed it is well-established that pleadings are generally not competent evidence even if sworn or verified." And I will tell your Honor the plea and abatement in this case is not verified. The vast majority of the exhibits that Mr. Allison has tendered are pleadings. All of the attachments with the exception of one to his plea and abatement are pleadings. He also attaches a transcript of a court hearing. And there's no declaration in support of the plea and abatement. There's no affidavit in support of the plea and abatement. And so my point is that they have not met their burden of proof. If you get to that issue, which I don't think you need to, but if you get to that issue, they have not met their burden of proof.

So, your Honor, I would just respectfully say that the motions should be denied on many grounds. We have mandatory forum selection clause that mandates Harris County and Harris County only. We have a mandatory -- in the alternative, we have a mandatory venue provision that mandates exclusive jurisdiction in Harris County. I'll also remind the Court that in the agreement that they signed, they agreed to waive any objections to proceeding with a case in Harris County. That was their agreement. And candidly, your Honor, they should be held to their agreement. And so we would ask the Court to deny the motion to transfer, and deny the transfer venue, and deny the plea and abatement. And I

believe Mr. Reasoner, since he's the removing party, I think he will address the remand issues that were raised. I don't think there's any question about that this Court, and in fact I heard several times counsel say that the Court has subject matter jurisdiction. I think they had some procedural arguments about the removal that I'll let Mr. Reasoner address. And if the Court has any questions, I'm happy to answer them, otherwise I will cede time.

THE COURT: Thank you, not at this moment. May I ask the only question I have is do you need a five-minute break? You okay, okay. Only because we've got -- I know we have to get Mr. Alistair to Austin.

MR. DAWSON: I'm not going anywhere.

THE COURT: Oh, I'm sorry.

MR. DAWSON: In fact, I sent the chief a nice note. I did not mention your name. I did not.

THE COURT: I'm sure you highlighted it.

MR. DAWSON: I just said a court in Harris County.

THE COURT: That's okay. That's okay. I will let him know I was the culprit.

MR. DAWSON: Thank you, your Honor.

THE COURT: Thank you very much.

Mr. Reasoner.

MR. REASONER: Good morning, your Honor,

Barrett Reasoner on behalf of Mr. Lawrence Berry. May it please the Court --

THE COURT: Of course.

MR. REASONER: -- counsel. Your Honor, I'm going to, as Mr. Dawson indicated, I'm going to touch on our response on the motion for remand. I also, because I lived it, am going to talk a little bit about some of the interrelated arguments just because I was -- I have been involved in that case for the duration. I do want to note at the outset, Mr. Allison went through musing thoughts, facts, observations really about the merits and we've known each other a long time. He's very eloquent always, but that's not what we're here about, your Honor. What we're here about is an evaluation of these cases as pled and what the law tells you should or respectfully must be done in certain instances in that regard.

I had a little section here on subject matter jurisdiction, but as -- as counsel eluded to, you're going to be spared hearing that because both counsel for the other side or the Co-Defendants have acknowledged that subject matter jurisdiction is proper in this Court, which is important. So that leaves them with only really two arguments in the papers that the Court has reviewed on why this should be remanded. One, is they point to the Texas Government Code 25A.006(e). And, frankly, your Honor, I think respectfully there's a

misapprehension of what that says in their argument. They say they rely on this provision which simply stands for pretty unremarkable proposition, Judge. It says, "If a case is filed in a county that does not have an operating business court, then you cannot remove that case to the business court." Okay, not controversial here. What they tried to say is, "Well, because Lawrence is a party to a case, another case in Nueces County, that -- and Nueces County does not yet have a business court, he can't remove this Harris County case to the Harris County business court." I'm not going to linger on that, your Honor. That's not what it says, not what it means, and there's zero support for that proposition. It's simply a misreading of that pretty straightforward and plain provision.

Next, in passing, they argue that our removal papers did not plead sufficient facts to support removal. Now, they cite no law for this proposition that what we pled was somehow inadequate. And because you-all are new here, there is no business court authority on this, not surprisingly; but when you look at federal removal cases, your Honor, I think that that provides very useful guidance on what the standards should be and what is required. And I'll cite exclusively Supreme Court cases and statutes, just to make it quite clear, but under 28 U.S. Code 1446(a), it says, "Containing a short and plain statement of the grounds for removal is sufficient." In the Mount Healthy City Board case,

the court said, "That when the amount in controversy is alleged in the petition, that is accepted, if made in good faith," so, you know, you rely on what's pled there. And that when the removing party, the removing party in the Gasch case, G-A-S-C-H, the removing party can rely on the facts pleaded. And if you look back at our notice of removal, your Honor, we noted what had been pleaded and why that fell within the subject matter jurisdiction. And we attached Mr. Dawson's client's pleading, and the court said -- the courts have said throughout the federal cases a short plain statement need not contain evidentiary submissions.

So those two arguments I think on why the case should be remanded are without merit. It's also, as Mr. Dawson I believe pointed out, they talk about, I think, at one point a remand to Nueces County. That would not be in the unlikely event I believe that this Court decided that a case should be remanded. It would not go to Nueces County, it would go to the Harris County Court from which it came, but that would not be appropriate here.

Now, if I can talk for a moment about the interrelated issue, but I want to touch on a point that I think is extremely important. And Mr. Dawson made it, but it bears reiteration; and that is, that you only get to that issue, this dominant jurisdiction question and the question of whether they are interrelated, if you find that there's proper

venue in both places. And if I may hand the Court the Gonzalez case. May I approach, your Honor?

THE COURT: Of course. Thanks.

MR. REASONER: Your Honor, and we've highlighted for both counsel and the Court, but in looking at the fourth page of that opinion, the court rejected Gonzalez's argument that the Hidalgo County Probate Court had dominant jurisdiction over the case holding "It is axiomatic that a court cannot have dominant jurisdiction if it does not have proper venue." And I won't reiterate Mr. Dawson's arguments there, but again when you have an investment agreement signed by the parties that says mandatory jurisdiction in Harris County, there is no argument to be made that you need to take the next step and look at the interrelatedness. Now, if they are at this point it sounds like they're going to try to say, "Well, that's a forgery," you know, you hope that looking at the surrounding circumstances, they will be refreshed and that won't be the testimony you will hear at the TI. But that's a factual issue for another day, but things like I think -- "I don't remember that, I think somebody might have forged it, I don't read my e-mail, so the fact that people were e-mailing me things," you know, all of those deep factual questions are not what this Court is asked at this stage of a proceeding to evaluate. You look at what's pled, you look at the documents that are provided. Clearly in a situation with signed

documents, the Court can rely on those and the pleadings to make a decision at this initial stage. They are not precluded from at a TI hearing or at a trial making arguments that documents are fictitious or created or falsely signed or whatever they may claim. That's an important issue there. And there was several of the things that Mr. Allison stated in his factual recitation respectfully we disagree with; but again, it's premature to go into that issue at this time. I think Mr. Dawson pointed out, and we had it in Exhibit 14 of our response to the motion for remand, the sending of the investment agreement signed by all to third parties with copies to the other Berry brothers. They received them at a time. Also, Mr. Allison, although I think he corrected it later, suggested that a transfer to Red Fish was not signed -- was only signed by Lawrence, but that was also signed by Dennis Berry and that's also in Exhibit 14. So their factual points that we will take issue with at the appropriate time, but I think that's a premature discussion at this point.

Now, if I could turn your Honor just to the interrelated argument, and I want to focus on and let me say, you know, as the Irish would say fair play to Mr. Allison, we largely lost the temporary injunction hearing. Now we're going to live to fight another day at trial, but what we've lost sight of here in this discussion is what was actually sought there and what was actually involved. And I think that

there is honestly they are trying to muddy those waters. The TI that we asked for was twofold, your Honor, to keep the other brothers from removing Lawrence Berry from the board of the Berry entities. Again, as Mr. Dawson pointed out, a defined term in our pleading that did not in any way implicate the Lone Star entity or Axis. It was specifically defined Berry entities; and we said, "Judge, keep them from removing Lawrence Berry until this case can be tried from that board." Denied, we lose that, okay.

Second point we said, "Keep them from selling real property without giving us two weeks' notice." The judge threw us a bone on that one. We got two days.

THE COURT: 48 hours.

MR. REASONER: Yeah, 48 hours exactly. But again as Mr. Dawson has repeatedly noted, his case has zero to do with real property. He is not asking this Court nor will he be asking this Court to enter any relief that would address real property. So the point is it is an absolute red herring to suggest that some order that this Court would be asked to enter would conflict with what Judge Galvan entered in Nueces County. It's simply not true. And I think Mr. Allison acknowledged what mister -- what Judge Galvan entered, denied our request to keep Lawrence on the Berry entity board and gave us a little bit of what we wanted on property, that's it. That's the order. There is zero -- and Mr. Dawson expressed

his intentions, but you don't have to take his word for it, although he is a credible man. You look at what he's pled here, the relief that he is asking for, your Honor, would not lead this Court to enter a temporary injunction that would conflict in any way, shape or form with Judge Galvan. So that's -- that's a very critical thing I think to keep in mind here, your Honor.

And on the interrelatedness piece, if I may just briefly approach.

THE COURT: Of course.

MR. REASONER: And I gave one of these -- it's just a simple few pages with some excerpts from our pleadings and an or charge, your Honor. But, again, just to bring home the issue, if you look at that first slide, you see the introduction of our Nueces County case and what -- and the fact that it's relating to the management and finances of these Berry entities listed there. And the specifics, your Honor, which I -- you know, are not things that come up here, but just to tell you the disparate nature of them, there was an allegation that the two other brothers engaged in self-dealing loans; that is, loaned the company money without notifying, some $75,000,000 to the Berry entity without notifying or getting approval from the board. You know, they will characterize that to the jury there as a selfless act and we will, of course, be talking about the hazards of a

self-dealing loan that's not disclosed and approved. And that's going to be a fact issue fought out before the jury there in Nueces County.

There's also an allegation there that Mr. Marty Berry bought some cranes, some heavy equipment and in his entity of his very own and leased those to the Berry entity, again, without disclosure and approval by the board. So that again is something that's going to -- and they're going to have their explanations and reasons for that. That'll be hard fought there. Now, the counterclaim, again, these brothers over the years the evidence shows spend some of their own money, get reimbursed, you know, do different things in terms of how they are managing things. And they have alleged in counterclaims there specifically focused on Orca, which is an entity that was involved that their investments were made, that Lawrence owes some money or, you know, misallocated certain money in that regard, etc. But the counterclaims do not in any way, shape or form make allegations about Lone Star Ports or Axis. In three -- as opposing counsel pointed out -- three days of testimony in that case in the TI, the only mention ever of anything to do with any of this was Tonya Fulgum (phonetic) who is Lawrence Berry's lieutenant, you know, she was asked, "Well, what are you working on now?" She said, "I'm working on a Lone Star Ports project," full stop. And that's all that came up in the three days of what I think

the judge and probably we would all admit was pretty extensive testimony and a lengthy process. That was it.

So, and again as Mr. Dawson eluded to, they on Tuesday, a couple of days ago, they have sprinkled in the word "Axis" and "Lone Star Ports" in a couple of places to their counterclaim; but again, the first point, Mr. Dawson saying, "You know, you can't add something. Hey, you know, first filed." But more importantly, it still -- it still does not address the claims that Mr. Powers and Allied are bringing here. They're not -- there is no addition of any sort of recitation about that or asking for relief with regard to Mr. Powers' assertion of his ownership based on the documents. And, again, circling back to what Mr. Dawson said, how could they, your Honor? I mean, there is -- Mr. Powers is not in that proceeding, and he's got an investment agreement that tells him where he has to bring a proceeding, Harris County. That's what he's done. And that's where you get to the Dolan's case, your Honor, that counsel mentioned. And I think that is -- that's one worth if you don't mind handing -- handing up as well.

THE COURT: And, Mr. Reasoner, I know Mr. Foster is going to ask me afterwards. Do you have an extra copy of this document?

MR. REASONER: I do. And I will give him -- I will give him that.

THE COURT: Please, give him a copy right now. That shouldn't be on the record.

MR. REASONER: I will give him a copy of Gonzalez and Dolan's as well.

I apologize, I should have given those to you earlier, sir.

MR. BAIRD: I appreciate you. Thank you.

THE COURT: Thank you.

MR. REASONER: But when you look, your Honor, at Dolan's, there in the court -- and this is Texas Supreme Court -- one of few arguments I've ever given where I'm only U.S. or Texas Supreme Court, your Honor. Dolan's, the court held that there was no abusive discretion denying a plea and abatement where judgment in the first filed suit would not have foreclosed all issues between the parties, okay. The judgment would not have foreclosed all issues. And that's -- that's important here because as Mr. Dawson indicated, Mr. Powers, we can litigate that, try that in Nueces County for a year, you know, for a year from now or whatever. It's not going to address whether or not Mr. Powers has ownership or not because that's not -- he's not a party to that case and that issue is not raised in that case, so what the Texas Supreme Court is talking about there is you shouldn't abate in a situation where judgment in the other case would not foreclose all issues between the parties.

Now, mind you, that's in Dolan's you're talking about a situation where you have gotten past that first step that Gonzalez tells you about, which is is venue proper in both places. It's not here, so you don't even get to that next stage of interrelated analysis. And, your Honor, just to briefly take you through the rest of these -- these slides on this -- not slides, handout -- the second page, as I indicated, the Berry entities are specified in the petition there and laid out. And then if you go to the -- in what Lawrence Berry filed in Nueces County, if you go to the next page, you see the chart of the entities that are involved and at issue in this case -- in that case in Nueces County.

Now, the third -- Page No. 3 is where you see the entities in this Harris County case brought by Mr. Powers and Allied. Again, not -- none of the Berry entities that are in that other case are here. And if you look at the relief on Page 4, we just point you to the relief that Mr. Powers is looking to, he's asking about compensation under an agreement. And then if you go to the fifth page, he's asking about declaratory relief, asking for -- talking about his ownership. And if you go to the sixth page, you look at Mr. Powers' petition and it does not include disputes about control over the Berry entities, but rather ownership or control of the separate project entities.

Okay. So I just wanted to walk through that

because I think it's very important. You know, there is a tendency to talk about these things in a sweeping way and say, "Well, maybe the judge will just throw up her hands and say, well, it all kind of sounds interrelated." As Mr. Dawson talked about, there is a lot of authority out there that talks about when you -- if you get to the interrelatedness phase, the analysis that you have to do and it is a strict analysis. And Mr. Dawson talked to you about the In Re: Martin case. There's also the Coastal case, which was a Texas Supreme Court Coastal Oil & Gas v. Garza, 2008 where parties overlapped and some things were legally similar, but these claims were not identical. And in that situation, the court held not abating was proper. So the bar is high and several of the cases cited by Mr. Allison have been talked about by Mr. Dawson, but if you look also at the Encore case that Mr. Allison cited, that was a case involving the same parties and the same contribution agreement was at issue in Encore. In J.B. Hunt, both cases involved the same automobile accident. In Phillips v. Phillips, the case involved one and order against domestic violence against the husband and the other the divorce proceedings. So those were all cases where venue -- first, venue was proper in both places; but secondly, it was about the absolute same thing. When you look at this clearly, your Honor, it's not. There is no basis to either remand this case or grant the other relief that is being asked for by the other

side. Thank you for your time, your Honor.

THE COURT: Thank you.

MR. ALLISON: Your Honor, I kind of outlaid a process and I think I want to stick to that; and that is, to offer exhibits at this time. I think most of them or many of them --

THE COURT: Mr. Garcia, do you have them?

MR. ALLISON: I apologize.

THE COURT: No, that's okay. Not since you just joined?

MR. GARCIA: I think they are totally right, Judge.

THE COURT: Your guesstimate.

MR. ALLISON: Was that a my Cousin Vinny argument? You have time.

THE COURT: Sorry.

MR. ALLISON: Sorry about that.

THE COURT: And that is my question for you and I should have said this at the beginning. What I'm noting, that I have his exhibit. I should have made this clear. The exhibit, your great demonstrative, that you had Judge Gilmore hold for you, that is Exhibit 1?

MR. ALLISON: Yes.

THE COURT: And it is that one exactly?

MR. ALLISON: I think it is exactly.

THE COURT: Yes, I just wanted -- I'm not questioning it, I just wanted to make sure. And I should have said that at the moment, at the time.

MS. GILMORE: Yes.

THE COURT: Thank you very much.

MR. GARCIA: I think -- I believe it is.

THE COURT: Okay. Thank you very much. Sorry about that.

MR. ALLISON: I didn't think any changes have been made.

THE COURT: No, it's fine. I'm not suggesting that.

MS. GILMORE: So can we offer the rest of the exhibits in now, your Honor?

THE COURT: Yes.

MR. ALLISON: Okay. We would offer Exhibit 1.

THE COURT: Yes. And...

MR. DAWSON: No objection.

THE COURT: Okay. Thank you.

(Exhibit No. 1 was admitted)

MR. ALLISON: We would offer Exhibit 2 which --

THE COURT: May I have some stickies. I usually have all these stickies. I have all of these things. Oh, wait, yes, I do. The nerd in me has stickies. Go ahead. Thank you. I'm sorry, you said Exhibit 1?

MR. ALLISON:  And that's admitted, your Honor?

THE COURT:  Yes.

MR. ALLISON:  And we would offer Exhibit 2, which is the actual permit.  It has two parts to it.  It's the public notice that describes what the permit application is and then it's the actual slides that show the permit.

MR. DAWSON:  No objection.

THE COURT:  Thank you.

MR. ALLISON:  Counsel, I'm going to jump over to the ones that I think are agreed to.

(Exhibit No. 2 was admitted)

MR. ALLISON:  Do you want to talk about -- let's go through it now.  Exhibit 3 we will go ahead and offer.

MR. DAWSON:  And Mr. Allison has made a representation to me about Exhibits 3 and 4 and accepting that representation, we have no objection.

THE COURT:  Thank you very much.

MR. ALLISON:  So we would offer 3 and 4, your Honor, at this time.

THE COURT:  And just for the Court's clarity, these are?  I'm looking at them.

MR. ALLISON:  Three, the orange shading is the land that Robert Rickett holds in his name nominally for the company for Berry JP, and Four is it's a combination of Two

and Three and let me tell you what I mean by that. If you look at slide -- and this is in the briefing -- if you look at Slide 32 of the Exhibit 2, which is the permit, and you overlay it with Exhibit 3, which shows Robert Rickett, you can see that the permit land is exactly overlapping with the Robert Rickett's land. And we have that in there, your Honor, to demonstrate that there is real property and that is part of and parcel to this permit and project; and so we overlaid them. And that's what the overlay is Exhibit 4.

THE COURT: Thank you.

(Exhibit Nos. 3, 4 were admitted)

THE COURT: And then we offer Exhibit No. 5 and that's an e-mail exchange relating to the exchange between counsels to release Robert Rickett.

MR. DAWSON: No objection.

THE COURT: Thank you.

(Exhibit No. 5 was admitted)

MR. ALLISON: We would offer Exhibit No. 6, which is the Plaintiff's petition or pleading in this case.

MR. DAWSON: No objection.

(Exhibit No. 6 was admitted)

MR. ALLISON: We would offer Exhibit No. 7, which is the agreement in the form that was attached to the original petition.

MR. DAWSON: No objection.

(Exhibit No. 7 was admitted)

MR. ALLISON: We would offer Exhibit No. 8, which is also an exhibit that was attached to the Plaintiff's original petition.

THE COURT: And I should be stating admitted, sorry. I'm busy doing stickies.

MR. ALLISON: And I apologize, and have all of those been admitted?

THE COURT: Yes. It's my fault because I'm -- I'm writing A, but I'm not saying it, so thank you. Yes, go ahead.

MR. ALLISON: So I think we're at One through Eight, we are asking those be admitted so we have a clear record.

MR. DAWSON: No objection.

MR. ALLISON: And, your Honor?

THE COURT: So just to be clear, Eight, Exhibit 8 which is the one that has two of the four signatures?

MR. ALLISON: Correct. And that's in the form that was attached to the original petition.

THE COURT: I agree. I recall. Thank you. Admitted.

(Exhibit No. 8 was admitted)

MR. ALLISON: And just so I'm clear, just a little housekeeping, maybe we didn't, maybe my fault, One

through Eight I think have been offered without objection?

THE COURT: Correct.

MR. ALLISON: And admitted?

THE COURT: Yes, and thank you.

MR. ALLISON: Okay. And we would offer Exhibit No. 11, which is the signed TRO in this case.

THE COURT: Yes, October 31st from Harris County.

MR. ALLISON: That's our Exhibit 11.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 11 was admitted)

MR. ALLISON: We would offer Exhibit 12, which is the first amended petition in this case.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 12 was admitted)

MR. ALLISON: And I'll go ahead and offer Exhibits 13 and 14, which respectively are the second amended and third amended petitions in this lawsuit.

MR. DAWSON: No objection.

THE COURT: And they are admitted.

(Exhibit Nos. 13, 14 were admitted)

MR. ALLISON: Then we would offer -- it says on its face Harris County, but it's the Nueces County case

because it got transferred by agreement.

THE COURT: In 2023.

MR. ALLISON: And that's Exhibit No. 15. We would offer that Plaintiff's original petition of Lawrence Berry's original petition filed here in Harris County transferred to Nueces, we would offer that.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 15 was admitted)

MR. ALLISON: We would offer Exhibit No. 16 into evidence, which is the temporary restraining order signed in Harris County, but relating to what is now and so it was in effect even after the transfer now, the Nueces County lawsuit.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 16 was admitted)

MR. ALLISON: There was also an amended temporary restraining order signed in that first filed case from a year ago where Lawrence Berry sued, that case now being in Nueces County. And we'd offer Exhibit No. 17, which is that amended TRO.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 17 was admitted)

MR. ALLISON: We would offer Exhibit No. 18,

which is the agreed transfer order.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 18 was admitted)

MR. ALLISON: We would offer Exhibit No. 19, which is Plaintiff's second amended petition.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 19 was admitted)

MR. ALLISON: When I say "Plaintiffs," I need to clarify. Not the Plaintiff here, but the Plaintiff down in Nueces County.

THE COURT: Thank you.

MR. ALLISON: I don't want to be misleading.

THE COURT: Thank you.

MR. ALLISON: And then we offer Exhibit No. 20, which is the Counter-Plaintiffs, that is Marty Berry, and Berry Operating Company, and Berry Contracting, LP, and Berry GP counterclaims against Lawrence Berry down in Nueces County. That's Exhibit 20. We offer it at this time.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 20 was admitted)

MR. ALLISON: I think both parties, your Honor, have the transcript from the temporary injunction hearing that

occurred in Nueces County. We have it as Exhibit 21 and we would offer it.

MR. DAWSON: No objection.

THE COURT: And the Court wants to thank you for the large file. I tried hard with four to a page.

MR. ALLISON: And that is admitted.

MR. DAWSON: No objection.

THE COURT: Admitted. Thank you.

(Exhibit No. 21 was admitted)

MR. ALLISON: And we would offer Exhibit No. 22, which is the ruling of the Nueces County. It's the transcript of it.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 22 was admitted)

MR. ALLISON: And we would offer Exhibit No. 23, which is the discovery in Nueces County that we propounded to Lawrence Berry and his trust, which by then was a party. And we'd offer that at this time, and it's the one -- it's the discovery that specifically asked about Axis and Lone Star Ports, all the entities.

MR. DAWSON: No objection.

THE COURT: Admitted.

(Exhibit No. 23 was admitted)

MR. ALLISON: Before that discovery was sent --

I'm a little out of order -- we would offer what is the Counter-Plaintiffs, again that's Marty Berry, Berry GP, and Berry Operating, and Berry Consulting -- excuse me, Berry Contracting, it's their second amended counterclaim down in Nueces County.  It's Exhibit 25 and we would offer it at this time.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 25 was admitted)

MR. DAWSON:  Counsel, are you going to speed this along if you want.

MR. ALLISON:  I'm trying to just have a clear record, and I didn't want to -- I didn't want to take your right away to object to any of them.

MR. DAWSON:  I will have no objections to 25 through 40.

MR. ALLISON:  25 through 40?

MR. DAWSON:  Yes.

MR. ALLISON:  We would offer Exhibits 25 through 40, your Honor.

MR. DAWSON:  No objection.

THE COURT:  Terrific.  Although I have to say I appreciate it, I actually have in the first -- well, the first TI so far, there are actually a fair amount of issues among the 139 exhibits.  So I do not --  I do not discredit you for

doing that, but thank you.

MR. ALLISON:  Thank you.

THE COURT:  So just to be clear through...

MR. DAWSON:  No objections to Exhibits 25 through 40.

THE COURT:  Thank you.

(Exhibit Nos. 26-40 were admitted)

MR. ALLISON:  We would have offered Exhibit No. 42, which is the lawsuit filed by Lawrence Berry's lawyer, Butch -- Butch Boyd here in Harris County against the Carlyle Group.  We would offer it at this time your Honor.

MR. DAWSON:  No objection.

THE COURT:  Admitted.

(Exhibit No. 42 was admitted)

MR. ALLISON:  And then Exhibit No. 43 in that same lawsuit is just an amended pleading.  We'd offer it.

THE COURT:  And to be clear, also admitted, too.

(Exhibit No. 43 was admitted)

MR. DAWSON:  Counsel, we will have no objections through to Exhibit 50.

MR. ALLISON:  Through 50, okay.

MS. GILMORE:  And, your Honor, 25 through 40 also admitted?

THE COURT:  Yes.  Thank you very much.

MS. GILMORE: Thank you, your Honor.

THE COURT: No, thank you. And I'm sorry, you just said it.

MR. DAWSON: I have no objections from 42 to 50.

MR. ALLISON: And so I offer them at this time.

THE COURT: Admitted.

(Exhibit Nos. 44-50 were admitted)

THE COURT: Good. Including the Orca asset. Okay. Thank you.

MR. ALLISON: That's it.

MR. DAWSON: And, your Honor, while we're -- if you don't mind, while we're on the subject of offering exhibits, we offer all the exhibits that are attached to our response to their motion to remand, and their motion to transfer venue, and the plea and abatement.

THE COURT: Any objections?

MR. ALLISON: We have no objection.

THE COURT: Admitted. Thank you.

(Exhibit Nos. 1-14 were admitted)

MR. REASONER: Your Honor, just for good order, we would like to offer the exhibits to our response to their motion for remand.

THE COURT: No objections?

MR. ALLISON: No objection.

THE COURT: Admitted. Thank you.

MR. ALLISON: Now, I think we have everything in the record. I know that took a little time. I apologize, your Honor.

THE COURT: No, no, that's perfect.

MR. REASONER: And, your Honor, one other thing just for the Court's convenience.

THE COURT: Sure.

MR. REASONER: We had done just a red line of their first versus the second amended petition just to show the Court could easily see the differences. I'm just handing that to Mr. Allison so he can double-check me on that.

MR. ALLISON: I did it, so -- well, I'm sure I believe him, but let me look.

THE COURT: We believe Mr. Reasoner. I'm impressed. Did you do this, Mr. Reasoner, or did someone whisper?

MR. REASONER: I will not mislead this Court.

THE COURT: Did someone whisper or did you ask for an instruction?

MR. ALLISON: Compare PDFs.

THE COURT: Did you -- wait, wait. Except I didn't give it the right...

MR. ALLISON: I was going to say.

MR. REASONER: Neither of.

THE COURT: You can imagine as an Argentine, I'm not sure how to give it the British accent. Let me go through my Venus versus (inaudible).

MR. REASONER: Neither of my colleagues, I think, have claimed to have done this either, your Honor.

THE COURT: I should have done that off the record, but I guess it's too late. Thank you.

MR. ALLISON: We have no objection to what is it numbered or how do you want to do it, just for the record?

MR. REASONER: We have 14 exhibits to our response. I believe this would be Exhibit 15, next in line to --

THE COURT: Okay. Thank you, Barrett.

MR. ALLISON: We have no objection to Exhibit No. 15, which is the red line between our two pleadings in Nueces County, our two counterclaims.

(Exhibit No. 15 was admitted)

MR. REASONER: And, your Honor, if we could also have Exhibit 16, understanding it's a demonstrative that I handed up to the Court. Yes, we would offer that.

MR. ALLISON: No objection, your Honor.

THE COURT: Okay. Thank you very much.

(Exhibit No. 16 was admitted)

MR. REASONER: Is that admitted, your Honor?

THE COURT: Pardon me? It is admitted. Sorry,

yes.

MR. ALLISON:  You're like me.

THE COURT:  No, it's good.  Thank you.  You're keeping me honest.

MR. ALLISON:  Your Honor, I checked the time. It's about 11:00.  I'm going to say if you'll give me 15 minutes, I would like to do some rebuttal.

THE COURT:  I have no problem, but indulge me. Why don't we take -- should we just take a quick break?

MR. ALLISON:  Thank you.

THE COURT:  Should we have five minutes, ten minutes?

MR. ALLISON:  Whatever you say.

THE COURT:  We can do about 10 minutes.

(Short break)

MR. ALLISON:  If you'll give me one second just because I was going to pull to a certain exhibit real quick.

MS. GILMORE:  We are not going to take as much time as we say.

MR. ALLISON:  We're not.

THE COURT:  It is fine.  The beauty of just starting this process, we're just so excited and please pardon my huge tea thing.  Ready?  Thanks.

MR. ALLISON:  May it please the Court, counsel. I will be brief.  At it's core, it is incredibly important to

point out that many, in fact, all of the venue-only cases that were referred to that are forum cases, forum selection clauses or venue selection clauses, the ones where it talks about oh, you know, it's mandamusable or it's an abuse of discretion are not dominant jurisdiction cases. So we've got to not conflate the two. We cannot confuse the two. We cannot -- we cannot allow that law to invade dominant jurisdiction law. And so, again, I do commend to you the Wyatt case, the Cleveland case, the Encore case, the Phillips case, and the J.B. Hunt case on dominant jurisdiction. Those cases and then I would also suggest to maybe review of the combined response because at it's core, the first thing to get to, and they mix, they continually mix venue and dominant jurisdiction. The first thing to get to is dominant jurisdiction, which is the focus of my combined reply. And it can be boiled down as clearly as this: I'm going to digress a little and say I agree we're not here trying to prove our case; they're not here trying to prove their case. What I said in my opening is not that we're not right, we're trying to convince you that we're right. Those are the allegations that are inevitably related to this project. We have these different entities that are really -- we're not suing the entities that we own. They sued an entity we owned. We think the fight really is between Berry GP and -- and I guess Allied, not even Mr. Powers.

But all of those statements that I made, I want

to be very clear, are not evidence and not me trying to say we're addressing the merits today. This Court, and what I think you are charged with doing, is looking at all of those allegations and looking at all of their allegations and seeing if the two collide and looking at how they've gotten an injunctive relief based on their pleadings in this case and how there was injunctive relief requested in the first case. Because those pleadings, nobody has stood up in front of you and said the TROs in this case or the TROs in the previous case were beyond the scope of the pleadings, they're not. They had to be within the scope of the pleadings to grant the relief requested. In this case, the TRO says that Marty Berry -- and by the way, and it says, "All companies associated with the project." You can look at the chain, the title, you know, the transfer of access from where I said, "It's all green and everybody agrees it's going from Lawrence to Berry GP," everybody knows Berry GP is the one that spent the 15 million dollars. And that's while the permit was owned by them and while they were the sole manager. And they still think they own it and are sole manager. And the TRO signed by the judge in this case precludes Marty Berry and all other entities or -- let me just read it.

THE COURT: Yes.

MR. ALLISON: "Holding any meeting that in any way seek to affect the management or ownership interest of

Axis or any other entity, property or tangible or intangible rights associated with the project." That means Berry GP, which we think owns Axis, they're directly affecting Berry GP by the order in this case. They are directly affecting Canada Program -- sorry, Canada Project Holdings, LLC because that is absolute -- they are the ones who hold the lease on Harbor Island. They are -- they have pled a case and gotten relief that collides with our ability to operate, quite frankly, huge employers and huge companies in Nueces County. It is -- it is a great gravidus to us to have abided by that for the period that we have abided by that.

They have also in this case asked for injunctive and obtained injunctive relief to this day changing, altering or transferring in any way management of access or any other entity associated with the project. Red Fish Bay Terminal, which we a hundred percent own, nobody disputes that, is associated with the project. They own all the land. They own all the land in Aransas Pass. Canada Project Holdings owns all the land and is paying -- not owns, has been paying 6.2 million, 5 million of which is Berry GP money when you look at the exhibit, and has spent that money to lease the property that the Axis permit is for. They are as interrelated -- I mean, and they are not just interrelated, they are married to each other. They are forever bound to each other. Then the third piece of relief they get is

changing, altering -- this is what they have precluded us from doing -- changing, altering or transferring in any way ownership property or tangible or intangible rights of any entity associated with the project.

In other words, they are telling us even though we have a clear reason because of a lack of a majority vote, we have a clear reason and belief. And by the way, Hummell and Marty -- Mike Hummell, and Marty Berry, and all the people sitting over here and my clients, they were the ones listed with the Texas Secretary of State (and I should ask to supplement the record on this if you want) until about a week ago. During the existence of the TRO, they went out and changed management on us. Think about that. They went and kicked us off the board while they had a TRO and put themselves on the board. But they have had a TRO in place that says we cannot do anything to affect management or ownership or property or intangible or tangible rights. All of that would occur through Berry GP, so we can't have a Berry GP meeting? All of that would occur if you're talking about Canada Projects Holdings would occur through the three trusts. I guess we can't even have the trust be operating or hold meetings or do things with the property they own? Of course they're interrelated. That's the very property on Harbor Island. Those are the allegations. I'm not saying it because you have to believe it or find that it's true, but those are

the allegations.

And then the last thing that I just wanted to obviously -- or show as an obvious point of collision -- by the way, I almost had a red line that I meant to bring and do the same thing, so I'm so thankful. What you'll see is in order to include Axis in the pleadings, and I did this very intentionally, I changed almost nothing in the pleading. What Lawrence Berry did, and we have discovered recently and filed the counterclaim, what Lawrence Berry did with Orca by signing his name, and acting like he's solely in control, and transferring things around, and hiding assets, which is the fight in Nueces, that is exactly the same thing he did here with this whole Axis entity. What he told the court, he signed that he's -- he's signed for every entity. I think he signed 18 different times his name as transferring it and receiving it, and transferring it and receiving it. And we have asked the court in Nueces County for this relief because it's the exact same conduct that's been the subject of litigation in our counterclaim up in Nueces County.

The exact relief we asked for was the Counter-Plaintiffs, that's us, seek a declaration pursuant to 37.004. A declaration that transfers, conveyances, contracts, manager appointments executed or accepted by Lawrence Berry, purportedly involving Orca and/or Axis, because it's the same conduct, without majority approval of the board should be

void, void ab-- found void, void ab initio, voidable, invalid, and of no legal force or affect. They've told you -- they've told you what we do here, "Oh, Judge, we don't want to do anything here. We're not going to do anything that has anything to do with what's up in Nueces." In Nueces, we've made it very clear, we're going to go make sure ownership of Axis is where we think it's always been when we were spending our 15 million dollars. We're going to make sure that it's with Berry GP. And if that doesn't matter to them, if they think that's unrelated, then why do they have pleadings on file that say they don't want us to change ownership, they don't want us to change management, they don't want us to do anything with Axis? We are on a direct collision course.

Okay. They are not just intertwined and they are intertwined. They're not just interrelated and they are interrelated. They are in a -- on a continuing collision course demonstrated easily by the fact that the breathe of the TRO in this case, clearly contradicts the relief in Nueces County. In Nueces County we can sell property with 48 hour notice to the board. We don't have to give notice to Lawrence; he's not on the board anymore. In Nueces County we can sell property with 48 hours' notice. Here, they have prohibited us from selling property, period, or exercising control over our property, which we must do. So, respectfully, we ask that you do note that they are

interrelated. That's the only issue we think you should, quite frankly, get to. The case law is very clear that you address dominate jurisdiction first. Please read carefully the cases because we cannot conflate the venue cases and the forum -- by the way, very quick note. It is a -- it's not a forum selection clause, it is a venue selection clause because it chooses one county, Harris County. That means you do go to 15.020 if you ever get there, and then read the Pearcy case that makes it clear you don't look at future earnings that may or may not happen. And so clearly under that case, 15.020 does not apply, but that's all in the briefing.

But let me get back on track; and that is, you'll never get there because clearly the conflict exists between the breadth of the jurisdiction previously exercised in the what is now the Nueces County case because we were originally prohibited from selling any of our property, just like they did here, same thing. And, you know, that -- those rights, you cannot unring that bell. I think it's so interesting he pledges -- and I'm sure he would try to do it, you know, to say, "Oh, well, we're only going to plead this, and we're only going to ask for that, we're really not going to ask for this over here." You can't unring the bell. They have had this pleading in a different court, different judge exercise jurisdiction in a way that is directly in conflict with what has happened and is happening in Nueces County.

Under the cases, we think dominant jurisdiction is absolutely the controlling issue, and the matter can be dismissed or abated. That is, I think, within the judicial prerogative of your Honor; and, you know, clearly we have to move forward with all. The cases are quite clear. The first filed case has to exhaust its remedies, exhaust it's exercise of jurisdiction before any other interrelated or any other intertwined case can go forward. Thank you.

THE COURT: Thank you very much.

MR. DAWSON: May I have a very brief reply, your Honor?

THE COURT: Yes.

MR. DAWSON: First of all, if you look at the -- I give you the handout of the enforceable forum selection clauses. If you look at many, most of those enforceable forum selection clauses specify a particular venue. And so just because the forum selection clause in this case specifies a particular venue doesn't say -- doesn't mean it's not a forum selection clause. Many of those cases, and I think most of those cases, they say in this particular venue of this particular state, which is exactly what our -- the clause here says.

I think my fundamental disagreement with Mr. Allison is he says you have to determine dominant jurisdiction first, but you only -- in order -- the first

starting place for dominant jurisdiction is venue proper in Nueces County? That's the first hurdle. And so really -- and as I told you earlier, dominant jurisdiction is really a venue question. And because there is no jurisdiction in Nueces County, their dominant jurisdiction argument fails.

Secondly, your Honor, they have --  I have heard them, I think, stipulate that subject matter jurisdiction exists in this case. I think I heard both Judge Gilmore and Mr. Allison say that. I'll remind the Court that the jurisdiction that gets us to this court is that the dispute has to exceed 10 million dollars. And so to me that's a stipulation that this qualifies as a major transaction. We're bringing suit under an agreement, an investment agreement. We stipulated that has a value in excess of 10 million dollars. They've stipulated to subject matter jurisdiction, so I think you get to major transaction under Section 15.020. If you agree with us on either the forum selection clause, which I think is where you should start or 15.020, you don't have to worry about whether this case and the Nueces case are interrelated. That stops the analysis for the Court or it ends the need for the Court to do further analysis if you agree with us on either of those two points.

With respect to the companies that are the subject of the TRO, they are the companies that are listed on that chart that is included in the third amended petition.

Those are the companies associated with the project. These companies that he's talking about, Orca and all those other companies, they are not mentioned in our petition, they are not companies that we're seeking to stop people from -- so what happened was Bonnie and Marty called a meeting. The first meeting, just so you know, they called a meeting for August 6th. You have a partial transcript of that meeting and they called a meeting of all these entities. And if you read the transcript, they're asking Lawrence Berry "Who owns Axis," and he says, "You have to ask Ted Powers, he set this thing up; you need to ask him." And what's not in the recording that you have is Mr. Powers comes and he attends that meeting. He sends them a letter ahead of time that says, "By the way, I'm a 20 percent owner of this project. I'm a 20 percent owner of Lone Star Ports Holdings," and he comes down, and if we get to the injunction hearing, you will see. He draws a diagram for them to show them the corporate ownership interest for the project.

And in that discussion, he tells them he owns 20 percent. They don't dispute him. They don't say, "Wait a minute, what are you talking about? What do you mean you own 20 percent?" Never disputed. And then thereafter having been told that Axis is owned by Lone Star Ports Enterprises, having been told that, they tried to call a meeting saying that they are owners, which they now admit that they know that they're

not.  Mr. Hummell was told that Lone Star Ports Enterprises is the owner, sole owner and sole manager of Axis Midstream. Notwithstanding him being told that, he calls for the meeting. And it's in the attachments to our third amended petition.

But in any event, the companies that are the subject of the TRO and the subject of this claim are those that are listed in the diagram that's in the third amended petition.  And then finally, your Honor, I would --  it's not part of today's argument, but I would ask the Court without pre-judging any ruling on the motions that you have taken up today, to go ahead and tell us if there is an injunction hearing, it will be on whatever particular day.  And I do that really for two reasons:  One, is so that the lawyers can get it on their calendar and we don't lose those dates between now and whenever the Court rules on the pending motions.  And the other thing is I'm going to ask -- the TRO expires today, and I'm going to ask Mr. Allison to extend it for a period of seven days after the injunction hearing, that way it gives the Court time to rule on whatever the Court --  assuming the Court -- and I'm not pre-judging your ruling, but assuming there is one, I'm going to ask him to do that.  And if he wants modifications to address what companies are the subject of the extension, I'm happy to do that as well.  And so if we could, whenever the Court --  whenever it's convenient for the Court, if you could tell us there's a conditional setting or

whatever without pre-judging your ruling on today's motions, that would be helpful, I think, to the lawyers.

THE COURT: Thank you very much.

MR. DAWSON: Thank you. If you have any questions...

THE COURT: Not at this moment. Let's allow and I think there's going to be some -- there may be a sur-reply for lack of a better terminology. So I will take that up momentarily, but Mr. Reasoner is at the reply.

MR. REASONER: I'll be shorter than both, your Honor. I just -- first, I'm not -- don't take it by my silence that I --

THE COURT: Silence does not deep consent.

MR. REASONER: The aspersions against my client...

THE COURT: Many fall seasons, understood. Yes, go ahead.

MR. REASONER: Two quick points, your Honor.

THE COURT: Yes.

MR. REASONER: First, they made no claims in the Nueces County case against involving Axis or Lone Star Ports until after Mr. Powers filed his case, until Tuesday of this week. That paragraph he was reading to you filed on Tuesday, it'll be in blue in exhibit, I think, it's 16, your Honor, that we tendered. Secondly, and we -- and the term

"dominant jurisdiction" has been thrown around a lot, and there's an effort to try to distinguish it from the venue problem. Again, Gonzalez, if you look at Page 6 of Gonzalez, if I may quote, "With regard to the parties' arguments as to which court had dominant jurisdiction, quote, unquote, "Over the wrongful debt suit, we agree with the Court of Appeals, that a less venue would be proper in both Harris and Hidalgo Counties. The concept of dominant jurisdiction," quote, unquote, "Is inapplicable to this case," Texas Supreme Court.

There is an agreement here that Harris County is the forum selected or at minimum the venue. And as Mr. Dawson has pointed out, that means others are not. That is the mandatory venue. Thank you, your Honor.

THE COURT: Thank you.

MR. ALLISON: I'll just very briefly, I will say this: That when the cases talk about dominant jurisdiction being really a venue issue, it takes precedence over all other -- in fact, there's cases cited, all other Texas Rule of Civil Procedure venue rules, period. There's a case that is cited in there that talks about, "Hey, I know that this one says this and it's mandatory venue, but you don't even get there because it gets decided by the dominant jurisdiction issue." And so I think that's very much a red herring to suggest to you that venue has to be proper in Nueces. I think they're wrong. Having said that, remember we

have an affidavit on file that the property is in Nueces County. It's another mandatory venue provision.

So for all of the reasons -- to be honest with you, you don't even get to the whole venue discussion like they want to try to put it first. They are trying to leapfrog it. The dominant jurisdiction is the venue and we do also know if we were going to go to the rules, the venue over one Defendant is venue over all of them, okay. So there's a lot of -- you cannot get -- you cannot put the venue discussion ahead of the dominant jurisdiction discussion. And if they're interrelated, I think the case law is very clear what the course -- the proper course of action is.

All of that being said, I do want to jump to one thing. He asked about the TRO, and the Court's aware I think we did it on the record last time. I think we extended it until today. I eluded to it a moment ago. And let me just start by saying this: I'm sure everybody's aware that injunctive relief is an equitable remedy. In order to ask for an equitable remedy, you have to have clean hands. To say that we are flabbergasted to learn yesterday that they have gone out and I think thrown Mr. Hummell out as general counsel and removed Marty Berry, they've gone and had a meeting, the exact thing that they enjoined, they went and did. There's no equity. And I need to say on top of that, the way that which they're asking us to extend affects Berry GP and companies are

the very decision-makers for a multi, multi-million dollar company and we've been tied up long enough. We cannot -- we just cannot. And I don't think under the circumstances since they've breached and they've breached, for them to go out and have a secret meeting during the existence of a TRO that they went and got is about as wrong of a breach of the spirit of that TRO as I can imagine. So the short answer to your question is we cannot agree.

MR. DAWSON: Well, your Honor, let me address one thing. There was no meeting. They had filed papers with the Secretary of State's office that inaccurately set forth who the manager of Axis Midstream was and who the officers were. And all my client did was file a document with the Secretary of State's office that clarifies the appropriate manager of Axis Midstream, according to the corporate documents that had been signed. That's all that happened. If he doesn't want to extend it, I can't force him to. The Court did ask us in a prior communication to have meaningful negotiations about trying to extend it. If he doesn't and they go out and try and do something, we'll come back and talk to you.

MR. ALLISON: Agreed. I think that's the way we have to go now.

THE COURT: Okay. Understood. Off the record.

(End of proceedings)

THE STATE OF TEXAS     )

COUNTY OF HARRIS       )

    I, Benjamin Alva, Official Court Reporter in and for the 165th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

    WITNESS MY OFFICIAL HAND this the __24th__ day of __January__, 2025.

01-24-25

BENJAMIN ALVA, Texas CSR 6499
Expiration Date: 04/30/25
Official Court Reporter
165th Judicial District Court
201 Caroline, 12th Floor
Houston, Texas 77002

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
THE BUSINESS COURT OF TEXAS,
11TH DIVISION

ALBERT THEODORE POWERS;  )
ALLIED PORTS, LLC         )
    Plaintiffs,           )
                  )
V.                        )
                  ) CAUSE NO. 24-BC11A-0025
AXIS MIDSTREAM HOLDINGS, )
LLC; ALLEN LAWRENCE       )
BERRY; MARVIN GLENN       )
BERRY; AND BONNIE BERRY,  )
As successor in interest  )
To DENNIS WAYNE BERRY     )
    Defendants.           )

    I, Benjamin Alva, Official Court Reporter in and for the 165th District Court of Harris County, Texas, do hereby certify that the following exhibits constitute true and complete duplicates of the original exhibits, excluding physical evidence, offered into evidence during the hearing on Marty Glenn Berry's Plea and Abatement and Motion to Abate; The Movant's Motion to Remand, Dismiss, and Transfer Venue Pursuant to Chapter 25; Defendant, Axis Midstream Holdings', Motion to Transfer Venue in the above-entitled and numbered cause as set out herein before the Honorable Sofia Adrogue, Judge for the 11th Division Business Court, Harris County, Texas.

    WITNESS MY OFFICIAL HAND on this, the____24th____day of__January_____, 2025.

                         01-24-25
    _____
    BENJAMIN ALVA, Texas CSR 6499
    Expiration Date: 04/30/23
    Official Court Reporter
    165th Judicial District Court
    201 Caroline, 12th Floor
    Houston, Texas 77002

# EXHIBIT 17

CAUSE NO.: 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and as Trustee of the ALLEN LAWRENCE BERRY TRUST, directly and derivatively on behalf of BECON, INC.; LDMA LIMITED PARTNERSHIP; and BERRY GP, INC.; | § § § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| BERRY GP, INC.; LDMA LIMITED PARTNERSHIP; and BECON, INC.; | § § § | |
| *Nominal Plaintiffs,* | § § § § | NUECES COUNTY, TEXAS |
| v. | § § | |
| MARTY BERRY, MICHAEL HUMMELL, BERRY GP, INC., BERRY OPERATING COMPANY LLC, and BERRY CONTRACTING LP; | § § § § § § | **JURY TRIAL DEMANDED** |
| *Defendants*. | § | 94th JUDICIAL DISTRICT |

## ALLEN LAWRENCE BERRY'S RESPONSE IN OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

### I.  INTRODUCTION

Plaintiff and Counter-Defendant Allen Lawrence Berry (herein after "Lawrence") files this Response in Opposition to Counter-Plaintiffs' Berry G.P., Inc. ("Berry GP") and Redfish Bay Terminals' ("RBT," and together with Berry GP "Movants") Application for Temporary Restraining Order and Temporary Injunction.  Movants' Application seeking to enjoin Lawrence from challenging Berry GP's ownership of Axis Midstream Holdings, LLC (hereinafter "Axis") is nothing more than an unconcealed attempt to end run around a recently filed order in Judge Adrogué's 11th District Texas Business Court in a separate lawsuit filed by third parties relating to the ownership of Axis and the Lone Star Ports Project.

1

Glaringly absent from Movants' Application to this Court is **<u>any</u>** mention of the earlier Petition and Request for Temporary Injunction filed in Harris County District Court on October 31, 2024, by Albert Theodore Powers ("Ted Powers") and his company Allied Ports, LLC ("Allied Ports"), which was later removed to the 11th District Business Court by Lawrence (the "Business Court Lawsuit").  The Business Court Lawsuit was filed against Lawrence as well as against Bonnie Berry and Marty Berry—both Counter-Plaintiffs in this litigation—and specifically seeks injunctive relief relating to the ownership and management of Axis.  Also absent from Movants' Application is any disclosure to this Court that ***for the past several months*** the Business Court has entertained and ultimately rejected Marty and Bonnie Berry's proffered dominant jurisdiction arguments to abate and/or transfer that Axis-related Business Court Lawsuit to the Court here in Nueces County.[1]

Finally, and most incredibly, Movants failed to inform this Court that on January 17, 2025, Judge Adrogué signed an order denying Marty and Bonnie Berry's motions to abate and transfer the Business Court Lawsuit, and that she has now set Plaintiffs Ted Powers and Allied Port's Application for a Temporary Injunction relating to the ownership and control of Axis for an evidentiary hearing next week, on January 29 and 30.  Without disclosing any of these facts, and a mere four days after Judge Adrogué's Order and one week before said Injunction Hearing, Movants Berry GP and RBT now seek to have this Court interfere with the Business Court's jurisdiction by enjoining Lawrence's conduct, speech, and potential testimony related to the ownership of Axis that is the very centerpiece of the Injunction Hearing proceeding in Judge Adrogué's Court next week. Such gamesmanship is entirely improper and should be rejected.

---

[1]  For the avoidance of doubt, Ted Powers, one of the two Plaintiffs in the Harris County Business Court Lawsuit, has no relation to the former CEO of Berry GP, Rob Powers, who was formerly a Defendant in this Lawsuit.

2

Further, Movants' Application is not only an improper circumvention of Judge Adrogué's recent ruling; it is also improper because Berry GP and RBT cannot prove imminent or probable harm, nor can they demonstrate a probable right to relief. For these reasons and the reasons stated below, Movants' Application should be denied.

## II.     FACTUAL BACKGROUND

### A.     Undisclosed Facts Relating to the Existing Business Court Lawsuit Related to Axis

On November 27, 2023, Plaintiff Lawrence filed this lawsuit—directly and derivatively on behalf of Becon, Inc.; LDMA Limited Partnership; and Berry GP—and sued Marty Berry, Mike Hummell and three Berry Entities (as nominal defendants) for various breaches of fiduciary duties and self-dealing transactions related to those three Berry Entities,[2] and sought injunctive relief against those defendants. *See generally* Pls.' 2nd Am. Pet. (filed 10/11/24) (the "Nueces County Lawsuit").[3] None of Lawrence's claims in this Nueces County Lawsuit relate to Axis or the Lone Star Ports Project (hereinafter "the Project"). Indeed, Ted Powers, Allied Ports, Axis, the Project,

---

[2] Berry GP; Berry Operating Company LLC; and Berry Contracting LP are defined in the Nueces County Lawsuit as the "Berry Entities." *See* Ex. 4 ¶ 1. The other Berry entities at issue in this Lawsuit are LDMA Limited Partnership and Becon, Inc. *See id.* ¶¶ 25-27.

[3] Specifically, in this lawsuit, Lawrence alleged that:

- Marty, with the assistance of Hummell and other management, imperiled a longstanding Berry GP line of credit in excess of $50 million, causing the line of credit to be placed in default, *see id.* ¶¶ 3, 45-56;

- Marty, with the assistance of Hummell and other management, colluded in secret to authorize $75 million in self-dealing loans between Berry GP and Marty and Dennis, *see id.* ¶¶ 37-41;

- Marty has been secretly usurping Berry GP corporate opportunities by buying cranes through a personally owned business named Western Gulf Equipment and then leasing them back to Berry GP, *see id.* ¶¶ 3, 72, 117; and

- Marty and the other defendants, in violation of the Berry GP bylaws, secretly attempted to sell a valuable Berry GP dock facility without notice to or approval of the Berry GP Board of Directors, *see id.* ¶¶ 3, 104.

3

and the Investment and Consulting Agreements regarding that Project are not mentioned anywhere in Lawrence's Petition in this Nueces County lawsuit. *See id.*[4]

On January 23, 2024, Marty and the three named Berry Entities filed counterclaims against Lawrence. *See* Counter-Pls.' 1st Am. Pet. (filed 4/15/24). They alleged mismanagement and conversion by Lawrence related to the use of funds pertaining to a series of companies Lawrence owns, referred to as "Orca." *See* Ex. 5 ¶¶14-20. Again, these counter-claims were entirely focused on the Orca transaction and were unrelated to the ownership interests of Axis or the Lone Star Ports Project.

On October 31, 2024, Ted Powers and Allied Ports filed their Original Petition and Motion for a Temporary Restraining Order and Temporary Injunction against Axis and the Berry Defendants in the 215th District Court of Harris County, Texas, Cause No. 2024-76060. *See* Ex. A (Oct. 31, 2024 Petition and Application for TRO). They did so when they learned that Marty and Bonnie Berry attempted to improperly call a meeting of Axis. *See id.* ¶ 22. That Harris County Business Court Lawsuit centers on the alleged breach of an Investment Agreement and Consulting Agreement and on Ted Powers' and Allied Ports' claimed 20% ownership and management

---

[4] Indeed, as the Court may recall from the lengthy three-day hearings on Lawrence's Application for an Injunction, on February 16, March 22, and March 25, 2024, that nowhere in the hundreds of pages of testimony and evidence admitted was Powers, Allied Ports, Axis, or the Investment and Compensation Agreements even mentioned. And the Lone Star Ports Project was mentioned only once in passing in response to a background question regarding what Lawrence's assistant, Tonja Fulghum, was currently working on for Lawrence. *See* Ex. 8, at 268:1-2 (3/25/24 Transcript).

interests in the Project. Plaintiffs' claims in the Business Court Lawsuit also center on the proper ownership and control of Axis, one of the Project entities. *See id*., *e.g.*, ¶¶ 18[5] & 22-23.[6]

Plaintiffs in the Business Court Lawsuit secured a temporary restraining order in Harris County on the same day and subsequently amended their petition and request for a temporary injunction, with the latest amendment on November 27, 2024. *See* Ex. B (Pls.' 3rd Am. Pet.).

On November 8, 2024, Marty and Bonnie filed a Motion to Transfer Venue ("Motion to Transfer") and a Plea in Abatement/Motion to Abate ("Motion to Abate"), followed by a Motion for Leave to File Motion to Transfer Venue on November 11, 2024. *See* Exs. C & D.

After a short hearing on November 12, 2024—which did not delve into the merits of any pending motions or the Plaintiffs' application for injunctive relief—the 215th District Court of Harris County extended the temporary restraining order to November 28, 2024. *See* Ex. E (11/14/24 Order).

Lawrence then timely removed that lawsuit to the 11th Division of the Business Court of Harris County on November 15, 2024. *See* Ex. F (11/15/24 Notice of Removal).

Marty and Bonnie Berry then filed their Motion to Remand in the Business Court Lawsuit on November 20, 2024, incorporating most of their arguments from their previously filed Motion to Transfer and Motion to Abate. *See generally* Ex. G (Motion to Remand). That Motion to

---

[5] "Of the several entities formed, in particular focus in this lawsuit (and the temporary relief sought) is Defendant Axis. Axis was formed to hold intangible property of the Project, including the permitting rights associated with development of the Project. Axis's sole Member and Manager is Lone Star Ports Enterprises, LLC ("LSPE"), which through the chain of entities above is ultimately managed by Plaintiff Allied Ports, LLC."

[6] "Changing the ownership of Axis is part of an overall plan to divest Plaintiffs of their interest by breaching the Investment Agreement by taking Axis out of the established and agreed to ownership chain of the Project now that the permit has been issued. Marty and Bonnie have purported to call a "meeting of owners" of Axis for November 6, 2024, where they intend to take action on (1) "Appointment and/or removal of Company Managers" and (2) Appointment and/or removal of Officers." Ex. 5. This meeting is obviously improper given Marty and Bonnie are admittedly not "owners" of Axis."

Remand contended that the Court here in Nueces County had dominant jurisdiction over the claims asserted in the Business Court Lawsuit. *See generally id*. Plaintiffs Ted Powers and Allied Ports and Defendant Lawrence responded to those arguments, arguing that no dominant jurisdiction could exist in Nueces County because (i) venue was improper in Nueces County (and was only proper in Harris County) and thus it could not have dominant jurisdiction as a matter of law; and (ii) that there was no substantial overlap between this suit and the Business Court Lawsuit that would warrant such a finding. *See* Ex. H (ALB's Response to Motion to Remand); Ex. I (Plaintiffs' Response to Plea in Abatement).

As a last -ditch effort to create some purported overlap between the Nueces County Lawsuit and the Business Court Lawsuit, Counter-Plaintiffs amended their counterclaims in this Nueces County Lawsuit on December 3, 2024, just before the hearing on their Motions to Remand, Transfer, and Abate to include references to Axis ownership. *See* Counter-Pls.' 2d Am. Pet. (filed 12/3/24).

After full briefing on these issues, Judge Adrogué held a lengthy hearing on December 6, 2025. Judge Adrogué then requested additional briefing from the parties to the Business Court Lawsuit, which was submitted on January 9, 2025. *See* Exs. J & K (Moving Parties' & Responding Parties' Briefs on Signature Issue).

On January 17, 2025, Judge Adrogué signed an order denying the Motions to Abate, Transfer, and Remand. *See* Ex. L. She has set aside January 29 and January 30 for the consideration of Plaintiffs Ted Powers' and Allied Port's Application for Injunctive Relief as it relates to Axis and the Project. *See* Ex. M (Notice of Hearing).

6

As part of that hearing set for January 29 and 30, Ted Powers and Allied Ports are seeking the following injunctive relief, *which includes any changes to the ownership or management of Axis* and the Lone Star Ports Project:

> To preserve the status quo and Plaintiffs' rights during the pendency of this action, Plaintiffs respectfully request that the Court grant and enter a temporary injunction precluding Defendants, their employees, agents, representatives, and any others acting on their behalf from taking any of the following actions unless expressly permitted by this Court to do so:
>
> a. ***Holding any meetings or taking any action for or on behalf of Axis unless called by or approved by the Manager Lone Star Ports Enterprises, LLC***;
>
> b. ***Changing, altering, or transferring in any way the permit (SWG-2018-00789) issued to Axis***;
>
> c. ***Changing, altering, or transferring in any way the ownership, management, or tangible or intangible rights of Axis***;
>
> d. Changing, altering, or transferring in any way the ownership, management, assets, or tangible or intangible rights held by the entities formed for the Project which is the subject of this lawsuit;
>
> e. ***Holding any meetings that in any way seek to affect the management or ownership interest of Powers or Allied Ports, LLC in the Project or in any of the entities formed for the Project***;
>
> f. Taking any action that would impact or affect Powers' or Allied Ports, LLC's 20% ownership interest in the Project that is the subject of this lawsuit or in any of the entities formed for the Project.

Ex. B ¶ 37 (Pls. Third Am. Pet. and Application for TRO and Injunctive Relief) (emphasis added).

Lawrence is currently under subpoena by Plaintiffs in the Business Court Lawsuit and plans to testify fully and truthfully as to his understanding of the true ownership of Axis. *See* Ex. N (Subpoena).

In their Application to this Court, Movants seek to enjoin Lawrence "and all those acting in concert with him" from "(1) filing any document with the Texas Secretary of State changing, modifying, or altering any information about Axis Midstream Holdings LLC, absent a majority vote of its Manager/Member (Berry GP or RBT); (2) calling for or holding any Members' meetings

7

purportedly on behalf of Axis Midstream Holdings LLC; (3) taking any action (through any person or company, including Lone Star Ports Enterprises LLC) purportedly as Member(s) and/or Manager(s) of Axis Midstream Holdings LLC; and (4) representing or suggesting to others any right of ownership or control of Axis Midstream Holdings LLC, except for Berry GP's (RBT's) 100% ownership and sole control – all such injunctive relief pending further Order from this Court or a final adjudication of the merits." *See* Movants' Application for TRO & TI (filed 01/21/2025) at 20-21.

**B.      The Corporate Documents and Conduct of the Parties Confirm that Axis is NOT 100% Owned by Berry GP.**

On September 20, 2017, Lawrence as the sole member of Axis transferred a 100% interest in Axis to Gansevoort ("Gansevoort") Investments LLC. *See* Movants' Ex. 3 ("Transfer Agreement"). On November 30, 2017, Lawrence as the Manager of Gansevoort transferred 100% interest in Axis to Berry GP. *See* Movants' Ex. 5 ("Transfer Agreement").

In 2018, Lawrence conceived the idea to create a state-of-the-art, crude oil delivery facility, earlier referred to here as the Lone Star Ports Project (the "Project"), and his brothers Marty and Dennis decided to pursue the Project with him. In October of that same year, Lawrence and his brothers engaged Ted Powers to assist in structuring and securing financing for the Project. Of the several entities formed related to the Project, Axis holds intangible property of the Project, including the permitting rights associated with development of the Project. *See* Ex. O (Lone Star Ports Project Organizational Chart).

As part of the structuring of the Project, on April 21, 2020, Berry GP transferred 100% of its interest in Axis to RBT. *See* Ex. P (Transfer of Interest Agreement and Change of Manager). On that same day, RBT transferred 100% of its interest to Lone Star Ports Holdings LLC. *Id.* (attaching Transfer of Interest and Change of Manager Agreements). Lone Star Ports Holdings

8

LLC then transferred 100% of its interest in Axis to Lone Star Ports Enterprises. *See id*. These documents were signed by Lawrence and Dennis at the Berry GP offices in Corpus Christi, while the Berry brothers were all together. The documents were then sent by Ted Powers to a potential third-party investor—Scott Baker—on April 23, 2020, with Lawrence, Dennis, and Marty copied on the emails, representing to Baker that the documents reflected the current ownership structure of the Project. *Id*.; *see also* Ex. Q (email attaching Axis, LSPE, and LSPV Operating Agreements). At no point did Marty or Dennis object that the documents were invalid or that the structure represented therein was improper.

Under the structure reflected in the April 21, 2020 documents signed by Dennis and Lawrence, and represented as accurate to a third-party investor, Axis' sole Member and Manager is Lone Star Ports Enterprises, LLC ("LSPE").[7]   Only LSPE has the right to call a meeting of Axis.

Thus, as of April 21, 2020, the corporate documents reflect Berry GP was no longer the 100% interest owner or manager of Axis.

### III.   ARGUMENT

**A.   Movants Seek to Improperly Enjoin Lawrence Regarding Axis**

**1.   Movants Fail to Disclose the Business Court Lawsuit and Attempt to End Run That Court's Order**

Movants Berry GP and RBT's Application is nothing more than an improper attempt to circumvent and disregard the carefully considered Order issued by Judge Adrogué relating to the Business Court Lawsuit which centers on the ownership and management of Axis and the Project. *See* Ex. L (1/17/25 Business Court Order).  Plaintiffs Ted Powers and Allied Ports filed their

---

[7] LSPE's sole Member and Manager is Lone Star Ports Ventures, LLC ("LSPV").  LSPV's sole Member and Manager is Lone Star Ports Holdings, LLC ("LSPH").

original TRO and Application for Temporary Injunction after learning that Marty and Bonnie Berry had improperly called a meeting of Axis which they had no authority to do and were claiming a 100% ownership interest in Axis. *See* Ex. A (Pls.' Oct. 31, 2024 TRO). Marty, Bonnie, and Axis then sought to abate the Business Court Lawsuit in favor of this Nueces County lawsuit or otherwise transfer the Business Court Lawsuit to this Court. *See* Exs. C & D (Motions to Abate/Transfer/Remand). After pages upon pages of briefing and hours of argument, on January 17, 2025, the Business Court declined to transfer, abate, or remand the Business Court Lawsuit. *See* Ex. L (1/17/25 Business Court Order).

Further, after weeks of scheduling attempts, the Business Court set Ted Powers' and Allied Port's application for injunctive relief for hearing on January 29-30, 2025 (the "Injunction Hearing"). Ownership and management of Axis will be a central issue at the Injunction Hearing. Lawrence has been subpoenaed by Plaintiffs in the Business Court Lawsuit to attend and testify at the Injunction Hearing as to his understanding of the ownership of Axis. *See* Ex. N (Subpoena). He plans to testify fully and truthfully. As detailed above in Part II.B, Lawrence understands that Axis is **not** 100% owned by Berry GP, which is confirmed by the documents and conduct of the parties in the real time.

As part of this Application—filed long after the Business Court Lawsuit, just days after Judge Adrogué's ruling and little more than a week before the Injunction Hearing—Berry GP and RBT now seek to enjoin Lawrence "and all those acting in concert with him" from "representing or suggesting to others any right of ownership or control of Axis Midstream Holdings LLC, except for Berry GP's (RBT's) 100% ownership and sole control." *See* (Movants' Application for TRO & TI (filed 01/21/2025) at 2. That Movants fail to disclose either the existence of the Business Court Lawsuit to this Court or the critical fact that the Injunction Hearing is set in the Business

Court ***next week*** pertaining to the ownership and management of Axis—the very subject of Movants' Application—confirms the procedural impropriety of Movants' gambit.

The aim of Movants' Application is to have this Court unwittingly issue a potentially conflicting order that would circumvent Judge Adrogué's ruling that this Court does not have dominant jurisdiction over the issue of Axis' management and control. It is a plain attempt to upend proceedings in the Business Court Lawsuit and frustrate next week's Injunction Hearing. Such gamesmanship and manipulation of the Texas legal system is entirely improper and should be denied.

> **2.** **The Application Seeks an Improper Restraint on Lawrence's Speech**

Movants' injunctive relief impermissibly seeks a prior restraint on Lawrence's future speech, which is presumptively unconstitutional. The law is clear: an administrative or judicial order that forbids certain future communications constitutes a prior restraint on speech. *See Alexander v. United States*, 509 U.S. 544, 550 (1993). Article One, Section Eight of the Texas Constitution provides that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege . . . ." TEX. CONST. art. I, § 8; *see Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex.1992) (explaining that Texas Constitution provides greater right to free speech than its federal counterpart). Accordingly, prior restraints on speech are presumptively unconstitutional and rarely allowed. *See Davenport*, 834 S.W.2d at 10; *Kinney v. Barnes*, 443 S.W.3d 87, 89 (2014) ("[P]rior restraints are a heavily disfavored" and "it is also well settled that prior restraints are rarely permitted in Texas due to their capacity to chill protected speech."); *San Antonio Express–News v. Roman*, 861 S.W.2d 265, 267 (Tex. App.—San Antonio 1993, orig. proceeding). Only in the narrowest of circumstances will Texas courts allow such injunctive relief.

Here, Movants' requested injunctive relief effectively seeks to have this Court issue a gag order over Larence's testimony in another court proceeding as to his understanding of Axis' ownership—all without even informing the Court of the existence of that Injunction Hearing, let alone offering any rationale for why such a restraint on speech is warranted. Gag orders in civil judicial proceedings are valid only when imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and the judicial action represents the least restrictive means to prevent that harm. *See, e.g.*, *Grisby v. Coker*, 904 S.W.2d 619, 620 (Tex. 1995) (citing *Davenport*, 834 S.W.2d at 9). Such a restraint is antithetical to Texas Constitutional law, which abhors such injunctive relief unless it falls within the extremely narrow exceptions on restraint—none of which have even been identified, let alone established here. Indeed, one could not imagine any court being allowed to prevent a witness from testifying under oath fully and truthfully as to the contested facts at issue in a pending lawsuit.

**B.**     **No Probable or Imminent Harm Exists**

Movants' Application also independently fails because Berry GP and RBT cannot demonstrate any true probable or imminent harm from Lawrence as related to Axis. In their Application, Movants point to various Secretary of State Filings regarding changes of registered agents and addresses in support of their imminent harm arguments. *See* (Movants' Application for TRO & TI (filed 01/21/2025), at 12-13. Movants incorrectly attribute those filings to Lawrence and likewise incorrectly direct the injunctive relief against Lawrence on that issue. Lawrence did not file any documents with the Texas Secretary of State seeking to change or modify any information about Axis. Indeed, this is plain from Movants' own exhibits, which indicate they were filed by Ted Powers, not Lawrence:



*See* Movants' Ex. 20, at 3. Lawrence has not evidenced any intention to file any such documents with the Secretary of State, and Movants cite nothing the contrary.

Thus, Movants improperly seek to enjoin conduct by parties (Axis and/or Ted Powers) that are not under this Court's jurisdiction, but who are instead parties to the Business Court Lawsuit. Again, this fact highlights why Movants' Application is nothing more than a ploy to circumvent the Business Court, which ***does*** maintain jurisdiction over those other parties. Other than his plan to testify fully and truthfully under oath at the Business Court Temporary Injunction Hearing on January 29-30 as to the ownership of Axis, Lawrence does not intend to take any of the other actions alleged by Movants.[8] Because Berry GP and RBT have failed to demonstrate any probable or imminent harm, the Application should be denied.

## C.   No Probable Right to Relief Exists

As Movants acknowledge, injunctive relief is only warranted if a party can demonstrate a probable right to relief. They have failed to meet that burden. Notably absent from Movants'

---

[8] Moreover, Movants cannot demonstrate that the Court is permitted to enjoin Lawrence from ***attempting*** to call any Members' meetings on behalf of Axis. Even if the Court were to credit their argument that Berry GP is the sole owner of Axis (which it is not), Lawrence is still an owner of Berry GP and would have the right to call a meeting of Axis members.

13

Application is reference to the various transfers and operating agreements that were executed by Lawrence and Dennis in the Berry GP offices and circulated in April 2020 to Lawrence, Marty, Dennis, and a potential third-party investor. *See* Part II.B, above. Those transfers and agreements unequivocally demonstrate that Berry GP transferred its 100% interest in Axis to RBT, that RBT then transferred its interest to LSPH, and that LSPH then transferred its interest in Axis to LSPE. *See* Exs. P & Q. The full corporate record not only shows that as of April 21, 2020, neither Berry GP nor RBT was the sole owner of Axis, but that Marty and Dennis Berry were ***aware of this fact in the real time*** and were representing to a potential third-party investor that the Port ownership structure was true and accurate.

Movants' after-the-fact attempt to ignore or explain away the indisputable existence of Berry GP and RBT's transfers of ownership simply underscores that, at a minimum, there is a hotly contested fact question to be resolved in the Business Court Lawsuit. Movants have failed to meet their burden of showing a probable right to recovery based on the current corporate documents, which plainly show that Berry GP is not the sole owner of Axis.

Because the overwhelming record evidence demonstrates that Axis is neither 100% owned nor managed by Berry GP or RBT, Movants have failed to meet their burden to show a probable right for relief, and their Application must fail.

## IV. CONCLUSION

For these reasons, Lawrence respectfully submits that Movants' Application for a TRO and Temporary Injunction should be denied in its entirety.

Date: January 23, 2025

Respectfully submitted,

By: */s/Barrett Reasoner*
Barrett Reasoner
State Bar No. 16641980
breasoner@gibbsbruns.com

14

Michael Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
L. Bruce Baldree
State Bar No. 24116064
bbaldree@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: 713.650.8805
Fax: 713.750.0903

and

Butch Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
**BUTCH BOYD LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Tel: 713.589.8477

and

Gabi S. Canales
State Bar No. 24012376
gabilaw14@gmail.com
**Gabi Canales Law Office**
5262 South Staples St., Suite 100
Corpus Christi, Texas 78411
Tel: 361.887.4700
Fax: 361.887.4761

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2025, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

/s/ *Bruce Baldree*
L. Bruce Baldree

15

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Roxanne Graham on behalf of Bruce Baldree
Bar No. 24116064
rgraham@gibbsbruns.com
Envelope ID: 96558778
Filing Code Description: Response
Filing Description: Allen Lawrence Berry's Response In Opposition To Application For Temporary Restraining Order And Temporary Injunction
Status as of 1/24/2025 1:08 PM CST

Associated Case Party: Lawrence Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 1/24/2025 9:42:17 AM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 1/24/2025 9:42:17 AM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 1/24/2025 9:42:17 AM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 1/24/2025 9:42:17 AM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 1/24/2025 9:42:17 AM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 1/24/2025 9:42:17 AM | SENT |
| Butch Boyd | | butchboyd@butchboydlawfirm.com | 1/24/2025 9:42:17 AM | SENT |
| Katrina Chamblee-Boyd | | katrinaboyd@butchboydlawfirm.com | 1/24/2025 9:42:17 AM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 1/24/2025 9:42:17 AM | SENT |
| Cameron Roth | | CRoth@gibbsbruns.com | 1/24/2025 9:42:17 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Shanna Gohlke | | gohlkes@bayltd.com | 1/24/2025 9:42:17 AM | SENT |

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Douglas Allison | | doug@dallisonlaw.com | 1/24/2025 9:42:17 AM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 1/24/2025 9:42:17 AM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 1/24/2025 9:42:17 AM | SENT |

Associated Case Party: Michael Hummell

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Roxanne Graham on behalf of Bruce Baldree
Bar No. 24116064
rgraham@gibbsbruns.com
Envelope ID: 96558778
Filing Code Description: Response
Filing Description: Allen Lawrence Berry's Response In Opposition To Application For Temporary Restraining Order And Temporary Injunction
Status as of 1/24/2025 1:08 PM CST

Associated Case Party: Michael Hummell

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Van Huseman | | vhuseman@husemanlawfirm.com | 1/24/2025 9:42:17 AM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 1/24/2025 9:42:17 AM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim Brunkenhoefer on behalf of Douglas Allison
Bar No. 1083500
kim@dallisonlaw.com
Envelope ID: 97245028
Filing Code Description: Motion for Emergency Relief
Filing Description: Relators' Emergency Motion for Temporary Relief
Status as of 2/11/2025 3:30 PM CST

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas AAllison | | doug@dallisonlaw.com | 2/11/2025 2:31:31 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 2/11/2025 2:31:31 PM | SENT |
| Vanessa AGilmore | | vg@robertsmarkland.com | 2/11/2025 2:31:31 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 2/11/2025 2:31:31 PM | SENT |

Associated Case Party: AlbertTheodorePowers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Alistair Dawson | 5596100 | adawson@beckredden.com | 2/11/2025 2:31:31 PM | SENT |

Associated Case Party: Allied Ports, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roland Garcia | 7645250 | garciar@gtlaw.com | 2/11/2025 2:31:31 PM | SENT |

Associated Case Party: AllenLawrenceBerry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barrett Reasoner | 16641980 | breasoner@gibbsbruns.com | 2/11/2025 2:31:31 PM | SENT |
| Michael Absmeier | 24050195 | mabsmeier@gibbsbruns.com | 2/11/2025 2:31:31 PM | SENT |